UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--------------------------------------------------------

Karonisha Ramsey, on her own behalf and as Special

Administrator of the Estate of Kajuan Raye, Deceased,


       Plaintiff,


    vs.                    Case Number 1:2016cv10913


Sergeant John Poulos and City of Chicago,


       Defendants.

--------------------------------------------------------

Deposition of John Poulos

Tuesday

November 6th, 2018


-at-


Erickson & Oppenheimer, Ltd.

223 West Jackson Boulevard

Suite 200

Chicago, Illinois

Exhibit 5, LLC

1                    APPEARANCES

2

3              For the Plaintiff:

4              Jared S. Kosoglad

5            Jared S. Kosoglad, P.C.

6          223 West Jackson Boulevard

7                  Suite 1615

8            Chicago, Illinois 60606

9

10             For the Plaintiff:

11              Ronak Maisuria

12            Michael Oppenheimer

13               Chloe Schultz

14         Erickson & Oppenheimer, Ltd.

15         223 West Jackson Boulevard

16                 Suite 200

17           Chicago, Illinois 60606

18

19         For Defendant John Poulos:

20              Brian P. Gainer

21             Monica Gutowski

22            Johnson & Bell, Ltd.

23           33 West Monroe Street

24                 Suite 2700

25           Chicago, Illinois 60606

1          For Defendant City of Chicago:

2                    Scott Cohen

3                 Caroline Fronczak

4          City of Chicago Department of Law

5                30 North LaSalle Street

6                     Suite 900

7                Chicago, Illinois 60602

8

9                   Also present:

10                 Karonisha Ramsey

11

12          RECORDER:  Good morning.  We are now on the

13    record.  Today is Tuesday, November 6th, 2018.  The

14    time is now 10:18 a.m.  We are located at Erickson and

15    Oppenheimer, Ltd., 223 West Jackson Boulevard, Suite

16    200, Chicago, Illinois, for a deposition in the matter

17    of Karonisha Ramsey, on her own behalf and as Special

18    Administrator of the Estate of Kajuan Raye, Deceased v.

19    Sergeant John Poulos and City of Chicago, case number

20    1:2016cv10913.  The venue is Northern District of

21    Illinois, Eastern Division.  The witness today is

22    Sergeant John Poulos.  Sergeant Poulos, my name is

23    Olivia Driscoll.  I'm a notary public, and I'm

24    recording this deposition on behalf of Exhibit 5, LLC.

25    At this time, would you please raise your right hand

1    for the oath?

2                    (Witness sworn)

3           RECORDER:  Thank you.  Would the attorney

4    please state their appearances for the record?

5           MR. GAINER:  I'm Brian Gainer, and I

6    represent Sergeant Poulos.

7           MS. GUTOWSKI:  Monica Gutowski for Sergeant

8    Poulos.

9           MR. COHEN:  Scott Cohen on behalf of the City

10   of Chicago.                                    0:00:56

11          MS. FRONCZAK:  Caroline Fronczak on behalf of

12   the City of Chicago.

13          MS. SCHULTZ:  Chloe Schultz for the

14   Plaintiff.

15          MS. MAISURIA:  Ronak Maisuria for Plaintiff.

16          MR. OPPENHEIMER:  Michael Oppenheimer on

17   behalf of Plaintiff.

18          MR. KOSOGLAD:  Jared Kosoglad for the

19   Plaintiff.

20          RECORDER:  That completes the required

21   information.  We can proceed.

22          MR. KOSOGLAD:  Thank you.

23                    EXAMINATION

24   BY MR. KOSOGLAD:

25      Q.  Could you please state and spell your name

1    for the record?

2            MR. OPPENHEIMER:  Two points, Jared.  The

3    Plaintiff, Karonisha Ramsey, is on her way.  She's kind

4    of -- going to break when she gets here.

5            MR. GAINER:  Okay.

6        Q.   Okay.  Can you state and spell your name for

7    the record, please?

8        A.   Sure.  John, J-o-h-n, Poulos, P-o-u-l-o-s.

9        Q.   Are you currently employed?

10       A.   I am.

11       Q.   How are you employed?

12       A.   I'm employed with the City of Chicago,

13   Department of Police.

14       Q.   Do you have any other employment?

15       A.   I do not.

16       Q.   Okay.  Have you ever given a deposition

17   before?

18       A.   I have.

19       Q.   How many times?

20       A.   Three, maybe four.

21       Q.   All right.  I understand you're a lawyer now

22   too?

23       A.   I am.

24       Q.   Okay.  You understand as a lawyer that there

25   are different degrees of telling the truth, right?

```
 1        MR. GAINER:  I just object to form.        0:02:01

 2        MR. COHEN:  Join.

 3        MR. GAINER:  If you know how to answer that

 4   question, go ahead and answer it.

 5     A.   I'm not sure what -- what you're trying to

 6   ask of me.  If we can just be clear, I'll answer any

 7   question you ask, but just be clear about what you're

 8   asking me.

 9     Q.   Sure.  So when I say to you that there's

10   different degrees of telling the truth, you don't

11   understand that question?

12     A.   I don't.  The truth is the truth.

13     Q.   Okay.  So you agree that part of telling the

14   truth includes -- includes all the important details.

15   Correct?

16        MR. GAINER:  Object to form.  Go ahead if you

17   --

18        MR. COHEN:  Join.

19        MR. GAINER:  -- can answer.

20     A.   Yes.

21     Q.   And would you agree that leaving out

22   important details can mean sometimes a witness is not

23   telling the truth?

24        MR. GAINER:  Go ahead.

25     A.   Sure, if they're done -- if it's done
```

1  purposefully, yes.

2      Q.   Have you ever had any training from the

3  police department on how to testify?

4      A.   I believe, in the academy, we did some mock

5  trials.  That was 18 years ago.

6      Q.   Okay.  And have you had a lot of on the job

7  training on how to testify?

8      A.   I've just testified it hasn't been training,

9  it's just been testifying in open court.

10      Q.   Sure.  And have you ever gotten advice from

11  state's attorneys or other police officers on how to

12  testify better?

13      A.   No.                                    0:03:21

14      Q.   Okay.  What kind of training did you get

15  about how to testify when you were in the academy?

16      A.   Again, aside from, I believe -- it was a long

17  time ago, I couldn't tell you.  It wasn't -- it wasn't

18  anything substantive.

19      Q.   Okay.  Were you taught to remain calm, cool,

20  and collected when on the witness stand?

21      A.   I don't think that was taught, but I --

22  again, I -- I couldn't tell you.  It was 18 years ago.

23      Q.   Is one of the things that they try to teach

24  you in the academy is how to be a more credible

25  witness?

1          MS. FRONCZAK:  Objection.  Form.

2          MR. GAINER:  Go ahead.                    0:04:12

3     A.    No.  If I may add, the academy can provide

4  you curriculum of what was -- what we were trained in

5  2001, so we can kind of bypass all this stuff.

6          MR. GAINER:  Just answer the question he

7  asked you, John.

8     Q.    Yeah.

9          WITNESS:  Sure.

10    Q.    I mean, we're not going to bypass it.  And --

11    A.    Okay.

12    Q.    -- and just to be clear, like, it's okay if

13  you don't remember things if I --

14    A.    Okay.

15    Q.    -- ask you about stuff that happened 18 years

16  ago.

17    A.    Sure.

18    Q.    Okay.  So have you always told the truth as a

19  police officer?

20         MR. GAINER:  Object to form.  I don't -- I

21  mean -- go ahead, answer that question.

22         MR. COHEN:  I'll join.

23         MR. GAINER:  Go ahead.

24    A.    Yes, I've tried to always tell the truth.

25    Q.    Okay.  Well when you say you've -- you've

1  tried, have you always actually done it?

2       MR. GAINER:  Same objection.

3       MR. COHEN:  Join.

4   A.   I would say yes.

5   Q.   Do you have any doubts about that?

6   A.   No.                                        0:05:08

7   Q.   So in your mind, as a Chicago police officer,

8  you don't have any doubts that you have always told the

9  complete truth when you have been a Chicago police

10 officer.  Correct?

11      MR. GAINER:  Asked and answered.  Harassing.

12 Go ahead, answer --

13      MR. COHEN:  Join.

14      MR. GAINER:  -- again.

15      MR. COHEN:  Join.

16  A.   I have no doubts that I've told the truth.

17  Q.   Okay.  Since becoming a Chicago police

18 officer, have you ever been accused of lying?

19  A.   I have.

20  Q.   How many times?

21  A.   Once.

22  Q.   When was that?

23  A.   2004.

24  Q.   Under what circumstances?                   0:05:53

25  A.   That I did not disclose on my application

Exhibit 5, LLC

 1    that I had been -- what was the exact term for it,

 2    interaction with the police.  That I never had any

 3    interaction with the police.

 4         Q.   Okay.  And what was the nature of the

 5    accusation that you lied about?

 6         A.   On my application, that I did not disclose

 7    that I had interaction with the police.

 8         Q.   Okay.  Had you had interactions with the

 9    police --

10         A.   I had.

11         Q.   -- and you said that you -- you got to wait

12    until the question's over --

13         A.   Sure.

14         Q.   -- Sergeant.  Had you had interactions with

15    the police and you disclosed that you had not?

16         A.   Yes.

17         Q.   Okay.  And -- and you consider that telling

18    the truth?

19              MR. GAINER:  Form.

20              MR. COHEN:  Join.

21              MR. GAINER:  Go ahead.

22         A.   Yes, because I had my record expunged, and

23    that was not required to disclose.

24         Q.   You were arrested, correct?

25         A.   Yes.

1    Q.   And --

2         MR. GAINER:  Object to relevance.  Go ahead.

3    Q.   And when you were asked by the police

4  department if you had ever had any interactions with

5  the police, you said, "No"?

6    A.   Correct.                              0:06:58

7    Q.   And your understanding that you were allowed

8  to do that because you had your record expunged,

9  correct?

10   A.   Correct.

11   Q.   Do you know what that -- was there an

12 investigation into whether you lied?

13   A.   Yes.

14   Q.   And do you know what the result of that

15 investigation was?

16   A.   At which time?

17   Q.   Well was there different ones?

18   A.   Well there was a 2004 investigation that was

19 completed, and then it moved itself all the way to

20 2018.

21   Q.   How so?

22   A.   2004, the department ruled that I should have

23 a 60 day suspension.  In 2018, I was brought before the

24 police board and unanimously reinstated.

25   Q.   Okay.  And were you reinstated because they

```
 1  found that you told the truth?

 2          MS. FRONCZAK:  Objection.

 3      A.   They did not disclose --

 4          MS. FRONCZAK:  Objection.  Calls for

 5  speculation.

 6          MR. GAINER:  Go ahead.                     0:08:00

 7      A.   Their opinion was that what the city was

 8  trying to do was egregious.

 9      Q.   Okay.  And when you say their opinion was

10  what the city was trying to do was egregious, what's

11  your understanding of what was egregious about it?

12          MR. GAINER:  Foundation.  Go ahead.

13          MR. COHEN:  Join.

14          MR. GAINER:  If you know the answer, you can

15  --

16      A.   I don't -- I don't know.  I don't know.

17      Q.   Okay.  Well did you ever come to understand

18  when they said what the city was trying to do was

19  egregious, what that meant?

20          MR. GAINER:  Same objection.  Asked and

21  answered.  Go ahead.

22          MR. COHEN:  Join.

23      A.   Again, this is only an assumption on my part,

24  that trying to fire me 17 years later -- 18 years later

25  was egregious.
```

```
 1        Q.   Okay.  So the City of Chicago Police

 2   Department attempted to terminate your employment?

 3        A.   Yes.

 4        Q.   And when did they do that?

 5        A.   I think the paperwork was filed July 4th,

 6   2017.

 7        Q.   Okay.  And this was over the allegation that

 8   you lied on your police application?

 9        A.   Yes, sir.                            0:09:03

10        Q.   Do you understand, as a sergeant in the

11   police department, why the Chicago Police Department

12   would want to know when an officer applies for

13   employment whether they have ever been arrested?

14             MR. GAINER:  Object to form.  Foundation.  Go

15   ahead.

16             MR. COHEN:  Join.

17             MR. GAINER:  You can answer.

18        A.   Yes.

19        Q.   And what's your understanding of that?

20             MR. GAINER:  Same objection.  Go ahead.

21             MR. COHEN:  Join.

22        A.   They would just like to make a better

23   informed decision.

24        Q.   So can you just briefly go over your

25   assignments since you've become a Chicago police
```

1  officer?

2     A.   I started 26 March 2001, attended the academy

3  for nine months, was then assigned to the seventh

4  district in Englewood on patrol.  Sometime in 2002, I

5  was run over by a car.  2003, took a leave of absence

6  from the department, returned in 2010, assigned to the

7  fourth district, where I remained until I was promoted

8  to sergeant and then back to Englewood.

9     Q.   Okay.  So you had an eight year leave of

10  absence?

11    A.   Roughly.                               0:10:36

12    Q.   And this resulted out of the car accident

13  that you had in 2002?

14    A.   Well a car ran me over.  I -- I wasn't in a

15  car, I was on -- I was on foot.

16    Q.   What injuries did you suffer?

17    A.   Left ulnar nerve, shoulder, back, various.

18    Q.   Okay.  When you say -- what was that, left

19  what?

20    A.   Left ulnar nerve.

21    Q.   Okay.  Which nerve is that?

22    A.   It's the nerve that's in the bicep elbow

23  area, controls the dexterity of the left hand, I

24  believe.

25    Q.   Was that injury completely healed?

1          MR. GAINER:  Object to form.  Go ahead.

2      A.    Not completely.

3      Q.    What's going on with that condition?

4          MR. GAINER:  Form.  Go ahead.  Do you mean

5  what's happening physically with him, or do you mean

6  what's happening with -- in terms of medical treatment?

7      Q.    Yeah, what -- what -- like -- like how is the

8  injury still affecting you?

9      A.    I just sometimes get some numbness.  That's

10  it.

11      Q.    So you have occasional numbness in your left

12  hand?

13      A.    In the pinky area.                         0:11:48

14      Q.    How often do you get that numbness?

15          MR. GAINER:  Relevance.  Go ahead.

16      A.    I -- I -- I couldn't answer that.  It comes

17  and goes.  I pay no mind to it.

18      Q.    Are you still getting medical treatment for

19  it?

20      A.    No.

21          MR. GAINER:  Relevance.

22      Q.    Are the other injuries you suffered in that

23  car accident completely healed?

24      A.    Yes, sir.

25          MR. GAINER:  Same objection.

1    Q.    Okay.  Are you left handed or right handed?

2    A.    I'm right hand dominant.

3    Q.    Okay.  Aside from the allegation that you

4  lied on your police application, have you ever been

5  accused of dishonesty by the police department?

6    A.    No.                                        0:12:57

7         MS. FRONCZAK:  Objection.  Foundation.

8    Q.    During the course of your eight year leave of

9  absence, did you receive pay?

10    A.    I did not.

11    Q.    How did you support yourself during that

12  time?

13         MR. GAINER:  Relevance.  Go ahead.

14    A.    I purchased a minority share in a

15  restaurant/bar.

16    Q.    Okay.  Are there any rules and regulations

17  about whether Chicago police officers were allowed to

18  own bars?

19         MR. GAINER:  I'm going to have a standing

20  objection to relevance to this line of questioning from

21  ten years ago and an issue that has nothing to do with

22  this case.  So I --

23         MR. COHEN:  Join.

24         MR. GAINER:  -- so I don't have to say,

25  "Relevance," every single time you ask an unrelated

Exhibit 5, LLC

1   question.

2           MR. KOSOGLAD:  That's fine.

3           MR. GAINER:  Go ahead.  You can --

4           MR. COHEN:  I'll join --

5           MR. GAINER:  -- answer.

6           MR. COHEN:  -- and foundation.

7           MR. GAINER:  Go ahead.

8       A.   There are.

9       Q.   Okay.  And what are they?                     0:13:51

10      A.   There's a state regulation that you cannot

11  own more than ten percent of a bar.  That -- by "bar,"

12  holds a liquor license, State of Illinois or City of

13  Chicago, and then there's a city regulation that no

14  police officer, firefighter, taxi driver -- taxicab

15  driver, like, I'm not sure who else, but they can't own

16  any part of a bar.

17      Q.   All right.  When did you get your law degree?

18      A.   God, 2007.

19      Q.   Okay.  And you're a member of the Illinois

20  Bar?

21      A.   I am.

22      Q.   Are you a member of any other bars?

23      A.   No.

24      Q.   Okay.  And was your ownership stake in the

25  bar that you had a minority interest in in compliance

1   with the city and state regulations?

2       A.   I was in compliance with the State of

3   Illinois, and at the time, I believed I was in

4   compliance with the City of Chicago since I was on

5   leave and not being paid.

6       Q.   Okay.  So I guess I'm a little confused by

7   your answer.  Are you saying that you were in

8   compliance with the city regulation or you thought you

9   were in compliance?

10      A.   I believed, at the time, I was in compliance

11  with the city regulation.

12      Q.   Okay.  And when you say you believed, does

13  that mean you were in compliance or you were not?

14          MR. GAINER:  Object to form.  Harassing.

15  Argumentative.  Go ahead --

16          MR. COHEN:  Join.

17          MR. GAINER:  -- answer again.

18          MR. COHEN:  Join.  Foundation.              0:15:08

19      A.   I was notified in 2005, after

20  self-disclosing, that because of my status of a leave

21  of absence, I am still bound by the rules, even though

22  I'm not being paid or have no benefits from the

23  department.

24      Q.   Okay.  Did you -- so you were notified that

25  you were in violation of the regulations.  Correct?

1      A.    Yes.

2      Q.    All right.  Did you take any action to cure

3   your violation?

4      A.    I did.

5      Q.    What did you do?

6      A.    My father and my brother purchased my share

7   in the ownership of the business.

8      Q.    Okay.  And what year did that take place?

9      A.    Shortly after.  I think it was beginning of

10  2006.

11     Q.    Okay.  Prior to taking an ownership interest

12  in the bar, did you do any research or try to conduct

13  any examination of whether you would be in compliance

14  with the city regulation?

15     A.    I did not.  We had an attorney.              0:15:58

16     Q.    So you relied on the -- the lawyer to advise

17  you on whether or not you were in compliance with the

18  city regulation?

19     A.    With all regulations, yes.  It's a -- it's an

20  arduous process to get a liquor license.

21     Q.    But in particular, you were relying on an

22  attorney to inform you about whether you were in

23  compliance with the city regulations on whether police

24  officers can own an interest in a bar.  Correct?

25          MR. GAINER:  Asked and answered.  Go ahead.

```
 1      A.   Yes, sir.

 2      Q.   When you say you self-disclosed that, how did

 3  you do that?

 4      A.   During a pension board hearing in maybe July

 5  of 2005.

 6      Q.   Okay.  What kind of hearing was that?          0:16:57

 7           MR. GAINER:  He just told you what kind of

 8  hearing it was.

 9      A.   A disability hearing.  I'm sorry, disability

10  hearing.

11      Q.   Okay.  And was that a hearing on whether you

12  should continue to get disability benefits?

13      A.   I wasn't getting any benefits.  It was a

14  hearing to see if I should attain any benefits or to --

15  for medical evaluation -- further medical evaluation.

16      Q.   Okay.  Why did you disclose it during that

17  hearing?

18      A.   Why did I disclose?

19      Q.   The fact that you owned a bar during that

20  hearing.

21      A.   I was asked the question do I have any other

22  gainful employment.

23      Q.   And during the time that you were on

24  disability, was the ownership interest in the bar your

25  sole means of earning an income?
```

Exhibit 5, LLC

           MR. GAINER:  Wait a minute.  Did you just

say, "During the time you were on disability"?  Because

I think that's inconsistent with what he's already

testified to.

           MR. KOSOGLAD:  You're right.  That was a

mistake.

      Q.   During the time that you were -- had taken a

leave of absence because of your injury --

      A.   Right.

      Q.   -- was your ownership interest in the bar the

sole means of earning an income?

      A.   Yes, sir.                              0:18:02

      Q.   Okay.  And then after your return from -- so

during the -- the eight years that you were on a leave

of absence, you didn't get any pay from the police

department.  Correct?

      A.   No, sir.

      Q.   Okay.  But coming back in 2010, you began to

get paid again.  Correct?

      A.   Yes, sir.

      Q.   And at that point in time, you had already

completed your legal education.  Correct?

      A.   Yes, sir.

      Q.   Where did you go to law school?

      A.   John Marshall.

1    Q.    And you were assigned to which district?

2          MR. GAINER:  When?

3    Q.    After you came back?

4    A.    Fourth district.

5    Q.    Thank you.  And then you served in the fourth

6  district for how long?

7    A.    Until I was promoted in late 2015, I believe.

8    Q.    Okay.  And did you seek a promotion?

9    A.    I did.                                    0:19:01

10   Q.    Okay.  And how did you go about seeking it?

11   A.    I --

12         MR. GAINER:  Object to relevance.  Go ahead.

13 You can answer.

14   A.    I tested in 2013, and I also sought a merit

15 nomination from my commander.

16   Q.    Okay.  Did you get a merit nomination?

17   A.    I did.

18   Q.    Who was your commander?

19   A.    Commander Kevin Navarro.

20   Q.    And that was something you received in 2013?

21   A.    The merit nomination was in two thousand --

22 it was February of 2015 -- February or March of 2015.

23   Q.    Okay.  And what did you do to go about

24 seeking that merit nomination --

25         MR. GAINER:  Form.

 1      Q.   -- from your commander?

 2           MR. GAINER:  Go ahead.

 3      A.   The -- the merit nomination packets were

 4  requested from anybody on patrol.  You had to meet

 5  certain criteria.  I met those criteria, and I

 6  submitted a packet, and I was selected along with one

 7  other person.

 8      Q.   Okay.  Did you have any other conversations

 9  with any other superior officers about your merit

10  nomination?

11      A.   I may have discussed it with my sergeant on

12  what should be in a merit packet, but nothing

13  substantive.

14      Q.   Okay.  Did you ever discuss it with your

15  commander?                                    0:20:21

16      A.   Of course.  He was the one that had to -- he

17  was the one I had to turn in the merit application to,

18  and he -- if selected, he would have had to turn it in

19  -- he would have had to do some work himself in turning

20  that in.

21      Q.   Okay.  Question -- but the question is did

22  you -- did you talk to Kevin Navarro about your

23  nomination?

24           MR. GAINER:  Asked and answered.  Go ahead

25  and answer it again.

1      A.    Yes.

2      Q.    Okay.  What conversations did you have with

3  Commander Navarro?

4      A.    "I'd like to be considered for meritorious

5  sergeant."  I gave him my resume, my work experience,

6  and some of the things I had done under his command

7  when he was a captain, as well as a commander in the

8  fourth district, and that was it.

9      Q.    Okay.  Did he say anything to you?

10     A.    He said, "I'll consider you like I would

11 consider anybody else who would -- who would ask for

12 it."

13     Q.    Okay.  Anything else that he said?

14     A.    No.                                    0:21:04

15     Q.    Okay.  When were you selected for your merit

16 nomination?

17         MR. GAINER:  Asked and answered.  Go ahead,

18 answer again.

19     A.    I think the packets were submitted in

20 February or March of 2015.  I did not find out until

21 four weeks before we would start the academy.  I'm not

22 really sure when that was, but it was in later part of

23 2015, in -- within the same year, within a six month

24 period.

25     Q.    Okay.  And then you received training for --

1  you -- so you received sergeant's training?

2      A.   I did.

3      Q.   When did you receive that?

4      A.   Late 2015.

5      Q.   And after your training, were you assigned

6  somewhere different?

7      A.   To the seventh district.

8      Q.   Back to Englewood?                          0:21:57

9      A.   Yes.  If we may go back for one moment?

10     Q.   Sure.

11     A.   After a commander receives a merit packet, he

12 submits it to the superintendent of police.  After

13 that, the commander is out of it.  The -- the process

14 then goes through, you know, deputy chiefs, up to the

15 chief of staff, through the superintendent of police,

16 and HR with the IG involved, and I think it's important

17 to know that.

18     Q.   Okay.  When you tested for sergeant in 2013,

19 did you pass?

20     A.   I did.

21     Q.   Okay.  But were you not picked for sergeant

22 at that point?

23     A.   They haven't gotten -- they -- they hadn't

24 gotten to my number at the time the merit process came

25 around.

1    Q.   Right.  So did you have conversations with

2  anyone else besides your commander and your sergeant

3  about your merit nomination?

4    A.   I did not.

5    Q.   All right.  And how many times have you

6  discharged your weapon in the field of duty?

7         MR. GAINER:  Object to form.  If you

8  understand that, go ahead.

9    A.   In incidents or the number of rounds

10  discharged?

11    Q.   Incidents.

12    A.   Three incidents.                          0:22:59

13    Q.   Okay.  And can you tell me when those were?

14    A.   First one was 2011, during a foot chase as

15  well, the second one was in 2013, off duty, and the

16  2016 incident.

17    Q.   Okay.  Can you briefly describe the

18  circumstances of the 2011 incident?

19    A.   And again, it's -- it's been about seven

20  years.  So I believe I was chasing a suspect who had

21  battered somebody over the head with an unknown weapon.

22  He cut through a gangway.  It was dark, I didn't

23  realize the gangway had a two and a half, three foot

24  fall, and as I was going down, I tucked my weapon down

25  under my body, went straight down with it, discharged a

1   round into the ground.

2      Q.   So the discharge was accidental?       0:24:07

3      A.   It was.

4      Q.   Okay.  Was that discharge investigated?

5      A.   It was.

6      Q.   And you were found to have done nothing

7   wrong.  Correct?

8      A.   No.

9         MR. GAINER:  I -- okay.  Well you can answer.

10        WITNESS:  Yeah, it's --

11     Q.   What were you found to have done wrong?

12     A.   Accidental discharges are always wrong.  I

13  mean, you should have perfect control of your weapon

14  all the time.

15     Q.   Sure, but aside from it being an accidental

16  discharge, you were not found at fault.  Correct?

17        MR. GAINER:  Object -- object to form.

18  Foundation.  Go ahead and answer if you can.

19        MR. COHEN:  I'll -- I'll join.

20     A.   So I had not been found that I did anything

21  wrong as to the suspect.  I was found that I -- I took

22  a reprimand, I believe, because I had an accidental

23  discharge.

24     Q.   Right.  So the mere fact that you

25  accidentally discharged your weapon resulted in a

 1  reprimand.  Correct?

 2      A.   Yes, sir.                                    0:25:05

 3      Q.   But they didn't -- they -- they -- but it was

 4  -- they agreed that it was an accident.  Correct?

 5      A.   Yes, sir.

 6      Q.   All right.  Can you briefly describe the

 7  second circumstances of the 2013 shooting?

 8      A.   So --

 9           MR. GAINER:  I object.  Just a standing

10  objection to relevance.  You can go ahead and answer.

11      A.   I encountered an individual who, I believe,

12  was trying to break into a house, I called the police,

13  we got into a physical altercation.  I believed he was

14  pulling a weapon out of his -- his pants, and I

15  discharged two rounds.  Those are the broad strokes.

16      Q.   Are there any other important circumstances

17  of that shooting?

18           MR. GAINER:  Object to form.  There's no way

19  for him to answer that question --

20           MR. COHEN:  Join.

21           MR. GAINER:  -- the way it's asked.  Go

22  ahead.

23      A.   I think the whole thing is important, but

24  those are the broad strokes that you -- briefly

25  describe, that's what I briefly described.

 1     Q.    Well did you -- did the bullets you fired

 2   make contact with the suspect?

 3     A.    They did.                              0:26:11

 4     Q.    Did you -- did the suspect die?

 5     A.    He did.

 6     Q.    Okay.  Would you consider those important

 7   circumstances of the shooting?

 8          MR. GAINER:  Object to form.  Argumentative.

 9   Harassing.  Go ahead.

10          MR. COHEN:  Join.

11          MR. GAINER:  Go ahead.

12     A.    You asked for my interpretation of a brief

13   description.  That's what I gave you.

14     Q.    My question is is would you consider the fact

15   that the discharges, in 2013, made contact with the

16   suspect and the suspect died important circumstances?

17          MR. GAINER:  Same objection.  Go ahead.

18          MR. COHEN:  Join.

19          MR. GAINER:  Go ahead, you can answer.

20     A.    Sure.

21     Q.    When you say that you thought the suspect was

22   trying to burglarize a house, what do you mean by that?

23     A.    He was on private property.  He was

24   trespassing.  He was at a doorway upstairs.  He -- it

25   appeared he had undone a light bulb because there are

1  normally lights up there.  I believed he was trying to

2  burglarize a house.

3      Q.   Right.  So you say that he was trespassing.

4  How did you know that?

5      A.   I asked him what he was doing, he told me to

6  mind my own business.  I asked him if he belonged to

7  the house, again, he told me to mind my own business.

8  It was my neighbor's home.  I knew the house was vacant

9  upstairs.

10      Q.   Okay.  So -- so let me just take a step

11  backwards here.  When -- when you first saw the

12  suspect, what was he doing?

13          MR. GAINER:  Go ahead.  I've already made my

14  standing objection to relevance.  Go ahead and answer.

15      A.   He was in the doorway.  The door was open,

16  ajar.  He seemed to be leaning down.

17      Q.   Let me -- were --

18          MR. GAINER:  Is -- were you finished with

19  your answer?                                    0:28:00

20          WITNESS:  Yes.

21      A.   Go ahead.

22      Q.   Where was the doorway?

23      A.   On the third floor.

24      Q.   Okay.  Was it inside or outside?

25      A.   Outside.

1    Q.   All right.  And you thought he was suspicious

2  because he was in the doorway, and you knew the home?

3    A.   Yes, I knew the home.

4    Q.   All right.  And you attempted to approach and

5  talk to the suspect?

6    A.   I wouldn't say approach.  I -- I did -- I did

7  say, "Hey, what are you -- what's going on?"

8    Q.   Okay.  So you -- you went -- where did you --

9  where did you say that from?

10   A.   From the alleyway.

11   Q.   Okay.  And you looked up and said, "What's

12  going on?"

13   A.   Yeah.

14   Q.   Okay.  And that -- what was the individual's

15  name?

16   A.   Rickey Rozelle.

17   Q.   Okay.  So you went and talked to Rickey

18  Rozelle and asked him what's going on, and he told you

19  to mind your own business?

20       MR. GAINER:  Just object to form.  "Went and

21  talked to," that mischaracterizes his previous

22  testimony.  Go ahead and answer.

23       MR. COHEN:  Join.                          0:28:58

24   A.   I did ask Mr. Rozelle what he was doing.

25   Q.   And he told you to mind your own business?

1     A.   Yes.

2     Q.   Okay.  Did you contact the police department?

3     A.   I did.

4     Q.   When?

5     A.   A few minutes later when I realized that he

6 did -- he didn't belong up there.

7     Q.   All right.  What happened after he told you

8 to mind your own business the first time?

9     A.   Identified myself as a police officer.  I had

10 my star on me, I showed it to him.  Again, he told me

11 to mind my own business, and that I didn't want to get

12 hurt.  I -- I told him I was the police, to just come

13 on down, leave whatever he's got up there, and just

14 come down and show me his hands.  That's it.

15     Q.   Okay.  And what happened next?         0:29:41

16     A.   He, again, just kept telling me to mind my

17 own business, and that I didn't want to get hurt.

18 There were some swear words, to my best of my

19 recollection, on his part.  Again, I kept telling him

20 that I was the police, to just come on down.

21     Q.   Okay.  And how long did that conversation

22 between you and Mr. Rozelle last?

23     A.   Short period of time.  I -- I can't -- I'd

24 only be estimating at this point, I -- I -- it's a long

25 time ago.

1    Q.    Okay.  So a few minutes?

2    A.    Maybe.

3    Q.    And at what point did you call the police?

4          MR. GAINER:  Asked and answered.  Go ahead

5    and answer it --

6    A.    I had called the police already.

7    Q.    Okay.  At what point during the conversation

8    did you call the police?

9          MR. GAINER:  Asked and answered for a third

10   time.  Go ahead and answer again.

11   A.    I think right after I realized he didn't

12   belong up there.

13   Q.    Okay.  And what's the next thing that

14   happened after this conversation?

15   A.    Mr. Rozelle continues to threaten me.  He's

16   -- he -- he closes the door.  There was a cylinder on

17   top of the -- on top of the banister on the third

18   floor.  He grabs a backpack, puts it over his shoulder,

19   hands in -- in -- in pocket or waist area, starts to

20   walk down the stairs.

21   Q.    Okay.  What happened next?                0:31:08

22   A.    He gets down the stairs.  The whole time down

23   the stairs, he's telling me that, you know, he's -- he

24   -- I don't -- I don't want to get hurt.  He calls me

25   some choice words.  I keep telling him that I'm the

1    police.  I'm kind of dumbfounded at the fact that he --

2    you know, he keeps threatening me as comes down the

3    stairs.  He gets to the base of the stairs, he turns,

4    he faces me.  I'm -- I'm -- before the gate, there's no

5    garage, so I'm before the gate, and he's on the other

6    side of the gate.  It's a six foot wrought iron with a

7    door.

8        Q.    What were you dumbfounded by?

9            MR. GAINER:  Go ahead.                    0:31:49

10       A.    The fact that I -- I had told him that I was

11   the police, like, and -- and he continued to tell me

12   that I was going to get hurt, that, "You don't want to

13   get hurt, mind your own business."  He called me the

14   N-word.  I -- I just -- I -- all of it, all of it to me

15   was kind of surreal to be honest with you.

16       Q.    Okay.  So when you say you were dumbfounded

17   by it, I mean, did you believe that he was trying to

18   burglarize the house?

19       A.    I did.

20       Q.    Okay.  And so what happened next?

21       A.    He squares up with me when he gets to the

22   base.  I have my gun out at this point, and he comes

23   charging right towards me.

24       Q.    Okay.  Was the fence still between you and

25   him?

            MR. GAINER:  No, he never said the fence was

1 between the two of them, so that mischaracterizes his

2 testimony.  If we're going to talk about this ten year

3 old incident, we should at least get it right.  Go

4 ahead.

6     A.    The -- the gate is open.                    0:32:46

7     Q.    Okay.

8     A.    And there -- there is no obstruction between

9 me and him since the gate is open.

10     Q.    Okay.  And he comes charging at you how?

11     A.    Puts his shoulder down, hand over a backpack,

12 his other hand was concealed, and he just comes

13 charging at me.

14     Q.    Okay.  What happened next?

15     A.    I can't remember if I -- if I struck him

16 first or -- or did a frontal kick, but there was --

17 there was a hand strike as well as a frontal kick,

18 which threw him back.

19     Q.    Okay.  And what happened next?           0:33:28

20     A.    He tells me he's going to kill me.  He -- he

21 continues to -- I mean, he just kept saying it over and

22 over, "You don't want to -- mind your own business, you

23 don't -- you're going to -- you're going to get

24 yourself hurt."  I have my gun drawn on him.  There is

25 -- Joe Gentry (phonetic) is there with me.  I can hear

1  Joe over my shoulder screaming at him, "He's the --

2  he's the police, what's wrong with you?"  And he -- he

3  says he's going to kill me.  He turns around, comes

4  towards me again.  He starts pulling his hand out, I

5  see it -- something shiny, what I thought to be a gun,

6  and I discharged my weapon twice.

7      Q.   It -- it turned out to be his watch.

8  Correct?

9          MR. GAINER:  Go ahead, answer if you can.          0:34:14

10     A.   I believe so.  I -- I don't know for a fact

11 that it turned out to be his watch.  I know that no

12 weapon was recovered.

13     Q.   All right.  Well what -- what about it looked

14 like a gun?

15     A.   The shiny metallic object.

16     Q.   Okay.  So it was shiny and it was metal, so

17 you thought it was a gun?

18     A.   Well when you take --

19         MR. GAINER:  Hold on a minute.  That

20 mischaracterizes everything he said about this incident

21 for the last seven minutes, so other than that, you can

22 go ahead and answer the question.

23         MR. COHEN:  Join.

24     A.   If it were just the shiny metallic thing, no.

25 When you take it all into account, I have my weapon

1  drawn, I have identified myself as a police officer,

2  he's attacked me.  I didn't discharge my weapon the

3  first time he attacked me because at that point, I

4  hadn't seen anything.  The fact that he's telling me

5  he's going to hurt me, to mind my own business, the

6  fact that he's -- he possibly could be committing a

7  burglary, yeah, I feared for my life.

8       Q.   So the circumstances of the confrontation

9  with Mr. Rozelle, in combination with seeing the shiny

10 metallic object, led you to think that the object was a

11 weapon?

12      A.   Yes, sir.                         0:35:21

13      Q.   Okay.  You found out that it was not a

14 weapon.  Correct?

15      A.   I -- I know that there was no weapon

16 recovered, yes.

17      Q.   All right.  Did you ever see an actual

18 weapon?

19      A.   No.

20      Q.   So you -- did you see -- how -- and was it

21 nighttime or daytime?

22      A.   It was nighttime.

23      Q.   Okay.  So when you saw the shiny metallic

24 object, was it -- did it have a shape?

25      A.   I -- I can't -- I -- I really don't remember.

Exhibit 5, LLC

1      Q.   Okay.  Have you ever described it as about

2   the size of a quarter?

3      A.   I don't believe so.

4      Q.   All right.  By the way, what -- what

5   documents did you review to prepare for your deposition

6   today?

7      A.   I reviewed pictures, my COPA statement, the

8   -- some diagrams of the area, and the -- my deposition

9   for Rickey Rozelle.

10     Q.   Okay.  Anything else?                    0:36:19

11     A.   I think that's about it.

12     Q.   All right.  And have you talked to anyone

13  aside from your attorneys about your deposition here

14  today?

15     A.   No.

16     Q.   All right.

17     A.   My wife.

18     Q.   Okay.  And aside from the communications

19  you've had with your attorneys, have you had any email

20  or written correspondence with anyone about the

21  shooting that you're here for today?

22          MR. GAINER:  Object to form.  Go ahead --

23          MR. COHEN:  Join.

24          MR. GAINER:  Did you say, "Email or written

25  correspondence"?

```
 1            MR. KOSOGLAD:  Yes.

 2            MR. GAINER:  So I think he said, "Aside from

 3   your attorneys," but obviously, anything you sent to us

 4   or have received from us is privileged, so go ahead and

 5   answer the question.

 6       A.   Communications about the shooting that night

 7   --

 8            MR. GAINER:  He said, "Written or emailed."

 9       A.   Yeah, no.                              0:37:12

10       Q.   Okay.  So aside from, and -- and I didn't

11   mean -- just mean that night, at any time, have you had

12   any written communications about the shooting, whether

13   email or otherwise, aside from ones with your

14   attorneys?

15       A.   I don't believe so.

16       Q.   Okay.

17       A.   I should say, yeah, I -- I don't believe so.

18   Nothing substantive.  "I hope you're doing fine," in a

19   text message to me and I would respond, "Yes, I'm

20   fine."

21       Q.   Okay.  So you received some messages from

22   other officers?

23       A.   Yes.

24       Q.   Okay.  Via text message?

25       A.   Yes.
```

1    Q.   All right.  Aside from receiving messages

2  from officers via text about how well you were doing

3  after the shooting, you had any other written

4  communications, whether email or otherwise, with anyone

5  else about the shooting you're here for today?

6    A.   I don't believe so.                          0:38:07

7    Q.   Okay.  Have you read the opinion that was

8  written by the police investigatory agency about your

9  2013 shooting?

10    A.   I have not.

11         WITNESS:  Do we have that?

12    Q.   So how did you become aware of what the

13  findings were of the disciplinary body with

14  relationship to that shooting?

15         MR. GAINER:  Wait a minute.  I just object to

16  form.  I mean, I have a standing objection to

17  relevance.  I'm -- I don't understand what you're

18  asking about.  Are you asking about -- can you just say

19  what you're asking about?  Are you saying IPRA, the

20  police board?  I don't understand what the question is.

21  If you understand, you can answer it.  I don't

22  understand.

23    Q.   You can answer if you understand.

24    A.   I'm assuming you're talking about IPRA?

25    Q.   Sure.                                        0:39:09

1     A.    Okay.  I don't -- I -- I either got a letter

2  -- I think they send a letter out, maybe got a letter.

3     Q.    Okay.  So you -- so you think you maybe got a

4  letter from IPRA saying that the investigation had

5  concluded with a finding that you had done nothing

6  wrong?

7          MS. FRONCZAK:  Objection to form.

8          MR. GAINER:  Go ahead.

9     A.    Possibly.  It was five years ago.  I --

10    Q.    Okay.  Have you ever -- have you ever seen

11 the written findings by IPRA about that shooting?

12    A.    You asked me that already.  I have not.

13    Q.    And did someone file a lawsuit against you

14 arising out of that shooting?

15         MR. GAINER:  Go --

16    A.    Yes.

17         MR. GAINER:  -- ahead.  You can answer.        0:40:13

18    Q.    Okay.  And do you know what happened in that

19 lawsuit?

20    A.    I believe the city settled the lawsuit.

21    Q.    And do you know what the amount of the

22 settlement was?

23    A.    Ballpark only.

24    Q.    What's your understanding?

25    A.    $900,000.

1  Q. So I'm going to ask you some questions about

2 the -- the shooting that took place in -- in 2016.

3 Okay?

4  A. Okay.

5  Q. Do you know what the -- the date was of that

6 shooting?

7  A. November 24th, 2016.

8  Q. And do you know the name of the person you

9 shot that day?

10  A. I do.

11  Q. What is it?

12  A. Kajuan Raye.       0:41:12

13  Q. And prior to your encounter with Mr. Raye,

14 what were you assigned to do that day?

15  A. I was a sector sergeant.  I believe 710

16 Robert.

17  Q. Okay.  And what is a sector sergeant?

18  A. I am responsible for a certain number of

19 cars, between four to eight cars, two man cars, and I

20 just track and log their activity for the day.

21  Q. Okay.  And at some point, was there -- prior

22 to the encounter with Mr. Raye, was there a call that

23 came over the radio?

24  A. Can you be specific?  There were -- there's a

25 lot of calls.

         Q.   Yeah, there was -- there was a call that --

that -- that led you to interact with Mr. Raye.

Correct?

         A.   Yes.                                    0:42:00

         Q.   And what was that call?

         A.   The call was a male wearing a dark jacket,

red sleeves, and a hoodie, beating a girl in an alley

between Ashland and Justine, which is one block east of

Ashland, and the girl was calling for help.

         Q.   Okay.  Do you recall the description of the

suspect aside from him having a jacket with red

sleeves?

         A.   I don't, but it -- it was -- I can recall it

being on my PDT in the car, so I don't recall exactly

what it was, it was some time ago.

         Q.   Okay.  And the PDT is your personal data

terminal.  Correct?

         A.   Yes, sir.

         Q.   And that is a computer that you had inside

your sergeant's vehicle.  Correct?

         A.   Yes, sir.                               0:42:50

         Q.   All right.  And so through the PDT, you were

communicated a written message about this person who

was suspected of beating a girl in an alley near

Ashland and Justine, right?

1    A.   65 and Ashland -- and Justine, yes.

2    Q.   All right.  Sorry, right.  65th and Justine,

3 right?

4    A.   Mm-hmm.

5    Q.   Okay.  And in response to that call, what did

6 you do?

7    A.   It wasn't my call.  I had seen that one of my

8 cars was down for about 20, 25 minutes, somewhere less

9 than 30 minutes, on that specific job, so I had sent a

10 message to OEMC through the PDT asking -- I believe it

11 was through the PDT, asking why this car was still on

12 that job.  Had they found something, you know, it would

13 -- it would have been something I would have had to

14 been notified.  It was one of my cars.  OEMC, I believe

15 over the radio, called 715 Robert and asked them, "Did

16 you get this job?"  I think I had sent 715 Robert a PDT

17 message as well.  They had not responded, so I had OEMC

18 call them over the radio.  15 Robert responded that

19 they had not received the job, that did not have a -- a

20 -- a terminal in the car.

21    Q.   So was the job to 715 Robert given over the

22 air, or was it through the PDT?

23    A.   So subsequently, the OEMC says, "We -- we put

24 it on your box," I believe is what the radio chatter

25 is, and 715 Robert says, "We don't have a box," meaning

--

Q.   Have you --

A.   -- a PDT.                                    0:44:31

Q.   Have you listened to the radio chatter?

A.   I have.

Q.   When?

A.   I think during my COPA investigation.

Q.   Okay.  And so what happened after 15 Robert

indicated they had not received the job?

A.   I told 15 Robert I would meet them at the

call scene, and that's what we did.  We met at -- you

know, in between the alley on 65 -- in between the

alley, you know, the alley between Ashland and Justine.

Q.   All right.  And this is 25 to 30 minutes

after the call.  Correct?

A.   Yes, sir.

Q.   And so, until that time --

A.   And that's an estimate, by the way.  I mean,

the OEMC can give you a better time.

Q.   Sure.  So from your memory, it was 25 to 30

minutes.  Correct?

A.   Roughly.                                   0:45:26

Q.   All right.  So from the time that a call came

in that a girl was being beaten in an alley by a

suspect in red sleeves and the time that you responded

1  to the approximate location, 25 to 30 minutes had

2  passed.  Correct?

3       A.    Roughly.  Estimation.

4       Q.    All right.  And you met with 15 Robert at

5  that time.  Correct?

6       A.    Yes, sir.

7       Q.    Okay.  And who was that?

8       A.    I don't know.

9       Q.    You don't know the names of the officers who

10 you met with --

11      A.    I --

12      Q.    -- near the alley at 65th and Justine?

13           MR. GAINER:  Okay.  Go ahead.  I just wanted

14 to let him finish.

15           WITNESS:  Yeah.

16           MR. GAINER:  Go ahead and answer.

17      A.    I don't.  They weren't my regular officers

18 that I would be -- that I -- I would be assigned to.  I

19 -- I'm not normally a sector car.

20      Q.    What are you normally assigned to?

21      A.    I'm normally assigned to a mission car.

22      Q.    And when you say that, what's the difference?

23      A.    One is plain clothes and one is not.

24      Q.    Okay.  So normally, you're a plain clothes

25 officer?

1    A.    Yes, sir.                                    0:46:17

2    Q.    All right.  And what unit are you assigned

3 normally?

4    A.    Seventh district.  0706 Robert would be my

5 call sign.

6    Q.    Sure.  And are you part of a special unit

7 there?

8    A.    It's a mission car.  Wherever, you know, the

9 -- the lieutenant, commander, captain, wherever they

10 pinpoint violence in the area, in Englewood somewhere,

11 and they want to assign more units, they assign the

12 mission car to it.

13    Q.    Okay.  What's your current assignment?

14    A.    I am a sergeant in the subpoena unit at 35th

15 and Michigan.

16    Q.    How long have you held that assignment?

17    A.    Five weeks.

18    Q.    And do you know why you got assigned there?

19         MR. GAINER:  Do -- when or why?

20         MR. KOSOGLAD:  Why.

21         MR. GAINER:  Okay.

22    A.    I don't.  I would assume because of my legal

23 background.

24    Q.    Okay.  Well have you ever talked to someone

25 about being assigned there?

```
 1      A.    No, sir.                                0:47:10

 2      Q.    Did you ask to be assigned there?

 3      A.    I did not.

 4      Q.    Are you upset about being assigned there?

 5      A.    No.

 6      Q.    Is it a lot different work than working as a

 7   mission car in Englewood?

 8      A.    It's considerably different.

 9      Q.    Okay.  Was it a surprise to you when you got

10   reassigned there?

11          MR. GAINER:  Relevance.  Go ahead.

12      A.    I wouldn't say -- surprised is the wrong

13   word.

14      Q.    Why is that?

15      A.    Because as a sergeant, you know, unless you

16   are assigned to a district, they can move you around

17   where the -- where they need you.  Prior to being in

18   the subpoena unit, I was a sergeant for a few months in

19   human resources, so they -- I -- I'm -- I'm not

20   surprised at anything the department does.  They put

21   you where they need you, which is fine.

22      Q.    So prior to being moved to the subpoena unit,

23   you were in the human resources department?

24      A.    Yes, sir.                               0:48:06

25      Q.    And what did you do there?
```

1    A.    I was in background investigations.

2    Q.    Okay.  And did you -- did you request to be

3    transferred away from the seventh district?

4    A.    I did not.

5    Q.    Okay.  Can you explain, after you were --

6    when and at what point you were at different locations

7    in the police department, after you were assigned the

8    seventh district?

9        MR. GAINER:  Object to form.  Go ahead.

10        MR. COHEN:  Join.

11    A.    It's -- it's customary for the department,

12    after you're involved in a shooting, to put you in an

13    administrative role for some time.  My administrative

14    role, because of my back -- my legal background, I

15    would assume they found a home for me in headquarters.

16    I could have been assigned to the front office.  I

17    could have been assigned anywhere.

18    Q.    So you have been assigned an administrative

19    function since the shooting in 2016?

20    A.    Yes, sir.

21    Q.    Have you made any kind of inquiry as to when

22    you'll be assigned back to the street?

23    A.    I have not.

24    Q.    Is that something you want?

25        MR. GAINER:  Object to form.  Go ahead if you

1    -- if you understand, you can answer.

2        A.   I don't know if I want to go back to the

3    street.

4        Q.   How come?                                    0:49:11

5            MR. GAINER:   Just object to form.  Go ahead,

6    unless you want him to --

7        A.   Because of instances just like this.

8        Q.   When you say, "Instances just like this,"

9    what do you mean?

10        A.   The possibility that you lose a little bit of

11    your humanity every time you go out on the street,

12    because you may be forced to take a life or the things

13    that we see.  I've done that.  I -- I just --

14        Q.   Do you feel like you've lost a little bit of

15    your humanity?

16        A.   I have.

17        Q.   Did you feel like you lost a little bit of

18    your humanity when you shot Mr. Rozelle?

19        A.   I did.                                       0:49:51

20        Q.   Okay.  So after you met with the officer near

21    the alley at 65th and Justine, what did you do next?

22        A.   I was facing west, he was facing east.  We

23    looked down the alleys, didn't see anybody, but there's

24    a lot of vacants and a lot of empty houses there, so I

25    sent 15 Robert to circle the block, come back -- come

 1  back around, come through the alley, see if they see

 2  anything, see if they hear anything.  I was going to

 3  head west, come up Ashland and circle the block to 63rd

 4  -- or 64th, and come back through that alley, again,

 5  staying in between Ashland and Justine.

 6      Q.   And sorry if I missed this, but where did you

 7  go?

 8      A.   I was facing west, so I -- I -- I headed

 9  towards Ashland.

10      Q.   Okay.

11      A.   On 65th.                                    0:50:53

12      Q.   All right.  And how far down 65th did you go?

13      A.   To the corner.  To 65th and Ashland.

14      Q.   Okay.  And would this be the east corner?

15      A.   It would be the northeast corner of 65th and

16  Ashland, on 65th.

17      Q.   Sure.  And what happened at the corner?

18      A.   I get to the corner, and as I'm waiting for

19  traffic to die down so I can either make my -- I think

20  it was -- I was going to make a right hand turn or a

21  left hand turn, I'm not really sure, across the street

22  standing at the bus stop, I see a young man who matches

23  the description that's on my PDT of the possible

24  offender for the battery that had occurred that the

25  anonymous caller had phoned in.

Q.   Okay.  And when you say he matched the

description, what was the description, and how did he

match it?

A.   Again, I don't know specifics on the

description because it's been two years, but the broad

strokes of it is the -- the -- the jacket, the red

sleeves, the hoodie.  It was so descriptive that it

would be almost impossible to have the same

combinations on the same person at the exact same

location.

Q.   So what happened?                              0:52:02

A.   I pull over, I back my car up to right on the

corner, just parallel park on the corner.  I turn on my

dome light.  I'm in full uniform, and I just start

doing paperwork.  At the same time, I -- I called 715

Robert and said, "Hey, I think I might have your

offender here, swing on by on 65 and Ashland."

Q.   Okay.  So did you -- did you park on the east

side of -- east of Ashland on 65th or west of Ashland?

A.   So I parked east of Ashland on the north side

of the street, on the northeast corner.

Q.   Okay.  And is there parallel parking there?

A.   It's a post office, I think there's no

parking there.

Q.   And you said you started doing paperwork?

A.   Yes.                                          0:52:53

Q.   Okay.  Why did you start doing paperwork if you had just seen someone who matched the description of the offender?

A.   I didn't -- so I got my clipboard out and I just started to check some boxes for the cars that I had checked, but I was also waiting for 715 Robert.  I didn't want to approach by myself.  I was ninety -- I was 99, meaning by myself, to conduct a field interview.  I -- I wanted another car to be with us.

Q.   But why did you start doing paperwork?

MR. GAINER:  Asked and answered.  Go ahead, answer again.

A.   While I was just waiting.  I was observing and doing paperwork.

Q.   Okay.  What paperwork were you doing?

A.   My log.  There's a log that we fill out for other cars.

Q.   Okay.  So you were working on your sergeant's log?

A.   Yes, sir.

Q.   Okay.  And I take it that while you were looking at your sergeant's log, you were looking down?

MR. GAINER:  Go ahead.

A.   No, I put the sergeant's log right on my

1   steering wheel, and I was checking off boxes.

2       Q.   Okay.  Would you agree --

3       A.   There was a time when I looked down.

4       Q.   Would you agree that while you're working on

5   your sergeant's log, you can't watch the suspect?

6           MR. GAINER:  Object to form.  Go ahead.

7           MR. COHEN:  Join.                        0:53:55

8       A.   I would not agree.

9       Q.   Okay.  How were you able to work on your

10  sergeant's log and watch the suspect at the same time?

11      A.   Like I said, I -- I took my log, put it on my

12  steering wheel, which is facing straight out, and I'm

13  just checking boxes, that's it.

14      Q.   Okay.  What boxes are you checking?

15      A.   Whether seven -- no, whether -- I think the

16  other cars, and I can't remember which cars there were,

17  had body worn cameras, we always check "no" because

18  seven was not a body worn camera district, whether they

19  had a PDT, just simple boxes that are normally checked

20  "yes" or "no."

21      Q.   Okay.  So to be clear, while you were out

22  investigating this call of a women being beaten near an

23  alley, you saw a suspect that matched the description

24  of the offender, and you stopped to check off boxes in

25  your sergeant's log?