1      MR. GAINER:  That mischaracterizes his

2  previous testimony.  That's argumentative.  Go ahead

3  and answer again.

4      MR. COHEN:  Join.

5      MR. GAINER:  Go ahead.

6      A.   While I waited for another car to come, so

7  that I didn't make the stop by myself.

8      Q.   Okay.  And you called 715 Robert?

9      A.   Yes.                              0:54:55

10     Q.   Okay.  And they were about a block away,

11  right?

12     A.   Roughly.

13     Q.   Right.

14     A.   I mean, I don't know where they were, but I'm

15  assuming if they -- if they stayed in the perimeter

16  that I asked them to, yes, maybe block away, block and

17  a half.

18     Q.   Right.  So you wouldn't have expected it to

19  take them very long to get to your location, would you?

20         MR. GAINER:  Object to form.  Go ahead.

21     A.   No, I wouldn't have expected it to -- to take

22  very long.

23     Q.   And I take it that, as their -- their

24  sergeant, when you -- did you radio for them to come?

25     A.   I did.

 1     Q.   And I take it that, as their sergeant, when

 2  you radioed for them to come you, would have expected

 3  them to respond right away?

 4     A.   I would have, yes.

 5     Q.   All right.  Because you radioed that you saw

 6  someone who matched the description.  Correct?

 7     A.   Yes, I did.

 8     Q.   Okay.  So while you waited for this unit to

 9  drive a block or block and a half to come meet you at

10  this location, you decided to work on your sergeant's

11  log?

12     A.   Yes.

13     Q.   Okay.                                    0:55:46

14          MR. GAINER:  That's been asked and answered

15  multiple times.  Move to strike.

16     Q.   Have you seen the sergeant's log that you

17  worked on since the shooting?

18     A.   I have not.

19     Q.   Okay.  Did you work on it after the shooting?

20     A.   I did not.

21          MR. GAINER:  Let me know when is a good time

22  to take a break, Jared.

23          MR. KOSOGLAD:  Sure.

24     Q.   So would you -- did you ever sign off on your

25  log from that shift?

1    A.   I did not.

2    Q.   So would you expect your log to be

3 incomplete?

4         MR. GAINER:  Object to form.  Go ahead.

5         MR. COHEN:  Join.

6    A.   I would assume so.  I don't -- I don't have

7 my log.  It was in the car.  I never went back to the

8 car.

9         MR. KOSOGLAD:  Okay.  We can take a break.

10        MR. GAINER:  Great.                    0:56:39

11        RECORDER:  Off the record, 11:14 a.m.

12              (Off the record)

13        RECORDER:  Back on the record at 11:21 a.m.,

14 and if you would just state your name for the record?

15        MS. RAMSEY:  My name is Karonisha Ramsey.

16        RECORDER:  Thank you.

17   Q.   Okay.  So at some point, I take it, that beat

18 715 Robert approached the intersection?

19   A.   The -- which intersection?  I --

20   Q.   Yeah, we -- so we left off --

21   A.   Right.

22   Q.   -- you -- you were working on your sergeant's

23 logs, waiting for beat 715 Robert --

24   A.   Correct.

25   Q.   -- so you didn't have to approach alone,

1   remember?

2        A.   Right.  Correct.

3        Q.   Right.  Okay.  So I take it at some point,

4   they approached?

5        A.   Yes.

6        Q.   Okay.  Where did they approach from?

7        A.   They came off of 63rd and Ashland, so off of

8   Ashland.

9        Q.   Okay.  And so they came northbound on Ashland

10  or southbound?

11       A.   Southbound on Ashland.                    0:57:29

12       Q.   Thank you.  I get confused.  So they came

13  from 63rd towards 65th?

14       A.   Correct.

15       Q.   And would they have been on the east or west

16  side of Ashland?

17       A.   On the west side of Ashland.

18       Q.   All right.  So that would have been across

19  the street from you.  Correct?

20       A.   Yes.

21       Q.   All right.  So they would have pulled up

22  parallel with the bus stop.  Correct?

23       A.   Yes.

24       Q.   All right.  So can you describe what

25  happened?

1    A.   715 Robert says, "We're on our way, turning

2  -- coming up Ashland."  I see 715 Robert come up

3  Ashland.  They stop near the bus stop.  I activate my

4  lights.  I cut across traffic, and I pull to the corner

5  -- the west corner, the northwest corner of 65th and

6  Ashland.

7    Q.   So 1715 (sic) Robert was parked near the bus

8  stop on Ashland.  Correct?

9    A.   Correct.                                    0:58:27

10   Q.   And then after they parked there, you

11 approached with your lights on?

12   A.   Yes.

13   Q.   All right.  Why did you activate your

14 emergency lights?

15   A.   To cut across traffic.

16   Q.   And why did you activate your emergency

17 lights to cut across traffic?

18   A.   I saw them approaching, I wanted both of us

19 to come up simultaneously.

20   Q.   Okay.  Was there an emergency?

21       MR. GAINER:  That's argumentative.  Go ahead.

22 You can answer.

23   A.   I wanted to make sure when I cut across

24 traffic, because I was cutting across four lanes, that

25 people would see me cut across four lanes.

1     Q.   Okay.  It's true there was no emergency,

2   right?

3         MR. GAINER:  Same objection.  Go ahead,

4   answer again.

5         MR. COHEN:  Form.  I'm sorry, join.

6         MR. GAINER:  Go ahead.

7     A.   Correct.  There was -- there was no immediate

8   emergency at this point.

9     Q.   As you said, you were approaching to do a

10  field interview.  Correct?

11    A.   Yes.

12    Q.   All right.  And a field interview is a

13  consensual encounter with a citizen.  Correct?

14        MR. GAINER:  Object to form.  Go ahead.

15        MR. COHEN:  Join.

16    A.   Correct.                          0:59:28

17    Q.   Right.  People do not have to allow

18  themselves to be interviewed if they don't want to,

19  right?

20    A.   Field interviews could start as a field

21  interview and then turn into an investigatory stop,

22  yes.

23    Q.   My question, sir, is that if someone does not

24  want to be interviewed, they are not required to be.

25  Correct?

 1          MR. GAINER:  That's an incomplete

 2  hypothetical.  Form.  Go ahead, you can answer.

 3      A.   For a basic field interview, correct.

 4      Q.   All right.  And if -- in a basic field

 5  interview, if someone refuses to answer your questions,

 6  they're entitled to do that, right?

 7          MR. GAINER:  Same objection.  Go ahead.

 8          MR. COHEN:  Join.

 9      A.   Yes, sir.

10      Q.   And so you were approaching Mr. Raye to have

11  a -- to ask him questions, right?

12      A.   Correct.

13      Q.   Right.  And you understood when you did that,

14  that he was free to refuse to answer your questions,

15  right?

16          MR. GAINER:  Object to form.  Go ahead.

17          MR. COHEN:  Join.

18      A.   Yes.

19      Q.   Okay.  So when you activated your emergency

20  lights, you said you parked on the -- what would be the

21  northwest corner of 65th and Ashland?

22      A.   Correct.                            1:00:35

23      Q.   And you --

24      A.   Northwest corner.

25      Q.   And you were facing west?

 1      A.    I was facing west.

 2      Q.    And you were adjacent to 65th Street.

 3  Correct?

 4      A.    Correct.

 5      Q.    All right.  And would you have parked right

 6  on the corner there where the bus stop is or a little

 7  further down?

 8      A.    I believe I parked right on the corner.

 9      Q.    All right.  And what happened?

10      A.    I get out of my car.  I start to come around

11  the doorway.  I believe I was about to utter like,

12  "Come here, let me talk to you."  Mr. Raye, at this

13  time, looks at me, pulls his pants up, takes off

14  running.

15      Q.    Okay.  So you -- before you ever had a chance

16  to say anything, he took off running?

17      A.    I think I got "brother" out of my mouth, but

18  -- or -- or "come here."  I -- I said something, but

19  very little.

20      Q.    Okay.  Well -- well what did you say?

21          MR. GAINER:  Asked and answered.  Go ahead,

22  answer it again.

23      A.    I think I started to get the word -- like I

24  think I was -- I -- I think I was going to say,

25  "Brother, come here, and let me talk to you."  I think

 1    I got "brother" out of my mouth -- out of my mouth.

 2         Q.    Okay.  So you think you said, "Brother" --

 3         A.    Yes.

 4         Q.    -- and then he took off running?

 5         A.    Yes.                                    1:01:38

 6         Q.    And you say that he looked at you?

 7         A.    Yes.

 8         Q.    All right.  And then he pulled his pants up?

 9         A.    Yes.

10         Q.    And he started running?

11         A.    Yes.

12         Q.    Okay.  Which direction did he start running?

13         A.    He ran west on 65th.

14         Q.    Okay.  Now the jacket that he had on, was it

15    zipped up?

16         A.    Yes.

17         Q.    All right.  And at that time, I take it that

18    you didn't notice that he had a firearm.  Correct?

19         A.    No.  His hands were in his pockets.

20         Q.    All right.  Which pockets were they in?

21         A.    I think they were in the jacket pockets.

22         Q.    Okay.  The outer jacket pockets?

23         A.    I believe so.

24         Q.    Okay.  And when he started to run, did he run

25    with his hands in his pockets?

1    A.  No, I just got done telling you he pulled his

2 pants up and he took off.

3    Q.  Okay.  And which direction did he run?

4    MR. GAINER:  Asked and answered.  Go ahead

5 and answer again.

6    A.  Westbound on 65th.

7    Q.  All right.  And did you pursue him?

8    A.  I did.             1:02:35

9    Q.  All right.  Did beat 715 Robert get out of

10 the car before Mr. Raye began to run?

11    MR. COHEN:  Object to foundation.

12    MR. GAINER:  Go ahead and answer.

13    A.  I believe they did.

14    Q.  Did -- I mean, were they present when you

15 tried to speak to Mr. Raye?

16    MS. FRONCZAK:  Objection to form.

17    MR. GAINER:  Go ahead.

18    A.  They were present.  I don't know how close

19 they were when I got out of my car.

20    Q.  Right, but -- I'm sorry, so -- but -- like

21 were you -- would you of all exited your vehicles at

22 the same time to conduct this interview?

23    A.  Yes.

24    Q.  Right.  And so you all would have been

25 approaching him at the time that he began to run.

1  Correct?

2      A.   Correct.

3      Q.   All right.  And did -- do you know whether or

4  not beat 1715 (sic) Robert pursued on foot as well?

5           MR. GAINER:  715 Robert.

6      A.   715 Robert --

7           MR. KOSOGLAD:  Isn't that what I said?

8           MR. GAINER:  You said, "1715."

9           MR. KOSOGLAD:  Sorry.  I apologize.

10     A.   715 Robert, I believe, got in the car and

11 paralleled me while I was on foot.

12     Q.   Both officers got in the car and paralleled

13 you?

14     A.   Correct.                              1:03:33

15     Q.   Okay.  And which direction did Mr. Raye run?

16          MR. GAINER:  Okay.

17     Q.   I -- I -- I understand that -- that -- look,

18 you said he went westbound on 65th, it's not to trick,

19 but --

20     A.   Right.

21     Q.   -- but I also understand that he cut in -- he

22 cut into the alleyway as well, didn't he?

23          MR. GAINER:  Did you hear the question?

24     A.   He did, yes.

25     Q.   Right.

1    A.    So he ran westbound on 65th from Ashland to

2  the first alley, between 65th, Ashland and 65th and

3  Marshfield.

4    Q.    Right.  And that's half a -- half a block?

5    A.    Half a block.  Correct.

6    Q.    Okay.  So he went half a block up 65th, and

7  he turned into the alley.  Correct?

8    A.    He turned south into the alley.  Correct.

9    Q.    Can you describe how he crossed 65th Street?

10    A.    In a -- in a diagonal.

11    Q.    Okay.  So did he kind of, once he left the

12  bus stop, immediately begin running in a diagonal

13  towards the alley?

14    A.    Slight diagonal.  Slight diagonal.  I think

15  he went up the sidewalk a little and then cut across.

16    Q.    Okay.  So you think that he ran a few -- a

17  few steps up 65th and then cut across?

18    A.    Yes.                              1:04:38

19    Q.    All right.  And he made a diagonal directly

20  towards the alley?

21    A.    Yes.

22    Q.    Okay.  And did you run up 65th Street first

23  in pursuit of him and then run diagonal across as well?

24    A.    I ran from the northwest corner in a diagonal

25  to the alley.

1    Q.   Okay.  And was he fast?

2    A.   He was.

3    Q.   Was he faster than you?

4    A.   He was.

5    Q.   All right.  I take it though when the pursuit

6  began, he was not that far in front of you?

7    A.   I mean, I don't -- I don't know what you mean

8  by that far in front of me.

9    Q.   When you began to run, how far in front of

10  you was Mr. Raye?

11    A.   20.  I -- I would only be estimating.  About

12  half the distance from the corner to the -- to the

13  alley.

14    Q.   Okay.  So when you said, "20," what did you

15  mean?

16    A.   20, 30 feet.  Somewhere -- about half -- I'd

17  only be estimating.

18    Q.   Okay.  So he got about half the distance to

19  the -- when you say, "Half the distance to the alley,"

20  did he run half the distance to the alley on 65th

21  Street, or had he already cut over on a diagonal?

22        MR. GAINER:  Object to form.              1:05:50

23    A.   Well your question was how far ahead was he.

24  Well I -- I already stated I believe he took a couple

25  steps onto 65th and then cut diagonal.  He was about

Exhibit 5, LLC

1  half the distance from the corner to the alley ahead of

2  me.

3      Q.   Okay.  And I take it that you began to pursue

4  him on foot within a second or two after he began to

5  run?

6      A.   Yes, sir.

7      Q.   All right.  And did the distance between you

8  and Mr. Raye grow as he continued to run?

9      A.   I -- it all depends on where -- which part of

10  the chase you're inquiring about.  The initial part, I

11  -- I told you up to the alley, he was about half --

12  half the distance away from me.

13      Q.   How long did it take you to get from the

14  corner of 65th and Ashland to the mouth of the alley?

15      A.   I have no idea.                           1:06:54

16      Q.   Would you agree it was a few seconds?

17      A.   I would just agree that I have no idea.  I --

18  I couldn't tell you it was a few seconds, I couldn't

19  tell you it was 30 seconds.  I -- I really have no

20  idea.

21      Q.   Okay.  Well would you agree it was less than

22  a minute?

23      A.   Possibly.

24      Q.   Okay.  You think it might have been more than

25  a minute?

 1        MR. GAINER:  Argumentative.  Go ahead.

 2     A.   I don't know.  That's why I'm -- I'm -- we

 3  can -- I really don't know.  I -- I'd be speculating.

 4     Q.   Okay.  So sitting here today, you can't say

 5  under oath whether or not it took Mr. Raye more than a

 6  minute to reach the mouth of the alley from the corner

 7  of 65th and Ashland?

 8        MR. GAINER:  Argumentative.  Harassing.  Go

 9  ahead and answer again.

10     A.   I can't say whether it took 30 seconds, a

11  minute, five minutes.  I -- I -- I really can't say.

12     Q.   Okay.  Do you think it might have been five

13  minutes?

14        MR. GAINER:  Argumentative.  Harassing.  If

15  we're going to -- if we're going to keep doing this,

16  I'm just going to tell him to stop.  Get the video and

17  watch for yourself.  Go ahead and answer again.

18     A.   Sir, I -- I -- I can't tell you.          1:07:51

19     Q.   Well, you can't say whether it was five

20  minutes -- under, over five minutes?

21        MR. GAINER:  Same objection.  Go ahead and

22  answer one more time.

23     A.   I can tell you it was probably under five

24  minutes.

25     Q.   Okay.  Can you be any more specific than

1  that?

2      A.   I can't.

3      Q.   Okay.  So you can't be any more specific

4  about how long it took Mr. Raye to get from the corner

5  of 65th and Ashland to the mouth of the alley, other

6  than saying that it was less than five minutes?

7          MR. GAINER:  Same objections, and it

8  mischaracterizes his testimony.  Go ahead.

9      A.   What I'm trying to tell you is that I can't

10  tell you how long it took him to get to the mouth of

11  the alley.

12     Q.   Right.  I understand, and my question though

13  is -- is you can't be any more specific about how long

14  it took him to get to the mouth of the alley from the

15  corner of 65th and Ashland, except to state that it was

16  under five minutes?

17          MR. GAINER:  Same objection, and it

18  mischaracterizes his testimony.  Go ahead.

19     A.   Yes.                                1:08:47

20     Q.   Okay.  When he reached the mouth of the

21  alley, which direction did he turn?

22          MR. GAINER:  Asked and answered.  Go ahead.

23     A.   He made a left into the alley, heading south.

24     Q.   Okay.  And did you see where he ran once he

25  entery entered the alley?

1    A.    No, because I hadn't reached the alley yet.

2    Q.    So did you lose sight of him there?

3    A.    I did.

4    Q.    For how long?

5    A.    Again, I -- you're asking me to give you

6  specifics on -- on stuff that happened two years ago

7  during a high stress situation.  I can't pinpoint the

8  amount of seconds or minutes.  I can just tell you that

9  I lost sight of him when he entered the alley.

10    Q.    I understand you can't pinpoint it, I'm just

11  asking you to be as specific as you possibly can.

12    A.    Again, under five minutes.

13    Q.    Okay.  So you lost sight of him for some

14  period of time under five minutes?

15    A.    I did.                              1:09:47

16    Q.    All right.  And did you see where he turned

17  after he entered the alley?

18        MR. GAINER:  Asked --

19    A.    Yes.

20        MR. GAINER:  -- and answered.  Go ahead.

21    A.    Yes.

22    Q.    Where did he turn?

23    A.    As I was coming into the mouth -- he turned

24  -- he turned west again into a vacant lot.

25    Q.    All right.  And do you know which vacant lot

1    he turned into?

2        A.   I believe it was the third lot off the mouth

3    of the alley.

4        Q.   Okay.  This was next to a parking lot?

5        A.   I believe so.

6        Q.   Are there street lights on 65th Street east

7    of Ashland?

8        A.   I don't know.

9             MR. GAINER:  "East of Ashland," is that what

10   you said?

11            MR. KOSOGLAD:  Well I was going to ask west

12   next, but --

13            MR. GAINER:  Oh.

14       Q.   Are there street lights on 65th Street west

15   of Ashland?

16       A.   I don't know.

17       Q.   Okay.  Are there street lights on -- in the

18   alley between 65th Street and Marshfield?

19       A.   I believe so because there's a church there.

20   There is -- I think there's -- there's lighting there.

21       Q.   Okay.  So there's lighting in the alley?

22       A.   I believe so.                          1:10:52

23       Q.   All right.  Was there lighting in the vacant

24   lot?

25       A.   Some.  Maybe illumination from a window.

1    Q.    Would you agree that there was no sunlight?

2    A.    Yes.

3    Q.    So the only light that was on -- that was

4 shining into the vacant lot was ambient light from an

5 -- from a window?

6         MR. GAINER:  That mischaracterizes what he

7 just said.  Go ahead, answer again.

8         MR. COHEN:  Join.

9    A.    Also from the alley and whatever lighting was

10 on Marshfield.

11    Q.    Do you know if there's street lights on

12 Marshfield?

13    A.    I would assume so, it's a city block.

14    Q.    So when Mr. Raye was in his field of view,

15 did you have any difficulty seeing him?

16         MR. GAINER:  Object to form.  Go ahead.        1:11:49

17    A.    When he was in my field of view?  I did --

18 no, I did not have any difficulty seeing him.

19    Q.    Okay.  All right.  So what happened after he

20 turned into the vacant lot?

21    A.    I followed.  I made a right into the vacant

22 lot, heading west, and as soon as I turned into the

23 vacant lot, I noticed Mr. Raye was turned back looking

24 at me while he's still running, and he was raising his

25 right arm.

1    Q.   Okay.  When you say that he was turned back

2  looking, how far through the vacant lot had he gotten

3  when he did that?

4    A.   I -- it would be a guesstimation, 20, 30

5  feet.

6    Q.   So by the time you got to the entranceway to

7  the vacant lot, had he stopped running, or was he still

8  running when he turned to look at you?

9    A.   He was still running.                    1:12:54

10    Q.   Okay.  And you say that he turned back with

11  his right arm?

12    A.   He --

13    Q.   He extend it or --

14    A.   His right arm was extended, yes.

15    Q.   Can you describe how it was extended?

16    A.   It was extended coming up.

17    Q.   Okay.  And just for the record, you've raised

18  your right arm about shoulder height and pointed behind

19  you?

20    A.   Yes, full extension on the right arm, about

21  shoulder height.

22    Q.   Okay.  And it was pointed up?

23    A.   Yes.

24    Q.   All right.  And you could clearly see that?

25    A.   Yes.

1    Q.   All right.  And he was 20 to 30 feet behind

2  you -- in front of you?

3    A.   In front of me.  Correct.

4    Q.   All right.  Is that about half the distance

5  between the alley and the street?

6        MR. GAINER:  Form.

7        MR. COHEN:  Join.

8        MR. GAINER:  Go ahead.

9    A.   Say the lot's 25 feet, I -- I would assume

10  so.  Half, maybe a little more.

11    Q.   Okay.  Is it -- it's a pretty narrow vacant

12  lot, right?

13    A.   It's just a vacant lot to me, I -- whether

14  it's narrow or not, I -- I couldn't say.

15    Q.   But is -- it's not like a single -- it's a

16  single wide lot, it's not a double wide lot.  Correct?

17    A.   It's a single wide lot, yes.            1:13:59

18    Q.   All right.  Okay.  And when you say that he

19  had his arm extended, could you see anything in his

20  hands?

21    A.   Yes.

22    Q.   What did you see?

23    A.   I saw a barrel and the circumference of the

24  barrel.

25    Q.   Okay.  So you saw the barrel of a firearm?

1   A.   Yes.

2   Q.   And the circumference of it?

3   A.   Yes, that's what sticks in my mind.

4   Q.   All right.  And what did the gun look like?

5   A.   Dark, had a little bit of a shine to it, but

6  not -- not glaring.  It just -- it -- it was -- it was

7  what looked like a barrel of a gun to me.

8   Q.   Okay.  So aside from describing the gun as a

9  little bit of a shine and dark, can you be any more

10 description about -- descriptive about the gun that you

11 saw?

12       MR. GAINER:  Well he also said other things

13 about the gun, but go ahead.  In -- in addition to what

14 you've already said.  Go ahead and answer.

15   A.   No, not in addition to what I've already

16 said.                                        1:14:59

17   Q.   Okay.  So aside from it being dark and a

18 little shiny, can -- can you describe it any further?

19       MR. GAINER:  He already has, so that

20 mischaracterizes his testimony.  Go ahead and answer

21 again.

22   A.   Nothing different.

23   Q.   Other than what?

24   A.   Other than it being barrel of a gun, slightly

25 dark with a shine to it, but not like a polish.

1      Q.   Was it pointed directly at you?

2      A.   Yes.

3      Q.   Okay.  Did he say anything to you?

4      A.   No.

5      Q.   At any point in time, did he -- from the time

6  that he was on the bus stop, on the corner of 65th and

7  Ashland, until he was found nearby the alley, did he

8  say anything to you?

9      A.   No, sir.                              1:15:56

10     Q.   All right.  So he had his arm extended, and

11  what happened after that?

12     A.   It was -- it was -- I like to refer to it as

13  an "oh shit" moment.  He had me.  If -- if -- I call on

14  my radio, I -- I simultaneously get my gun out and grab

15  my radio, and I fired a round in fear for my life --

16          MR. GAINER:  Go ahead.  Keep answering --

17          WITNESS:  Okay.

18          MR. GAINER:  -- while they're talking.  Go

19  ahead.

20     A.   And I called on the radio that he's got a

21  gun, shots fired by the police.

22     Q.   Are you saying that Mr. Raye looked back and

23  kept running as he was pointing the gun?

24     A.   Yes.                                  1:16:57

25     Q.   And you took out your firearm at that point?

Exhibit 5, LLC

1    A.   I did.

2    Q.   All right.  And how many shots did you

3  discharge?

4    A.   One shot.

5    Q.   Okay.  And what happened after you discharged

6  that one shot?

7    A.   He lowered the gun in his arm, and he -- he

8  -- he was still running, continued to run.

9    Q.   Okay.  And he was running with the gun in his

10  hand?

11    A.   Yes, sir.

12    Q.   All right.  And could you continue to clearly

13  see the weapon in his hand the entire time he was in

14  the vacant lot?

15    A.   No.

16    Q.   When did you lose sight of it?

17    A.   When he brought it down.

18    Q.   All right.  So once he had brought it down to

19  his side, you couldn't see it anymore?

20    A.   Yes.

21    Q.   All right.  And while he brought it down to

22  his side, did he continue to run?

23    A.   He did.

24    Q.   Okay.  Did he hold it down at his side?

25    A.   I couldn't see it, so I couldn't tell you

1  what he was -- what he did with it.

2      Q.   You couldn't see what?

3      A.   I couldn't see the gun when he brought it

4  back down.

5      Q.   Was he pumping his arms while he was running?

6      A.   I don't remember.

7      Q.   When you fired your shot, did you stop to

8  fire your shot?

9      A.   I did not.                                    1:18:00

10     Q.   Okay.  So you fired while you were in a full

11 run?

12     A.   Yes.

13     Q.   All right.  And did you continue to run

14 towards him as you fired?

15     A.   Yes.

16     Q.   Okay.  So you didn't stop for cover or

17 anything like that?

18     A.   There was no cover.  There was really no time

19 to stop for cover.  It was a split second decision.

20 There -- there was no time.

21     Q.   Were you still in the mouth of the alley when

22 you fired, or were you in the lot?

23     A.   No, we were about -- about ten feet, roughly

24 ten feet in the lot.

25     Q.   Okay.  So at the time that you fired, you

1   were about ten feet in the lot?

2       A.   Yes.

3       Q.   And he was 20 to 30 feet in front of you?

4       A.   Estimation, yes.

5       Q.   Okay.  And when he turned, after he lowered

6   the gun, did he have his back toward you?

7       A.   He did.

8       Q.   Okay.  Did you fire your gun while he still

9   had the weapon pointed at you?

10      A.   Yes.

11      Q.   Okay.  And what happened next?                1:18:52

12      A.   He continues to run.  He gets closer to the

13  front of the lot, and he just -- this time, not his

14  face, just his arm, just brings his arm back up again.

15  I discharge one more round until the threat, to me, the

16  gun going back down, isn't -- you know, it's not there

17  anymore.

18      Q.   Well -- well how far from the parking lot was

19  Mr. Raye when you fired the first shot?

20      A.   What -- what parking lot?

21      Q.   Like, you described him as 20 to 30 feet in

22  front --

23           MR. GAINER:  Vacant lot.

24      Q.   -- but there's a parking lot to the side,

25  correct, with a fence?

```
 1        A.    Correct.

 2        Q.    Right.  How far from the fence was he when

 3   you fired the first shot?

 4        A.    More towards the south side of the property.

 5        Q.    Okay.  So closer to the house that's on the

 6   side of the property?

 7        A.    Correct.                              1:19:53

 8        Q.    All right.  And would you say that -- when

 9   you say he's closer to the house, how close to the

10   house was he?

11        A.    Maybe a little more than half of the lot.  So

12   if you cut the lot straight in half, he was on the -- a

13   little more over to that side at the first shot.

14        Q.    So about three quarters of the way over?

15              MR. GAINER:  Just object to

16   mischaracterization.  Go ahead.

17        A.    Between half and three quarters.  Somewhere

18   in -- somewhere in there.

19        Q.    Okay.  And when he turned for the second

20   time, how far away from the house was he, about the

21   same distance?

22        A.    A little further, but yes, approximately the

23   same distance.

24        Q.    Was he still in the lot when he turned the

25   second time?
```

1      A.    Yes.

2      Q.    And you never slowed down.  Correct?

3      A.    After the first shot, I did slow down a

4  little bit.

5      Q.    Okay.  You slowed down a little bit?

6      A.    A little bit.

7      Q.    Okay.  But you continued to run after him?

8      A.    I did.

9      Q.    All right.  And when he pointed his arm back

10  at you the second time, can you describe how he did

11  that?

12     A.    So he's still facing forward running, the arm

13  just comes back.

14     Q.    Okay.  But his head doesn't turn around?

15     A.    His head does not turn around.          1:20:57

16     Q.    Okay.  So he's -- he extends his arm

17  backwards in your direction with just his hand, but not

18  his head?

19     A.    Not his head, with the gun in his hand.

20     Q.    His body turns or no?

21     A.    Just enough for the arm to come back.

22     Q.    Okay.  And he's still running?

23     A.    He's still running.  Yes, sir.

24     Q.    Okay.  And he's in a full run?

25           MR. GAINER:  Well object to calls for

1  speculation.  Go ahead.

2        MR. COHEN:  I'll join.

3    A.   He's running.

4    Q.   Okay.  Would you -- I mean, would you

5  describe it as a full run, or did he slow down?

6    A.   He was running the same as if he entered -- I

7  -- I mean me saying, "Full run," I don't know what his

8  -- what a full run to him is, right?  He -- he was

9  running the same speed, distance as when he entered the

10  mouth of the alley, as when he entered the vacant.

11   Q.   Okay.  So from the time that he entered the

12  lot to the time he exited, he never slowed down.

13  Correct?

14   A.   Not to my -- not -- not the way I saw it.

15   Q.   Right.  Okay.  And were you directly behind

16  him, or were you off to the side when he pointed his

17  weapon at you the second time?

18   A.   I was just slightly to the -- would have been

19  to the right of him.

20   Q.   Okay.                                    1:22:05

21   A.   Slightly, so.

22   Q.   And at the second time, were you still 20 to

23  30 feet away from him when he pointed -- when he turned

24  his hand back towards you the second time?

25   A.   May -- a little more.  A little more.

1    Q.   Okay.  How much more?

2    A.   Again, it's -- it's a guesstimation, 30, 40

3 feet.

4    Q.   Okay.  And what happened after he extended

5 his arm the second time?

6    A.   I fired one round, and his hand came down,

7 and he kept going, came out of the vacant lot, made a

8 left heading south, and I lost sight of him at that

9 point.

10    Q.   Okay.  And when you say that he made a left

11 heading south, did he cut left immediately, or did he

12 cross the street first?

13    A.   Cut left.

14    Q.   All right.  So he ran perpendicular up, which

15 would been Marshfield, correct?

16    A.   Yes.                                1:23:05

17    Q.   All right.  And do you know that -- if he was

18 on the sidewalk?

19    A.   I don't know because by the time I came out

20 of the lot, he was just making it across the street in

21 between two cars to get on the west Marshfield

22 sidewalk.

23    Q.   Okay.  So when you exited the vacant lot, you

24 observed Mr. Raye running between two vehicles on the

25 west side of Marshfield?

Exhibit 5, LLC

1    A.   Yes.

2    Q.   All right.  And where were those two vehicles

3 located on Marshfield?

4    A.   Maybe two houses to the south of -- of the

5 vacant lot.

6    Q.   All right.  And did he get up on the

7 sidewalk?

8    A.   Yes.                              1:23:57

9    Q.   Okay.  And which direction did Mr. Raye go

10 next?

11    A.   He went south on the sidewalk.

12    Q.   So he ran south on the sidewalk at that

13 point?

14    A.   Correct.

15    Q.   And the entire time that you observed him,

16 from when you came out of the mouth of the alley, was

17 he continuing to run at approximately the same speed

18 you had seen him run through the vacant lot?

19         MR. GAINER:  Just object to form.  Go ahead

20 if -- if you understand.

21    A.   I can't say because I wasn't behind him when

22 he was crossing -- when he had made it across.

23    Q.   Right, but when you saw him, was he still

24 running at the same speed when you saw him?

25    A.   I can't say.  He was -- he was just running.

```
 1   I -- I can't say if he was running at the same speed at

 2   that time.

 3       Q.   Well did he appear to you to be running any

 4   slower or faster than the speed at which he ran through

 5   the vacant lot?

 6           MR. COHEN:  Objection.  Form.

 7           MR. GAINER:  Go ahead.

 8       A.   I -- I really can't say.  I don't -- I don't

 9   know.

10       Q.   All right.  So he turned west and ran up the

11   sidewalk.  Correct?

12       A.   Yes.                              1:25:13

13       Q.   Okay.  When you saw him running between the

14   cars, did you still see the weapon in his hand?

15       A.   I could not.

16       Q.   Okay.  So could you see that there was no

17   weapon in his hand at that point?

18       A.   I could not.

19       Q.   So you couldn't -- is -- was it too dark to

20   see his hands?

21       A.   I just didn't see -- I -- I couldn't see his

22   hands.  He was running.  I couldn't see his hands.  He

23   had made it across, and I was just crossing.  I

24   couldn't see his hands.

25       Q.   Why -- why couldn't you see his hands?
```

     A.   He was ahead of me.  I would assume because

he was -- his hands were in front of him while he was

running.

     Q.   Well when you came out in -- from the vacant

lot, you could see him at an angle.  Correct?

     A.   I am between -- he had just gotten to -- like

passed in between the cars, yes.

     Q.   And at some point, you made a bunch of radio

calls about the shootings that had happened.  Correct?

     A.   Correct.                                    1:26:07

     Q.   When did you make those calls?

     A.   One was in the vacant lot after my first

shot.  The second -- I believe the second call was at

6524 South Marshfield.  I think there was an original

call, maybe call one was running westbound.

     Q.   Westbound on Ashland?

     A.   On -- from --

          MR. GAINER:  No.

     Q.   65th, sorry --

     A.   65th, westbound 65th.

     Q.   I -- I'm not trying to trick you on the

street --

     A.   I know you're not.

     Q.   -- confused.

     A.   I know.

Exhibit 5, LLC

```
 1        Q.   So -- so call one was the suspect's running
 2   westbound on 65th Street.  Correct?
 3        A.   Correct.
 4        Q.   And then call two would have been while you
 5   were in the vacant lot?
 6        A.   Correct.                               1:26:58
 7        Q.   And you would have been announcing that you
 8   had shot --
 9        A.   Discharged.  That he had a gun and I had
10   discharged my weapon.
11        Q.   Would you have done that before the -- after
12   the first or the second shot?
13        A.   I think I did it either simultaneously or --
14   or right after my -- my first shot.
15        Q.   Okay.  And you continued to pursue him as he
16   ran westbound -- not westbound.  You continued to
17   pursue him as he ran down Marshfield.  Correct?
18        A.   I did.
19        Q.   All right.  And he would have been running in
20   which direction down Marshfield?
21        A.   South.
22        Q.   All right.  And at some point -- did you ever
23   see his hands again after he left the vacant lot?
24        A.   I did.
25        Q.   Okay.  When did you see his hands again?
```

```
 1       A.   When he got to 6524, as he makes a right hand

 2  turn to head west down that gangway.  As he's making

 3  his turn, he comes up with his hand like this.  At that

 4  time --

 5           MR. GAINER:  Can you just -- just when you

 6  say, "Like this" --

 7           WITNESS:  Yeah.

 8           MR. GAINER:  -- can you explain what that is?

 9           WITNESS:  Oh, sure.                     1:28:12

10       A.   An over the shoulder motion.  At that time, I

11  only saw his hand -- his -- his arm, and I dove into

12  some bushes.

13       Q.   You dove into the bushes?

14       A.   Yes.

15       Q.   Okay.  So I -- I just want to go back.  So

16  while he was running down Marshfield, you don't know

17  whether he had a weapon in his hand --

18       A.   I don't.

19       Q.   -- or not, right?

20       A.   I don't.

21       Q.   Okay.  And then he cuts into a gangway at

22  6527 South Marshfield.  Do I have that right?

23           MR. GAINER:  No.  That mischaracterizes his

24  testimony.  Go ahead.

25       A.   At 6524, at the southwest corner of the
```

1  property, he -- he goes to make a right hand turn down

2  the gangway, and that's when he brings his right arm

3  over his shoulder.

4      Q.   So it was -- it was 6524.  I wrote it down

5  wrong.  Sorry.  At 6524 South Marshfield, he cuts down

6  the gangway on the southwest corner of the property?

7      A.   Correct.                                    1:29:14

8      Q.   All right.  And that's when he makes this

9  overhand motion?

10     A.   Prior to making the turn, he makes the

11 overhand motion.  Correct.

12     Q.   And can you describe the overhand motion that

13 he makes?

14     A.   Yes.  He takes his -- his full arm, extended

15 out, and he comes around, as I'm demonstrating.

16     Q.   Okay.  So when you say that -- and as you're

17 demonstrating it, when you say that he comes around,

18 you mean that he extends his hand forward, and then

19 comes around, meaning that he raises his arm upward and

20 behind him?

21     A.   In one -- in one motion, he just comes

22 around.

23     Q.   And -- and which direction was he facing when

24 he made that motion?

25     A.   He is facing -- he is just getting ready to

Exhibit 5, LLC

1  make his turn into the gangway.

2      Q.   Okay.  Did he stop to make that motion?

3      A.   Yes.

4      Q.   Okay.  And so he was facing westbound?

5      A.   No, he was facing southwest.          1:30:06

6      Q.   Okay.  So he was facing southwesterly when he

7  made that motion?

8      A.   Yes.

9      Q.   Okay.  And did you see him throw the gun at

10 that point?

11     A.   No.

12     Q.   All right.  So was he pointing his hand back

13 towards you again?

14     A.    I -- I didn't get that far because there were

15 civilians in between us, and I had -- I had been

16 yelling to civilians to get down, that he had a gun,

17 and I believe it was a male and a female between us,

18 and then another male had run -- had -- was on the side

19 of the porch, so I had my gun out.  I -- I couldn't

20 discharge a round, I couldn't -- you know, at that

21 point, it was just I was yelling for everybody to get

22 out of the way, and the easiest cover that I found, as

23 soon I saw his hand coming around, was a bush, and I --

24 I dove in -- I dove into the bush.

25     Q.   Okay.  Where -- where was the bush located

1 that you dove into?

2    A.   One house to the north of 6524.

3    Q.   All right.  And was it on -- like, it was in

4 a bush on the property itself?

5    A.   Adjacent to the sidewalk.

6    Q.   Okay.  Like, what is that area called between

7 sidewalk and a street?  The --

8          MR. GAINER:  Parkway.               1:31:16

9    Q.   The parkway.  Is it on a parkway?

10    A.   No, it was on the property.

11    Q.   Okay.  So when he made this overhand motion

12 that you described, you didn't see a weapon in his

13 hand?

14    A.   I did not.

15    Q.   Okay.  And you didn't see a weapon leave his

16 hand, correct?

17    A.   I did not.

18    Q.   All right.  And after you dove into the bush,

19 what did you do next?

20    A.   I looked to see where he went.  He went down

21 the gangway.  I got back up, I peeked around the corner

22 with my weapon.  I stopped to take a breath, to look at

23 the address, so I can relay the information.  I asked

24 the three civilians who were standing there, you know,

25 "Marshfield or Paulina?  Marshfield or Paulina?"  And

1    they did not respond, but it dawned on me that it was

2    Marshfield because Paulina's next.  I called it over

3    the radio, and then I proceeded to slowly go up the

4    gangway to the -- straight through the alley.

5        Q.   Now the individuals on the porch, they didn't

6    tell you what street --

7        A.   No.

8        Q.   -- you were on?  Okay.  And did they respond

9    to you at all when --

10       A.   No.

11       Q.   -- you asked?

12       A.   No.

13       Q.   You gotta wait until the question is over.

14       A.   Sure.                                    1:32:20

15       Q.   So the civilians didn't respond to you at all

16   when you asked what street you were on?

17       A.   They did not.

18       Q.   All right.  And then you proceeded slowly up

19   the gangway?

20       A.   Correct.

21       Q.   Okay.  Was it dark?

22       A.   It was.

23       Q.   Were there any lights in the gangway?

24       A.   Not that I remember, no.

25       Q.   All right.  And the gangway that you headed

 1    up, was it -- was there, like, an open area in the

 2    front of the house, or was it a very narrow gangway as

 3    we're accustomed to seeing in city of Chicago streets?

 4         MR. GAINER:  Object to form.  Go ahead.  Go

 5    ahead and answer.

 6       A.   It was a standard gangway on --

 7         MR. GAINER:  Bless you.

 8         MS. MAISURIA:  Bless you.

 9         MR. COHEN:  Thank you.

10       A.   It was just a -- it was standard gangway.  It

11    was a standard gangway, and I think there was a --

12    there was an opening to go down into the basement about

13    halfway through the -- halfway down the gangway.

14       Q.   So the -- the -- the entrance that you would

15    have made would have been where there was two houses

16    that were, let's say, within a few feet of each other

17    that opened up into the gangway, right?

18       A.   Yes.                              1:33:18

19       Q.   Okay.  All right.  Then you would have

20    proceeded between those two houses all the way to the

21    back of the property?

22       A.   Yes.

23       Q.   All right.  And when you exited the gangway,

24    what did you see?

25       A.   Do you mind if we stop there so I can use the

1  bathroom?

2      Q.   Sure.

3      A.   Yeah, thank you.

4          RECORDER:  Off the record, 11:58 a.m.

5                  (Off the record)

6          RECORDER:  Back on the record, 12:10 p.m.

7      Q.   So I -- I just want to go back and ask you

8  some questions about the -- the -- the -- when he's in

9  the vacant lot pointing the gun, right?  Did you see

10  where he took the weapon from when he took it out of

11  his pocket?

12     A.   I did not.

13     Q.   And -- and --

14         MR. GAINER:  Did you see that what -- wait a

15  minute.  It mischaracterizes his testimony that he took

16  it out of his pocket.  That's your testimony, not his,

17  so I object to that.

18         MR. COHEN:  Join.

19     Q.   Well did -- did -- did you see him take the

20  weapon out from anywhere?

21     A.   I did not.

22     Q.   Okay.  So when you came around the corner and

23  entered the lot, he already had the weapon out?

24     A.   Yes.

25     Q.   All right.  And when he had the weapon out,

1  could you see it right away, or did you see it -- or

2  was it pointed at you right away?

3      A.   He was coming up with his arm when I first

4  saw him.

5      Q.   Okay.  So you saw the weapon being raised?

6      A.   Correct.

7      Q.   Okay.  And this was while he was in a full

8  run, correct?

9      A.   Well he was running, correct.

10     Q.   Right.  And he -- and the weapon was being

11  raised behind him, and he was looking at you at that

12  point, correct?

13     A.   Yes.

14     Q.   All right.  And did you ever see the profile

15  of the weapon, or was it just straight out?

16         MR. GAINER:  Object to form.  Go ahead.

17     A.   Just -- just straight up.

18     Q.   All right.  And then he turned -- you shot at

19  him, right?  And -- did he turn --

20         MR. GAINER:  Wait a minute, wait a minute,

21  wait a minute, wait a minute.  He asked you a question,

22  you gotta answer out loud.

23         WITNESS:  Yeah.

24         MR. GAINER:  So the question was, "You shot

25  at him, right?"

     A.   When he raised the weapon, I discharged my

weapon once.

     Q.   All right.  And -- and would -- did you take

your weapon out when you saw the weapon in his hand?

     A.   I took my weapon out, yes, when I first saw

the weapon in his hand.

     Q.   Okay.  And prior to that, you didn't have

your weapon out, correct?

     A.   No.                                    1:35:20

     Q.   All right.  And when he -- and after you

discharged your weapon one time, that -- is that when

he turned and continued to run through the vacant lot?

     A.   Yes.

     Q.   All right.  And you continued to see the

weapon in his hand as he was running through the vacant

lot, correct?

          MR. GAINER:  That mischaracterizes his

previous testimony.  Go ahead.

     A.   No, I think I already -- I -- I think I told

you that I did not see it again until he raised it the

second time.

     Q.   Okay.  So between the -- the first time he

raised his arm and the second time he raised his arm,

you lost sight of the weapon?

     A.   Yes.

1    Q.   But when he raised it the second time and

2  wasn't looking at you, you could see the weapon again,

3  correct?

4    A.   Correct.

5    Q.   All right.  And after he continued to run,

6  did you see him put the weapon in his pocket?

7    A.   No.

8    Q.   Okay.  So he continued to run with the weapon

9  out, as far as you know?

10   A.   I --

11        MR. GAINER:  Object to form.  Calls for

12  speculation.  Asked and answered.  Go ahead.

13        MR. COHEN:  Join.

14   A.   I would assume so.  I -- I don't know what he

15  did with it.

16   Q.   All right.  So I'm going to go back to when

17  you come out of the gangway on the other side of 6524

18  South Marshfield, okay?

19   A.   Okay.                            1:36:31

20   Q.   When you came out of the -- between the two

21  houses, what happened?

22   A.   In the alley, either right near the gangway

23  or a little bit to the -- to the north in the alley,

24  there was a jacket matching the -- the description of

25  the original call, the one Mr. Raye was wearing while I

1  chased him.  It was presumably his jacket laying there.

2  It was the jacket and the hoodie, I think.

3      Q.    Okay.  And where was it laying exactly?

4      A.    In the middle of the alley.

5      Q.    Okay.  Directly out of the gangway?

6      A.    Somewhere in that general area.  Right after

7  the gangway, where you exit the property, maybe a

8  little bit north of there.

9      Q.    Okay.  And was it -- it was directly in the

10  middle of the alley?

11          MR. GAINER:  Asked and answered.  Go ahead.

12     A.    Yeah, I think it was directly in the middle

13  of the alley.

14     Q.    Okay.  So to be clear, it was directly in the

15  middle of the alley a little bit north of the gangway

16  where he had run through, correct?

17     A.    If my recollection suits me, yes, that's --

18  that's where I believe it was.

19     Q.    Okay.  And what happened after you saw the

20  jacket?

21     A.    I scanned around to see if I saw anybody.  I

22  saw a car, a beat car on 65th, I saw officers on 66th.

23  I quickly picked up the jacket, I patted the jacket

24  down looking to see if the weapon was in the jacket,

25  and two officers came up.

1    Q.   Okay.  So when you were in the alley, you

2  picked up the jacket, and you felt for the weapon?

3    A.   Yes.                                    1:38:13

4    Q.   Okay.  And did you feel anything in the

5  jacket at that --

6    A.   I did not.

7    Q.   -- time?  Okay.  And what happened after the

8  officers came up?

9    A.   When you said -- I should say -- when you say

10  did I feel anything in the jacket, I did not feel a

11  bulge of a gun.  That's what I was looking for.  I

12  wasn't looking for anything else.

13    Q.   But you -- but -- but you didn't feel

14  anything, correct?

15    A.   No, I just felt the jacket.

16    Q.   Right.

17    A.   Yeah.

18    Q.   And when you felt the jacket, you didn't feel

19  anything inside the jacket, correct?

20    A.   No, I -- again, I was only focused on looking

21  for a bulge for a gun.

22    Q.   I understand that you were focused on looking

23  for it, but --

24    A.   Right.

25    Q.   -- I'm asking when you felt the jacket, if

1   you felt anything, and I'm just confirming that when

2   you felt the jacket --

3        A.   Yeah --

4        Q.   -- you didn't feel anything?

5        A.   Nothing but the jacket, like, the curvature

6   of the jacket that --

7        Q.   All right.

8        A.   Okay.

9             MR. KOSOGLAD:  Go on.

10            MR. GAINER:  Wait, wait.  Why don't you ask a

11  question now?

12            MR. KOSOGLAD:  Sure.

13       Q.   So -- so who were the officers who approached

14  you?

15       A.   I believe it was Lucki and Turner.

16       Q.   And do you know what beat they are?

17       A.   They are 706 beat.  I don't know beat they

18  were that night.

19       Q.   All right.  And what happened when they

20  arrived?

21       A.   We kind of scanned around to see -- I -- we

22  talked about -- I believe we talked about, like, well

23  if they came up -- if they came up from 66th, they

24  didn't see him running that way.  There was a fence,

25  there was a locked fence, I think, directly in front of

1   us.  He -- you know, we were, like, easiest path.  We

2   saw an open fence a little further north of the gangway

3   and where the jacket was, no garage, looked like a

4   vacant, and we decided to go check that out.

5       Q.   Okay.  So were you having a conversation

6   about which direction the suspect fled?

7       A.   Yes, yes.                                    1:39:45

8       Q.   All right.  And you concluded together that

9   he probably went through that fence?

10      A.   Through that yard.

11      Q.   Yeah.

12      A.   There was no fence there.

13      Q.   Sorry.

14      A.   It's open.

15      Q.   You -- you -- after your conversation, the

16  three of you concluded he likely went through that

17  yard?

18      A.   Yes.

19      Q.   And did the three of you then proceed to that

20  yard?

21      A.   Yes.

22      Q.   And what happened?

23      A.   There was a back door.  I believe it was a

24  white door ajar, open, so I was going to go into the

25  house.  It was a vacant, and I asked -- I -- I directed

1  them to go to the front of the house, one to cover me

2  on the side and one to go to the front of the house.

3  By the time I got to the front door, one of the

4  officers, I -- I don't know if it was Lucki or Turner

5  said, "Serg, we got him.  He's over here."

6      Q.   Okay.  You don't know which officer told you

7  that?

8      A.   I -- I don't.  I don't.

9      Q.   All right.  And what happened after they

10  said, "We got him, he's over here"?

11      A.    I come around from the back door just

12  straight south and then west on the property, and I

13  ask, "Did you guys find the gun?"  There was an officer

14  talking to him.  It wasn't Lucki or Turner, they were

15  standing next to me.  They said, "No."

16      Q.   So when you got to the side --

17          MR. GAINER:  Hold on, were you finished with

18  your answer?

19          WITNESS:  No, but --

20          MR. GAINER:  Okay.  I -- I just ask that he

21  be allowed to finish his answer before you start --

22      Q.   I'm not -- I wasn't trying to interrupt you.

23  The question was --

24          MR. GAINER:  Well you did interrupt him, so

25  I'm just saying --

1     Q.   The question was what happened next?  And I

2  -- there was a natural pause in your -- your dialogue

3  here, so.

4          MR. GAINER:  I would just ask that the

5  witness be allowed to finish his answer before you

6  start your next question.  I think that's probably

7  common courtesy in a deposition.

8          MR. OPPENHEIMER:  Okay.  Officer, finish your

9  -- finish your answer.

10     A.   So I asked if they had found a gun, they

11  said, "No, somebody said he's shot."  I got on --

12  immediately on the radio and ordered EMS for him, and I

13  ordered one of them to handcuff him.

14     Q.   Okay.  So when you went -- were you done?

15  Okay.

16     A.   Counselor, please.

17     Q.   When -- when -- when you -- when you -- well

18  I didn't want to interrupt you again.  When -- when you

19  --

20          MR. GAINER:  I don't think that's --

21     Q.   When you --

22          MR. GAINER:  -- necessary at all, to --

23     Q.   When you finish the --

24          MR. OPPENHEIMER:  Move on.                    1:41:50

25     Q.   When you finished the -- the -- when you came

1  around the side of the house, there were three officers

2  present?

3       A.   Three officers and one officer in the gangway

4  further up towards the front of the house.

5       Q.   Okay.  So there were four officers?

6       A.   Yes.

7       Q.   All right.  And you said that the officer --

8  there was -- was there an officer talking to Mr. Raye?

9       A.   There was.

10      Q.   Okay.  Who was that?

11      A.   I don't know.

12      Q.   And who was the fourth officer further up the

13  gangway?

14      A.   I don't know.

15      Q.   All right.

16      A.   They weren't from our unit.  I -- I don't

17  know.

18      Q.   All right.  And then somebody said, "He's

19  shot"?

20      A.   Correct.

21      Q.   Do you know who said that?

22      A.   I don't.

23      Q.   Okay.  And you order EMS right away?

24      A.   I did.

25      Q.   And who did you order to handcuff Mr. Raye?

1     A.   I don't -- I -- I -- I don't know who

2  handcuffed him.  I just said, "Cuff him."

3     Q.   All right.  And was Mr. Raye saying anything

4  at that point?

5     A.   Not that I can remember.

6     Q.   Okay.  Was he conscious?

7     A.   He was conscious.

8     Q.   All right.  When you say -- do -- do you know

9  whether he was saying anything at all, or you just

10  don't remember what he was saying?

11     A.   No, he was say -- he was having a

12  conversation with the officer that was on the ground

13  with him.

14     Q.   Okay.  So he was talking to the officer who

15  was on the ground with him?

16     A.   Yes.

17     Q.   Could you hear what they saying?

18     A.   No, I -- I -- I could not.

19     Q.   All right.  What happened next?

20     A.   I ordered them to cuff him because I was

21  focused on the weapon.  We had EMS coming.  I then -- I

22  said to stay with him until EMS gets there.  Somebody

23  was going to go to the hospital with him.  I went back

24  to start retracing my steps since the gun had not been

25  recovered, and I went back towards the alley.  There

 1  was an officer with the jacket, I believe.  I don't

 2  know who that officer was, and because we -- we told

 3  him -- we told an officer to stay with the jacket

 4  because it was evidence.  I walked back up the gangway,

 5  I flashed my flashlight down that little, like,

 6  basement crevice where you would enter the basement

 7  apartment.  I get to the front of the house.  At that

 8  point, my captain is coming.  We meet at the front of

 9  the house.

10      Q.   All right.  So can you describe the officer

11  who was talking to Mr. Raye?

12      A.   Only -- he was in uniform, African American.

13  I mean, he -- he was crouched down.  Maybe a little

14  heavy set.

15      Q.   Any other description you can give?

16      A.   No.                                    1:44:15

17      Q.   And can you describe the officers coming up

18  the gangway?

19      A.   He wasn't -- there wasn't an officer coming

20  up the gangway.  There was an officer in the gangway,

21  towards the front of the house.

22      Q.   Can you describe that officer?

23      A.   I think he was Caucasian.

24      Q.   Can you describe him any further?

25      A.   I can't.

1    Q.   And can you describe the officer who was

2  guarding the sweatshirt or the jacket?

3    A.   I can't.

4    Q.   Okay.  All right.  And when you -- your

5  captain arrived, you said.  Who was that?

6    A.   Randall Darlin.

7    Q.   Okay.  And when Captain Darlin arrived, what

8  happened next?

9    A.   He asked me to -- he asked me if I was okay,

10 if I needed medical attention.  I was -- I was heavy

11 breathing, worked up, and he asked me if we had found

12 the gun.  I said, "No."  He said, "Okay.  Let's retrace

13 your steps."  I said to him -- he asked -- he might

14 have asked me if -- if I saw him throw the gun.  I

15 said, "I didn't."  I said, "The only -- the only time I

16 saw any type of movement that might have been that he

17 could have thrown something was when we came to the

18 corner of 6524, that -- that -- the corner of the house

19 right there when I dove into the bushes."  He asked me

20 to walk him through -- retrace my steps, just retrace

21 the steps.  He called my lieutenant to bring a car to

22 the mouth of the alley, maybe behind the church, and he

23 sat me in the car.

24   Q.   All right.  So in the conversation with your

25 captain, he -- he asked you if you'd found the gun?

1    A.   Yes.                                    1:45:55

2    Q.   Okay.  Did you tell him that he had a gun?

3    A.   I believe so.

4    Q.   Okay.  So prior to him asking you if you

5 found the gun, can you describe what you told the

6 captain?

7    A.   That we had him in custody, that he was on

8 the Paulina side, that Lucki and Turner were with him,

9 and that's when he asked, "Did you -- did you find the

10 gun?"  I believe.

11   Q.   Okay.  But at some point, did you describe

12 the fact that he had pointed a weapon at you?

13   A.   Yes.

14   Q.   Okay.  When was that?

15   A.   When we were walking through -- through the

16 gangway.

17   Q.   Okay.  And what did you tell him --

18   A.   Not the gangway, I'm sorry.  When we were

19 walking through the vacant -- through the vacant.

20 Just, again, broad strokes that he pointed a gun twice

21 at me, I discharged two rounds.

22   Q.   All right.  And when you say you were walking

23 through the vacant lot, that would have been after the

24 conversation you had in front of the gangway, correct?

25   A.    In front of 6524, yes.

Exhibit 5, LLC

1    Q.   Right.  So do -- do you know how the captain

2  knew that the individual had a weapon?

3    A.   From my radio transmission.

4    Q.   Okay.

5    A.   Yeah.

6    Q.   And did he tell you that he was monitoring

7  the radios?

8    A.   He wouldn't have to tell me.  The captain

9  monitors the radio.

10    Q.   So he -- he -- he just -- he just immediately

11  asked you, "Did you find the gun?"

12    A.   Yes.                                    1:47:17

13    Q.   All right.  And you told him no?

14    A.   Yes.

15    Q.   All right.  And then you retraced your steps?

16    A.   Yes, we retraced our steps.

17    Q.   Okay.  Which means that you walked down

18  Marshfield towards the vacant lot?

19    A.   Yes.

20    Q.   Okay.  And then did you go through the vacant

21  lot?

22    A.   We went through -- we went through the vacant

23  lot, yes.

24    Q.   Right.  And during that conversation with the

25  captain, if he asked you if he saw -- throw the gun,

1    and you told him no, you just saw the overhand motion,

2    correct?

3        A.    Correct.

4        Q.    Do you know what that overhand motion was?

5        A.    I don't.

6            MR. GAINER:  Just object to foundation.  Go

7    ahead.                                              1:47:48

8        Q.    Did -- so -- okay.  So you said the only

9    thing that you can think of was the overhand motion?

10       A.    Yes.

11       Q.    All right.  And you continued to -- what did

12   you talk about when you walked down Marshfield?

13       A.    Just the -- the path.  There wasn't -- we

14   didn't -- we didn't talk about much.  Just the -- the

15   path that he -- that I believed Kajuan Raye took.

16       Q.    All right.  And what did you talk about when

17   you walked into the vacant lot?

18           MR. GAINER:  Asked and answered.  Go ahead.

19       A.    Just the broad strokes of within the lot, he

20   pointed the gun at me two times, I discharge my weapon

21   two times.

22       Q.    All right.  And did you show him where these

23   things occurred, or was it just the broad strokes --

24       A.    No, it -- it really was just the broad

25   strokes.

1    Q.    Okay.  And then he ordered a car and put you

2  in it?

3    A.    Yes.                                    1:48:39

4    Q.    Okay.  Did anyone advise you to contact the

5  FOP?

6    A.    No.

7    Q.    Okay.  Did you contact the FOP?

8    A.    I wouldn't contact the FOP.

9    Q.    What's the sergeant's union?

10   A.    The PBPA.

11   Q.    Did you contact them?

12   A.    I -- I did not.  I think --

13   Q.    Okay.

14   A.    -- somebody did.  I did not.

15   Q.    Right, and do you know who that person was

16 who contacted them?

17   A.    I don't.

18   Q.    And is it your experience that after a police

19 involved shooting, somebody usually contacts the police

20 union?

21   A.    Yes, immediately.

22   Q.    All right.  And at some point, did

23 representatives from that union arrive at the scene?

24   A.    The president, Jim Ade, arrived on the scene.

25   Q.    Okay.  And when did that happen?

     A.   Sometime later.  I was still in the car in

the alley.  I -- I -- I don't know how much -- how much

later.

     Q.   The conversation that you had with the

captain at the -- at the mouth of the gangway, did that

-- was that just a couple minutes?

     A.   Yeah.                                    1:49:25

     Q.   All right.  And the conversation that you had

in the vacant lot, was that, like, less than a minute?

     A.   About the distance it took, yes, it was

probably less than a -- maybe two minutes tops to walk

through the lot.

     Q.   Yeah.  And then how long were you in the car

for before the president arrived?

     A.   I don't know.  I was -- I really had no

concept of time, to be honest with you, because of the

nature of the incident.  I mean, it -- it was highly

volatile, shock.  I don't know how long I was in the

car.

     Q.   Did you have your phone with you?

     A.   I did have my phone with me.

     Q.   Did you contact anyone?

     A.   I did not.

     Q.   You didn't call anyone?

     A.   No.

1     Q.   Did you text anyone?

2     A.   No.                              1:50:04

3     Q.   Okay.  And so you just sat in the car and

4 waited?

5     A.   Yes.

6     Q.   Okay.  And at some point, the president

7 arrived?

8     A.   Yes.

9     Q.   And again, you said you don't know how long.

10 Was it, like, within an hour?

11    A.   It could have been within the hour.

12    Q.   Okay.  Would it have been in minutes or

13 longer?

14    A.   No, no, it was with -- within an hour.

15    Q.   Okay.  And was he the first person you talked

16 to after the -- talking to your captain?

17    A.   No, Tim Wolf, my lieutenant in the car.

18    Q.   Sorry, the lieutenant was in the car with

19 you?

20    A.   Yes, sir.

21    Q.   Did you talk to the lieutenant in the car

22 while you were waiting for --

23    A.   Yes.

24    Q.   Okay.  And what did you talk to the

25 lieutenant in the car about?

1    A.   He just inquired about how I was feeling, if

2  I -- if we need to get to the hospital, we talked about

3  our families.  Really, he's a -- I think I said this

4  before too, he -- he's a good lieutenant, and he's been

5  in IAD, and he was -- he -- he knows procedure, and we

6  did not discuss whatsoever this incident.

7    Q.   Okay.  When you say he knows procedure and

8  you didn't discuss this incident, what -- what's your

9  understanding of that?

10        MR. GAINER:  Just object form.  Go ahead.

11        MR. COHEN:  Join.

12    A.   That once you're involved in a shooting, all

13  communication stops.

14    Q.   Okay.  And do you know why that is?

15        MR. GAINER:  Foundation.  Form.  Go ahead.

16        MR. COHEN:  Join.

17        MR. GAINER:  Go ahead.

18    A.   Because your -- your first statement should

19  be to an investigator, whoever that investigator would

20  be.

21    Q.   Okay.  Was your first statement in this case

22  to an investigator?

23    A.   My first statement was to the initial OCIC,

24  which was Deputy Chief Watson.

25    Q.   Okay.  And that would be aside from the

 1  statement you made to your captain, right?

 2      A.   Correct.                                1:51:46

 3      Q.   All right.  Did you give your statement to

 4  the deputy chief before the union representative

 5  arrived?

 6      A.   No, no, after.

 7      Q.   And when the lieutenant asked if you were

 8  okay, do you need to go to the hospital, you told him

 9  you're fine and you don't need to go?

10      A.   I told him that aside from the cuts and

11  bruises and -- I could wait until they were certain

12  that nobody else wanted to wait for me.

13      Q.   Okay.  Well let me just be clear, what --

14  what did you tell the lieutenant about your injuries?

15      A.   I had scraped my arm, my -- my two knees, and

16  that I could wait until they needed to -- to -- if

17  anybody else needed to talk to me, I can wait and then

18  he could take me.

19      Q.   Okay.  Take you where?

20      A.   To the hospital.

21      Q.   I see.  And did you tell lieutenant -- the

22  lieutenant anything else?

23      A.   I don't believe so.                     1:52:47

24          MR. GAINER:  Other than -- that

25  mischaracterizes his testimony to the extent that he

1  already told you what he told the lieutenant.  Go

2  ahead.

3       Q.  Did you -- did you tell the lieutenant

4  anything else about any subject matter aside from your

5  injuries?

6            MR. GAINER:  Asked and answered.  He's

7  already testified to that.  Go ahead and tell him

8  again.

9       A.  We talked about my mental health, my

10  condition.  We talked about our families.  That's it.

11      Q.  What did you --

12      A.  Very little.

13      Q.  -- tell him about those things?

14           MR. GAINER:  Well in terms of what he said

15  about his family is -- if it calls for identifying

16  family members, he's not going to testify to that.

17      Q.  Yeah.  Without identifying your family,

18  obviously, what did you tell him about things, like,

19  that you spoke to at the time?

20      A.  That I would call my wife when this was all

21  over with, that they were sleeping, that's -- that's

22  about it.

23      Q.  Did you tell him anything about your mental

24  health?

25      A.  I don't think so.

1      Q.    Okay.  Aside from what you've already

2  testified to, did you tell the lieutenant anything

3  else?

4      A.    I don't believe so.

5      Q.    All right.  And then the union representative

6  arrived.  Correct?

7      A.    Correct.                                1:53:47

8      Q.    All right.  And I believe you said it was the

9  president of the union?

10     A.    Yes.

11     Q.    Okay.  And did you talk to him about the

12 shooting?

13     A.    He knocked on the window, I rolled the window

14 down.  He told me that somebody would be coming out

15 from the union, that he was out to dinner with his wife

16 and that he -- he wasn't going to be the union rep for

17 the shooting scene.  I said, "Okay."  He said, "Do you

18 want to me call anybody, John?"  I said, "No, I got

19 it," and he said, "Okay," and he left.

20     Q.    And was that the extent of your conversation

21 with the president of the union?

22     A.    That's it.

23     Q.    All right.  At what point did the union rep

24 arrive?

25     A.    I never saw the union rep.

1     Q.   Okay.  So at the scene of the shooting, you

2 never saw the union rep?

3     A.   No.

4     Q.   Did you ever see the union rep at any time?

5     A.   Maybe at the area.  Maybe towards the tail

6 end before I was getting ready to go at the area.

7     Q.   Well if you say -- because you say, "Maybe,"

8 did you see them, or you think you --

9     A.   I -- I don't remember.  I don't remember.

10     Q.   Okay.  So you don't remember whether you saw

11 the union --

12     A.   No.

13     Q.   -- rep?

14     A.   No.

15     Q.   All right.  Okay.  So going back, it's --

16 what was the next person you talked to after the

17 president of the union arrived?

18     A.   Went to the hospital, talked to the doctors.

19 Left the hospital within 30 to 45 minutes, went to the

20 area south, and I believe I was ordered to do my TRR

21 and OBR by either the deputy or Captain Darlin.

22     Q.   Okay.  And what -- what did you tell the

23 doctors about how you got your injuries?

24     A.   I think I said I was chasing a bad guy and --

25 and fell down.

```
 1       Q.   Okay.  Did you tell them you dove into a
 2  bush?
 3       A.   I don't remember.
 4       Q.   All right.  So aside from telling anybody you
 5  fell down, do you remember anything else you told them
 6  about how you got your injuries?
 7       A.   That's all I would have told them.
 8       Q.   Okay.  And to be clear, the -- the time that
 9  you fell down was when you -- you dove into the bush?
10       A.   Yes.                              1:55:42
11       Q.   Right?
12       A.   Yes.
13       Q.   Okay.  So -- and in fact, when you dove into
14  the bush, that's how you got the injuries that you
15  described previously?
16            MR. GAINER:  Asked and answered.  Go ahead.
17       A.   Correct.
18       Q.   All right.  Okay.  So did they give you any
19  medical treatment at the hospital?
20       A.   They did.
21       Q.   What did they do?
22       A.   They bandaged me up, put some ointment on the
23  cuts on my knees, and on my hand, and on my thumb,
24  asked if I had gotten a tetanus shot, I think I said I
25  had fairly recently, and then discharge me.
```

1    Q.   Okay.

2    A.   They wanted to give me pain meds too, but I

3 -- I -- you know.

4    Q.   What did they give you -- where did they

5 apply bandages?

6    A.   I think on my hand, my thumb, and one of my

7 knees.

8    Q.   And then you went back to the area?

9    A.   Went back to the area.

10    Q.   Okay.  And somebody ordered you to complete

11 paperwork?

12    A.   Yes.               1:56:42

13    Q.   All right.  And who did that?

14       MR. GAINER:  Asked and answered.  Go ahead.

15    A.   I believe it was either Captain Darlin or

16 Deputy Chief Watson.

17    Q.   All right.  And did you complete the

18 paperwork that you were ordered to complete?

19    A.   I did.

20    Q.   All right.  And did you complete that

21 paperwork by yourself, or did you have assistance?

22    A.   By myself.

23    Q.   All right.  So you filled out all of the

24 paperwork?

25    A.   I did.

1    Q.   All right.  And did you sign and submit that

2  paperwork?

3         MR. GAINER:  I didn't hear the question.

4    Q.   Did you sign and submit that paperwork?

5    A.   I -- I -- well electronically signed with my

6  PC number.

7    Q.   What happened after you signed and submitted

8  your paperwork?

9    A.   It was just more sitting around, waiting for

10 IPRA or any other investigator who might have wanted to

11 talk to me for the night.

12   Q.   Okay.  Did you talk to anyone else at the --

13 about the shooting at that point?

14   A.   At that point, no.

15   Q.   Okay.  So while you were waiting, you didn't

16 speak to anyone about the shooting?

17   A.   No, Lieutenant Wolf, I believe, sat with me

18 the whole time.

19   Q.   All right.  And what did you guys talk about?

20   A.   Nothing really.

21   Q.   Okay.  You didn't speak at all?

22   A.   No, I -- I -- I was -- I was in shock.

23   Q.   Okay.  You were in shock?

24   A.   I believe so.

25   Q.   Did you tell the doctors at the hospital you

1  were in shock?

2      A.    I don't remember.  I don't think so.

3      Q.    All right.  So who was the next person you

4  talked to about the shooting?

5      A.    At some point, the deputy chief called me

6  into his office, and he needed to -- he needed me just

7  to give him a very brief synopsis of what had happened

8  so he could walk it through the -- the chain of

9  command, I would assume.  He didn't say that, but I'm

10 assuming that's why he needed to know.

11     Q.    So the deputy chief told you that he needed a

12 very brief synopsis?

13     A.    A brief synopsis of what happened.

14     Q.    Okay.  Did he say, "A brief synopsis"?

15     A.    Yes.                                    1:58:31

16     Q.    Okay.  And did you give him a brief synopsis?

17     A.    I did.

18     Q.    What did you tell him?

19     A.    I told him we had encountered an individual

20 who matched the description of a -- a suspect who may

21 have committed a battery.  We approached the individual

22 to conduct a field interview, the individual took off

23 running, I gave chase, the individual pointed a gun at

24 me twice, I fired my gun twice, we found the individual

25 sometime later, placed him in custody, and was

1  transported through EMS with a gunshot wound.

2       Q.   Okay.  Did he ask you questions about the

3  weapon?

4       A.   He did not.

5       Q.   Did anyone ask you up until between the time

6  of the shooting and the time that you spoke to the

7  deputy chief, aside from the conversation you had with

8  the captain, about where the weapon was?

9       A.   He did not.

10      Q.   You said, "He did not."  I'm asking did

11 anyone talk to you about the location of the weapon --

12      A.   No.

13      Q.   You have to wait for the question.

14      A.   Sure.

15      Q.   Did anyone talk to you about the location of

16 the weapon outside of that brief conversation you had

17 with the captain in front of 6524 South Marshfield?

18      A.   No.

19      Q.   Okay.  So who was the next person that you

20 talked to after the deputy chief about the shooting?

21           MR. GAINER:  Just object to foundation.  Go

22 ahead.

23      A.   As an investigative body or just the next

24 person?

25      Q.   The next person.

 1     A.   The next person would have been my lawyer.

 2     Q.   Okay.  So the conversation that you had with

 3  the deputy chief, was that just, like, a minute or two?

 4     A.   Yes, very brief.

 5     Q.   Okay.  And when you say with your lawyer, who

 6  was that?

 7     A.   Jim McKay.

 8     Q.   Okay.  And is he from the union?

 9     A.   He is not.                            2:00:04

10     Q.   Okay.  So who is he in relation to you?

11     A.   He is my private attorney.

12     Q.   Okay.  And what -- why do you have a private

13  attorney?

14          MR. GAINER:  Object to form and -- hold on.

15  Well, if -- go ahead and answer that question, why do

16  you have a private attorney, if you can.

17     A.   To protect my constitutional rights.

18     Q.   Okay.  And when did you retain Mr. McKay to

19  represent you?

20     A.   A short time after the incident.

21     Q.   Okay.  So at what point did you contact Mr.

22  McKay?

23     A.   Within a week.  Within a week of the

24  incident.

25     Q.   Okay.  So -- so you're saying that after you

1  left the area that night, you went out and hired

2  private counsel?

3      A.   I did.

4      Q.   Okay.  At that point in time, were you aware

5  that a weapon was not recovered at the scene?

6           MR. GAINER:  At what point in time?

7      Q.   At the time that you hired a private lawyer.

8           MR. GAINER:  Go ahead.

9      A.   Yes, I was aware that a weapon had not been

10  recovered yet.

11     Q.   And how did you become aware that a weapon

12  was not recovered?

13          MR. GAINER:  And just to the extent that you

14  can answer that question without infringing upon the

15  attorney-client privilege, go ahead and answer.

16          WITNESS:  Sure.

17     A.   The Friday after the shooting, Counsel and

18  some of the family members were on TV claiming that I

19  had shot another African American male in the back

20  unarmed.

21     Q.   Okay.  And --

22          MR. GAINER:  Were you finished with your

23  answer?

24          WITNESS:  I am.                        2:01:29

25          MR. GAINER:  All right.

     1        Q.    And --

     2              WITNESS:  Thank you.

     3        Q.    -- to be -- to be clear, so -- so you didn't

     4   know until you saw the press conference with Counsel,

     5   you indicated towards Mr. Oppenheimer, right?

     6        A.    Yes.

     7        Q.    Okay.  So you didn't know until you saw the

     8   press conference with the family and Mr. Oppenheimer

     9   that no weapon had recovered from the scene?

    10        A.    No, I didn't know.

    11        Q.    Okay.  So did you hire a private attorney

    12   before you knew that -- whether a weapon had been

    13   recovered?

    14        A.    No.

    15        Q.    Okay.  So it was after you found out a weapon

    16   was not recovered, correct?

    17        A.    Yes, sir.

    18        Q.    Did you talk to anyone about why a weapon was

    19   not recovered?

    20        A.    No.

    21              MR. GAINER:  So -- wait a minute.

    22              WITNESS:  Oh.

    23              MR. GAINER:  When we're in this -- just so

    24   that we're clear, when we're in this section of

    25   conversation, since we're asking a bunch of questions

1   about your lawyer, any of these questions that call for

2   you to divulge information protected by the

3   attorney-client privilege, you shouldn't do that, all

4   right?

5          WITNESS:  Yes.

6          MR. GAINER:  As an attorney, I think you

7   know.

8      Q.   All right.  So did you ever speak with any

9   members of the individuals who were searching for the

10  weapon?

11         MR. GAINER:  Object to form.  Go ahead.

12     A.   No.

13     Q.   Okay.  Did you ever direct them where to

14  search?

15     A.   No.

16     Q.   Did anyone ever ask you, "Hey, we can't find

17  this gun this kid -- you say this kid had it.  Do --

18  can you help us locate it?"

19     A.   No.                               2:02:42

20     Q.   So to be clear, the night of the incident and

21  the following day, you never got any questions like

22  that from anyone, correct?

23     A.   Correct.

24     Q.   Okay.  Do you know -- are you aware of any

25  actions Mr. McKay took on your behalf?

Exhibit 5, LLC

```
 1          MR. GAINER:  I'll just object to form, and

 2   because that question is so vague, I instruct you not

 3   to answer it based on the attorney-client privilege.

 4      Q.   Okay.  Do you know if Mr. McKay took any

 5   actions on your behalf?

 6          MR. GAINER:  Same objection because I don't

 7   know how he would become aware of that, other than

 8   talking with McKay, so if you can be more specific, I

 9   think I can probably direct him more appropriately.

10          MR. KOSOGLAD:  What?

11          MR. OPPENHEIMER:  What --

12          MR. KOSOGLAD:  Yeah.

13      Q.   What -- what constitutional rights were you

14   trying to protect by hiring Mr. McKay?

15          MR. COHEN:  Objection to form.

16          MR. GAINER:  Go ahead.  I mean, if you -- if

17   you can answer that.

18          WITNESS:  Sure.

19      A.   I wanted to make sure that if I gave a

20   statement, I had an attorney with me.  I didn't know

21   whether or not the PBPA would be providing an attorney

22   or what attorney it would be, so I hired my own

23   attorney.

24      Q.   Okay.  Did you know Mr. McKay from previous

25   experience?
```

```
 1      A.    Just by reputation.                        2:03:59

 2      Q.    Okay.  And how did you learn about Mr.

 3   McKay's reputation?

 4      A.    He was a prosecutor for 30 plus years for the

 5   Cook County prosecutor's office.

 6      Q.    But how did you learn about that?

 7      A.    Through my dealings with the police

 8   department and the court system.

 9      Q.    Okay.  But did anyone recommend him to you?

10            MR. GAINER:  Just -- I'm going to object to

11   the extent that if that calls for conversations with

12   other attorneys.  If not, you can go ahead and answer.

13      A.    No, nobody recommended him to me.

14      Q.    Did anyone, who was not a lawyer, advise you

15   to hire private counsel?

16      A.    No.                                        2:04:37

17      Q.    So was the decision to hire private counsel

18   something that you did on your own?

19      A.    Yes.

20      Q.    Did you ask anybody why they were unable to

21   recover a weapon after the shooting?

22            MR. GAINER:  Asked and answered.  Go ahead.

23            MR. COHEN:  Join.

24      A.    No.

25      Q.    Okay.  And -- and at any point in time?  I
```

1  mean, did you ask anyone who was not a lawyer why they

2  were unable to hire (sic) a weapon?  Excuse me.  At any

3  point in time after the shooting, between now and then,

4  have you asked any person who was not a lawyer why they

5  were unable to recover a weapon at the time of the

6  shooting?

7          MR. GAINER:  Go ahead, and that assumes facts

8  not in evidence.  Go ahead, answer.

9          MR. COHEN:  Join.  I'll object to form as

10 well.

11     A.   No.

12     Q.   Was there -- was there ever any doubt in your

13 mind about whether or not they had -- that Mr. Raye had

14 a weapon?

15     A.   No.

16     Q.   Okay.  There's no chance that you just -- you

17 may have perceived something in his hand that was not a

18 weapon?

19          MR. GAINER:  Just object to form.  Go ahead.

20          MR. COHEN:  Join.                    2:05:49

21     A.   I saw the barrel of a gun.  To me, that's a

22 gun.

23     Q.   Okay.  And without revealing anything that's

24 protected by your attorney-client privilege, are you

25 aware of any actions that Mr. McKay took on your

 1  behalf?

 2         MR. GAINER:  Well without revealing any

 3  attorney-client privilege information, and I just

 4  object to form because I think it's vague.  Go ahead

 5  and answer if you can.

 6      A.   Nothing that I know of.  Mr. McKay sat in on

 7  my COPA statement.  That would be considered an action.

 8      Q.   Did you ever find out that the union was

 9  willing to provide a lawyer for you on your behalf?

10         MR. GAINER:  Relevance.  Go ahead.

11      A.   I did not.

12      Q.   I can't remember what you said, so I

13  apologize if I've asked this question again, but --

14  before, but after the -- the shooting, did you ever

15  talk to a union rep?

16         MR. GAINER:  That's asked and answered.  Go

17  ahead.                                    2:07:30

18      A.   So the president came up while I was sitting

19  in the car.  After that, I -- I don't believe so.  I --

20  I -- there was never a time, I should just put -- put

21  it this way, there was never a time that I was taken

22  aside and -- that I can remember, and I -- it didn't

23  happen, that a union rep came to me and said, "Let's go

24  talk in the other room."  I -- I was always -- when I

25  was at the area -- when I was in the car, I was with

1    the lieutenant, when I was at the area, I was with the

2    lieutenant until I spoke to the deputy chief, and then

3    after that, I think it was until about 7:00 in the

4    morning, I got driven back to the district.

5        Q.   Okay.  So outside of a -- of a -- of your own

6    representative with the union, did you -- and the

7    president, who you already testified to, have you ever

8    spoken to anyone at the sergeants' union about this

9    shooting?

10       A.   Sure.  When I was stripped, I spoke to Jim

11   Ade and Paul Bilotta.

12       Q.   Okay.  And who are they?

13       A.   President and vice-president of the union --

14   former president, now president and vice-president of

15   the union.

16       Q.   And -- and what did they say to you, and

17   what, if anything, did you say to them?

18       A.   I -- I think our only communication was that

19   it's going to be okay, that it's common practice these

20   days to go into some administrative role, "let us know

21   if you need anything."  It's a small union, they don't

22   have a lot of money.

23       Q.   Okay.  Did you say anything to them in

24   response?

25       A.   I had told them that I had hired Jim McKay.

1     Q.   Anything else?

2     A.   No, that's it.               2:09:17

3     Q.   Okay.  And when did that conversation take

4 place?

5          MR. GAINER:  Asked and answered.  Go ahead.

6     A.   With the union -- the -- with the

7 vice-president and president?

8     Q.   Yes.

9     A.   Sometime within a ten day period of -- of

10 being stripped on the 27th or the 28th.

11     Q.   Okay.  And did you have to pay Mr. McKay to

12 represent you --

13     A.   I did.

14     Q.   -- personally?

15     A.   I did.

16     Q.   How -- how much did you pay?

17     A.   $5,000.

18     Q.   And was that initially, or was that in total?

19     A.   In total.

20     Q.   And between the ten day -- the conversation

21 you had ten days after -- within ten days of the

22 shooting with the vice-president and president of the

23 union and the time of your COPA statement, did you

24 speak to anyone about the shooting?

25          MR. GAINER:  So the question is just did you

1  speak to anyone, so go ahead and answer that question,

2  just by identifying the people to whom you spoke

3  between --

4      Q.   Yeah -- yeah, listen, you're a lawyer.  You

5  know I'm not -- I'm not trying to ask you questions

6  that are privileged --

7           MR. GAINER:  Hold on a minute.

8      Q.   -- attorney-client privilege.

9           MR. GAINER:  Hold on a minute.  I'm entitled

10  to qualify this, Jared.

11           MR. KOSOGLAD:  All -- all I was going to do

12  was clarify something for the witness, so that we could

13  make this go quicker.  That's all.

14           MR. GAINER:  I -- I -- I appreciate the need

15  to make it go quicker, but I also think that the

16  question is such that I need to interject, all right?

17  So I'll do that, and then we'll move on.

18           MR. KOSOGLAD:  And you can --

19           MR. GAINER:  Okay.  And I did.

20      Q.   I -- all I want to do is I just want to say,

21  as a lawyer, you understand I'm not -- I'm not going to

22  ask you any questions about what you spoke about

23  between yourself and your attorney, and you don't have

24  to reveal those conversations to me, so but -- but when

25  I ask you who you spoke to, obviously, that's not

1   privileged, so between the time of the -- of the

2   conversations you had with the union within ten days of

3   the shooting and the time of your COPA statement, did

4   you speak to anyone about the shooting?

5           MR. GAINER:  Go ahead.  You can answer.

6       A.   Yeah, my lawyer, not much with -- with my

7   family and not with anybody at the department because I

8   just didn't want to get them wrangled up into this

9   mess.  Yeah, that's about it.

10      Q.   And from the time of that conversation with

11  the -- with the union until the time of your COPA

12  statement, outside of your counsel, have you spoken to

13  anyone about the fact that there was no weapon

14  recovered at the scene on the night of the shooting?

15      A.   No, I mean, it was in the paper, so I -- I --

16  what's there to be said?

17      Q.   I don't know.  I'm --

18      A.   Yeah, no, no, no.

19      Q.   Okay.  And then you gave your -- your COPA

20  statement, correct?

21      A.   I did.

22      Q.   And you reviewed that statement, right?

23      A.   I did.                          2:12:16

24      Q.   And is that statement true and accurate to

25  the best of your knowledge?

1     A.   It is.

2     Q.   All right.  Is there anything, after having

3  reviewed your statement, you would have changed or said

4  differently?

5          MR. GAINER:  Object to form.  Go ahead.

6     A.   No.

7     Q.   And can you describe the circumstances of the

8  interview, like, the setting and who was present during

9  your statement?

10         MR. GAINER:  Object to form.  Go ahead.

11    A.   In a room similar to this, much smaller

12 table.  I was sitting where I'm sitting at this point,

13 Jim McKay was to my left, across from me was a lead

14 investigator, and I -- and an attorney, I can't

15 remember her name, and then an older Caucasian

16 investigator.

17    Q.   Okay.  Do -- you said you don't know who the

18 attorney's name was?

19    A.   I don't.

20    Q.   Do you know -- could you describe the

21 attorney?

22    A.   Female from California, blondish-brown hair,

23 yeah.

24    Q.   Okay.  And during the -- do you know how long

25 the interview lasted?

1      A.    Two and a half hours, maybe.  Two hours.  It

2   was taped.  My --

3      Q.    During the course of the interview, were you

4   -- do you know how long after the shooting the

5   interview took place?

6      A.    I just gave my interview a few months ago.

7      Q.    And do you know why there was such a delay

8   between the time of the shooting and the time of your

9   interview?

10         MR. GAINER:  Object to foundation.  Go ahead.

11         MR. COHEN:  Join.

12      A.    I don't know.  I -- I've asked the question.

13   I -- I don't know.

14      Q.    Okay.  Who have you asked the question to?

15      A.    I believe I called COPA.  I -- actually, I'm

16   sorry, Jim McKay asked the question.  He had called

17   COPA wondering when the process was going to end.

18      Q.    Okay.  Did -- during the course of the

19   interview that you had with COPA, were you allowed to

20   consult with your attorney?

21      A.    Yes.                                2:14:18

22      Q.    Okay.  And did you take breaks so you could

23   consult with your attorney during the interview?

24      A.    I think we only took one break, and that was

25   a break that the investigators had requested.

1    Q.   Okay.  But during the course of their

2 questioning, was he able to speak to you and you could

3 speak to him?

4    A.   Yes.

5    Q.   Was -- and did these conversations happen off

6 the record?

7    A.   No.

8    Q.   They were on the record?

9    A.   Yeah.

10    Q.   All right.  So you never had any off the

11 record conversations with your attorney during the

12 course of your interview aside from when the -- the

13 break took place?

14    A.   No.

15    Q.   When -- when you say, "No," just to clarify

16 for the record, you mean that there no other

17 conversations --

18    A.   There were no other conversations aside what

19 was said in that room.

20    Q.   Okay.  And after your interview with COPA,

21 did you have any conversations with anyone about the

22 shooting, outside of your attorneys?

23    A.   No.                                    2:15:14

24    Q.   And just because I want to make sure I ask

25 the question clearly, outside of what you've already

1   testified to and conversations you've already explained

2   here, did you have any conversations with anyone after

3   the shooting about the circumstances in which the

4   weapon that Mr. Raye supposedly had was found?

5        A.   No.

6             MR. GAINER:  Object to --

7        Q.   -- aside from your attorneys?

8             MR. GAINER:  -- form.  Go ahead.

9        A.   No.

10            MR. KOSOGLAD:  Okay.  Can we take a break?

11            MR. GAINER:  Sure, thanks.

12            RECORDER:  Off the record, 12:52 p.m.

13                  (Off the record)

14            RECORDER:  Back on the record, 1:07 p.m.

15       Q.   When you saw officers talking to Mr. Raye

16   after he was found, how far away were you from those

17   officers?

18       A.   A few feet.

19       Q.   Okay.  Like, as far away as we are now?

20       A.   Yes.

21       Q.   Okay.  And did you see Mr. Raye handcuffed?

22       A.   I -- I don't believe so.  I don't believe so.

23       Q.   Okay.  Did you see him resist at all?

24       A.   I don't believe so.

25       Q.   All right.  Were you close enough to what was

1  happening that if he had resisted, you would have seen

2  it?

3      MR. GAINER:  Object to form.  Calls for

4  speculation.  Go ahead.

5      A.   For the short period of time that I was

6  there, yes, I -- I believe so.

7      Q.   All right.  And do you know who Officer Hoard

8  is?

9      A.   I don't.

10     Q.   Okay.  Do you know who Gary Wilkins is?

11     A.   No.                                    2:17:01

12     Q.   Okay.  Did you ever become aware of a claim

13  by a police officer that Mr. Raye had admitted that he

14  threw the gun?

15     A.   At some point later on, yes.

16     Q.   Okay.  Do you know how much later on?

17     A.   Much later on.

18     Q.   Okay.  Months?

19     A.   I -- I think right around my COPA statement.

20     Q.   Okay.  And at some point, did you become

21  aware of a witness who had made the claim that he saw

22  Mr. Raye throw a gun?

23     A.   Is that the same question we just -- you just

24  asked me?

25     Q.   No, I asked you about the officer.

1     A.    Yeah, I think during the same time --

2     Q.    Okay.

3     A.    -- right -- I -- during my conversations with

4   my attorney.

5     Q.    All right.  And did you ever become aware of

6   the -- how did you become aware of the gun recovery in

7   February?

8          MR. GAINER:  Just to the extent that that

9   calls for infringement upon attorney-client privilege,

10  I instruct you not to answer.  If you became aware some

11  other way, go ahead, talk about it.

12    A.    There's a -- there's a police blog, and

13  somebody had posted on the blog that a weapon had been

14  recovered.

15    Q.    Okay.  Which blog is that?

16    A.    Second City Cop.

17    Q.    So you became aware through Second City Cop

18  of the -- the gun being recovered?

19    A.    Yes, a -- a gun being recovered.

20    Q.    A gun being recovered.  Have you ever made

21  any posts on that website?

22          MR. GAINER:  Object to relevance.  Go ahead.

23  Related to this or ever?  Anything?

24    A.    Oh --

25    Q.    Well let's --

1    A.   -- sure.  I -- I'm sure I've made one or two.

2    Q.   Okay.  Have you ever posted about this case?

3    A.   I have not.

4    Q.   Have you ever posted about any attorneys who

5 were working on this case?

6    A.   I have not.

7    Q.   Okay.  And did you ever become aware of a

8 plastic piece of coil being found in the jacket that

9 was in the alley?

10    A.   In my communication with my attorney.

11    Q.   Okay.  And when was that?

12    A.   Sometime later, right around my -- same time

13 with my COPA -- my COPA statement.

14    Q.   But up until your COPA statement, you were

15 unaware of the officer's claim -- well let me not make

16 it a compound question.  Up until around the time of

17 your COPA statement, you were unaware of the plastic

18 piece and the coil that was found in the jacket, right?

19    A.   Correct.                 2:19:31

20    Q.   Okay.  Okay.  Do you know who Officer Newsome

21 or Officer Williams is?

22    A.   No.

23    Q.   Okay.  Were you in --

24    A.   May I stop you?  Dave Williams?  I mean, is

25 -- there's -- there's a lot of Williams.  I know a Dave

```
 1   Williams, he's a detective in area north, so.
 2         MS. MAISURIA:  It's Markus.
 3      Q.   Didn't think about that, but Officer Williams
 4   --
 5      A.   Right.
 6      Q.   -- is probably a pretty common name.
 7         MS. MAISURIA:  Markus.
 8      A.   Right.
 9      Q.   Markus?
10      A.   Okay.  No.
11      Q.   All right.
12      A.   No.
13      Q.   Okay.  And were you ever shown pictures of
14   the gun that was recovered?
15      A.   Yesterday.
16      Q.   Okay.  So prior to yesterday, you were never
17   shown pictures of the gun that was recovered?
18      A.   No.
19      Q.   Okay.  Did anyone ever ask you to ID the gun
20   that was recovered?
21      A.   No.
22      Q.   Okay.  So at no point in time did COPA or any
23   investigator ever ask you if the gun that was recovered
24   was the same gun you saw in Mr. Raye's hands?
25      A.   Never.                              2:20:24
```

     1      Q.   All right.  And when you saw the pictures

     2   yesterday, did you recognize it as the same gun you saw

     3   in Mr. Raye's hands?

     4      A.   Distinctively similar, yes.

     5      Q.   Okay.  And what was similar about it?

     6      A.   That it had a small -- had a slight shine to

     7   it, wasn't fully -- wasn't, like, a silver gun, the

     8   long barrel, the -- the diameter wasn't a regular nine

     9   millimeter, the diameter was, you know, like, I -- I

    10   told you it was fresh in my mind about the diameter of

    11   the -- of -- of the barrel, those -- those kinds of

    12   things.

    13      Q.   Okay.  What -- what about the diameter of the

    14   barrel?

    15      A.   For some reason, it just stuck in my mind.

    16   The -- the diameter of the barrel when I came around

    17   the corner, it -- that stuck in my mind.

    18      Q.   That it was small or large?

    19      A.   Large, large.

    20      Q.   So -- so when you -- so did you tell

    21   investigators that you -- when you saw the barrel of

    22   the weapon, that the diameter of the gun looked large?

    23      A.   The COPA investigators?

    24      Q.   Yes.

    25      A.   Yeah.

1          MR. GAINER:  Is it --

2      A.   But --

3          MR. GAINER:  Hold on.  Object to form.  Go

4  ahead and answer.

5          MR. COHEN:  I'll join.

6          MR. GAINER:  Go ahead and answer.

7      A.   Yeah --

8          MR. GAINER:  I think that was a question.  A

9  yes with a question mark, so go ahead and answer that.

10     A.   Yes, I told COPA that.

11     Q.   And -- and did you ever tell, the night of

12  the shooting, any of the other police officers who had

13  interviewed you that you thought the barrel of the gun

14  looked large?

15         MR. GAINER:  Go ahead, answer.

16     A.   Nobody interview me.

17     Q.   Okay.

18     A.   We've been -- I -- I -- I think I was very

19  clear on that, that the only person that asked me for

20  broad strokes was Deputy Chief Watson.

21     Q.   Okay.  So the answer is -- to be clear, you

22  never told any police officers that night that you

23  recognized the barrel of the gun was large, correct?

24     A.   No.

25         MR. GAINER:  Asked and answered.

 1      A.   No.

 2      Q.   And the reason you didn't tell them that is

 3   because no one ever interviewed you for the specific

 4   details of what occurred, correct?

 5      A.   Yes, sir.                                2:22:17

 6      Q.   Would you -- would you agree that, as a

 7   general proposition, that people tend to remember

 8   things better closer in time to events that occur?

 9           MR. GAINER:  Object to form.  Go ahead.

10           MR. COHEN:  Join.

11      A.   Just depends on the circumstances.  I -- I

12   wouldn't agree or disagree.  It just depends on the

13   circumstances.

14      Q.   Well under these circumstances, would you --

15   do you think that you had a better memory of what

16   occurred during the shooting closer in time to when it

17   happened?

18           MR. GAINER:  Object to form and relevance.

19   Go ahead.

20           MR. COHEN:  Join.

21      A.   In terms of -- of the minutiae of -- of the

22   details, distance, time, that kind of stuff, sure.  I

23   -- even -- even in a high stress situation, I would

24   probably say possibly, but the facts are still the

25   facts.  Those haven't changed.

Exhibit 5, LLC

 1      Q.   So your memory about certain details would

 2 have been better closer in time to the shooting,

 3 correct?

 4           MR. GAINER:  Object to form.

 5 Mischaracterization of the testimony.  Go ahead, you

 6 can answer.

 7           MR. COHEN:  Join.

 8      A.   Yes, the -- the -- the items that I just

 9 mentioned.

10      Q.   All right.  And would you agree, just as a

11 general proposition, that memory fades over time?

12           MR. GAINER:  Object to form.  Go ahead.

13 Relevance.

14           MR. COHEN:  Join.

15           MR. GAINER:  Go ahead.

16      A.   Some memory, yes.

17      Q.   Okay.  So did you do anything to preserve

18 your memory of what occurred during this shooting after

19 it took place?

20           MR. GAINER:  Object to form.  If it calls for

21 anything you discussed with your lawyer, don't answer

22 it.  Otherwise, you can answer.

23           MR. COHEN:  Join.                        2:24:14

24      A.   Outside of counsel, I -- I did nothing to

25 preserve my memory.

1    Q.   Okay.  Well did you ever create any written

2  account of what occurred?

3    A.   No.

4    Q.   So outside of communications with your

5  counsel, you didn't do anything to try to preserve your

6  memory of the circumstances of the shooting back in

7  2016?

8         MR. GAINER:  Asked and answered.  Go ahead.

9         MR. COHEN:  Join.

10   A.   Correct.

11   Q.   Okay.  I'm going to show you --

12        MR. KOSOGLAD:  Do you have the Exhibit --

13  okay.

14   Q.   I'm going to show you what we'll have marked

15  as Exhibit 1 for identification.

16        MR. GAINER:  Thank you.

17   Q.   Do you recognize this document?

18   A.   I do.                              2:25:58

19   Q.   Okay.  And what is this?

20   A.   It is a tactical response report completed

21  the night or following day of the incident.

22   Q.   Okay.  And do you know what time you

23  completed this report?

24   A.   It says, "23 November 2016, 2307 hours,"

25  which is 11:07 --

1      Q.   All right.

2      A.   -- p.m.

3      Q.   And do you -- the check boxes that are put on

4  this document, you fill those out, correct?

5      A.   Yes.

6      Q.   All right.

7      A.   Online.

8      Q.   I'm sorry?

9      A.   Online.

10     Q.   Yeah, on the computer --

11     A.   Yeah, yeah.

12     Q.   -- correct?

13     A.   Yeah.

14     Q.   All right.  And so I'm just going to start at

15  the top.  Do -- do you fill out the date and time of

16  the incident?

17     A.   Yes, sir.

18     Q.   And you filled out the address of occurrence,

19  correct?

20     A.   Yes, sir.

21     Q.   All right.  And does anyone -- did anyone

22  give you that information, or did you just know it?

23     A.   I think the address, I may have asked what

24  the address of the vacant lot was.  I -- I'm --

25     Q.   Do you know who you asked?

1     A.   I don't.                              2:27:02

2     Q.   All right.  And then the information about

3 yourself, do you -- is that automatically inputted, or

4 is that something that you manually input?

5     A.   I think when I enter my PC number, the

6 pertinent information like my title code, sergeant,

7 yes, that -- that box from -- I can't see the numbers,

8 but where it says, "Member involved," self-populates.

9     Q.   Right.  And all the stuff about your date of

10 employment, your employee number, things like that,

11 correct?

12     A.   Yes, sir.

13     Q.   All right.  And it says that you were injured

14 in the incident, correct?  In box 19?

15     A.   This is small print, so I -- if you can --

16          MR. GAINER:  It's up here.

17          WITNESS:  Yeah, sure.

18     A.   If -- if it -- yeah, if it's checked, yes.

19     Q.   All right.  And the injuries that you're

20 referring to there were the -- the injuries to your

21 knees, and your hand, and thumb, correct?

22     A.   Yes, sir.

23     Q.   All right.  And the information about Mr.

24 Raye, would you have put that in manually?

25     A.   That would have been entered manually, yes.

1     Q.   Okay.  So how would you have gotten his date

2  of birth?

3     A.   I believe somebody in the area probably gave

4  me that information to -- to input.

5     Q.   Okay.  And do you know who?

6     A.   I don't.

7     Q.   All right.  And you described his height and

8  weight as 5'11", 175 pounds, correct?

9     A.   Correct.

10     Q.   And is that -- sorry, were you finished?

11     A.   No, no, I just said correct, it's on the

12  report.

13     Q.   Yeah, and would that been an estimate on your

14  part?

15     A.   I would assume so, yes.

16     Q.   Okay.  And then in box 29, you put his

17  address, correct?

18     A.   Is that the "1407 East 136th"?

19     Q.   "156th," I think it says.

20     A.   A hundred -- okay.  Yes.

21     Q.   And -- and how would you have gotten that

22  information?

23     A.   I think that probably would have been

24  provided.

25     Q.   Okay.  And do you know who provided it to

1  you?

2      A.   I don't.

3      Q.   All right.  And do you see where it says,

4  "Was subject armed?"

5           MR. GAINER:  It's here.

6      Q.   Box 31.

7      A.   Yes.

8      Q.   Okay.  And you click "yes," correct?

9      A.   Mm-hmm.

10      Q.   And then --

11           MR. GAINER:  You gotta say, "Yes."

12      A.   Yes.                                    2:28:54

13      Q.   And then in the text there, you put, "Firearm

14  - semi-automatic," right?

15      A.   I -- again, I can't read this, so I'm going

16  to rely on --

17           MR. GAINER:  That's what it says.

18      A.   -- Brian.  Yeah, yes.

19      Q.   Okay.  And do you see that that's written

20  twice?

21      A.   Yes.

22      Q.   All right.  Do you know why you wrote that

23  twice?

24      A.   I don't.  It could have been a system glitch.

25  I --

1     Q.   Okay.  Well it's not a -- it's not a -- but

2  that's not a drop down box, right?

3     A.   No.

4     Q.   That's something that you manually type in,

5  correct?

6     A.   Yes.

7     Q.   All right.  And do you see how there's a -- I

8  -- I guess if you can't read it with your glasses on,

9  you don't know that after the first one, there's a

10  comma, correct?

11     A.   Correct, there's a comma there.  Correct.

12     Q.   Okay.  And so you would have manually typed

13  in "firearm - semi-automatic," comma, "firearm -

14  semi-automatic," right?

15         MR. GAINER:  Object to form.  Go ahead.

16     A.   Again, I don't -- I don't know why it's

17  listed twice.

18     Q.   Well no one else would have filled that in,

19  correct?

20     A.   No, no, I filled this in.

21     Q.   So it would have been manually typed in

22  correct?

23     A.   The fire -- the first part, the -- the

24  "semi-automatic -- firearm semi-automatic," yes.  I

25  don't know why it's twice.

1    Q.   Right.  I'm saying but you would have -- you

2  would have manually entered in "firearm -

3  semi-automatic," comma, "firearm - semi-automatic,"

4  correct?

5         MR. GAINER:  I'll just -- you know what --

6         MR. COHEN:  Objection.

7         MR. GAINER:  -- asked and answered three

8  different times.  I mean, you haven't cracked the case,

9  I promise, but go ahead and answer it.

10    A.   I -- I wouldn't have -- I -- again, I know

11  that I entered it once.  I don't know why it's twice.

12    Q.   Okay.  So you don't know whether you did it

13  twice?

14    A.   Correct.                              2:30:19

15    Q.   All right.  And it says that, "Subject

16  injured by member," and you said, "Yes," correct?

17    A.   Correct.

18    Q.   All right.  And it says, "Subject alleged

19  injury by member," and it says, "Yes," correct?

20         MR. GAINER:  Actually, I don't think that's

21  what it says.  I think you've read that wrong.

22         MR. KOSOGLAD:  Oh, you're correct.  I -- I

23  apologize.  That was a mistake.

24    Q.   It says, "Subject alleged injury by member,"

25  and it's actually "no" that's checked, excuse me.

Exhibit 5, LLC

1    A.    Yeah.

2    Q.    Right?

3    A.    Correct.

4    Q.    Okay.  And the injury that was caused to the

5  subject was the gunshot wound?

6    A.    Correct.

7    Q.    All right.  And I guess you did not know or

8  had not heard any allegation by Mr. Raye that he was

9  shot, correct?  Let me -- let me -- let me ask a better

10  question.  Why did you check "no" in box 33?

11    A.    So because I believed that this was saying

12  did the subject allege that I battered them or what's

13  -- what's the -- what's the verbiage here?

14    Q.    "Subject alleged injury by member."

15    A.    "Subject alleged injury," right.  I -- the

16  subject didn't allege injury, that's why I checked

17  "no."  I was forced to discharge my weapon, which

18  injured the subject.

19    Q.    Okay.  And you described the injury as fatal,

20  correct?  In box 34?

21    A.    Yeah.

22    Q.    All right.  And so at the point in time that

23  you filled out this report, you knew that Mr. Raye had

24  expired, correct?

25    A.    Correct.                              2:31:47

1     Q.   How did you find that out?

2     A.   I would assume that somebody in the area said

3 something.

4     Q.   Okay.  Do you know who told you that Mr. Raye

5 died?

6     A.   I don't.

7     Q.   Do you know when you found that out?

8     A.   Well I did the -- I did the report at 11 --

9 well no, this says the -- this was probably completed

10 -- I -- I don't know when I found out.

11     Q.   Okay.  Do -- do you know how you found out?

12     A.   I don't know how I found out.

13     Q.   All right.  Do you know how you reacted when

14 you found out?

15     MR. GAINER:  Form.  Go ahead.         2:32:12

16     A.   I -- I really don't know I reacted.  I -- I

17 -- you know, it's never a good reaction when you take

18 somebody's life.

19     Q.   Okay.  But to be clear, in this shooting, you

20 don't know how you reacted when you found out that Mr.

21 Raye had died, correct?

22     A.   I don't remember.

23     Q.   Right.  All right.  And it shows that he went

24 to Christ Hospital, correct?  Mr. Raye?

25     A.   Yes.

1     Q.   Okay.  To -- to be clear, I -- and I just

2  want to make a record, I don't mind, I mean, this is

3  fine, but --

4     A.   Yeah.

5     Q.   -- but -- but you can't read the information

6  --

7     A.   It's --

8     Q.   -- on this -- correct?

9     A.   Even with my glasses, like, and these are

10  just magnifiers, I -- I'm having a problem reading the

11  -- the -- it didn't carbon copy well, so.

12     Q.   But you -- but you can't read the word

13  "Christ," on there, correct?

14     A.   No, I can read "Christ."  I --

15     Q.   Oh, you can see that?

16     A.   Yeah, I can see "Christ."  I can see

17  "Courtland" (sic).  I can see "Christ."  I just can't

18  read the -- what the questions are, that's why I'm

19  asking.

20     Q.   And -- and you see the word "Courtland" on

21  here?

22     A.   I do.

23     Q.   Okay.

24          MR. GAINER:  That's not what it says, first

25  of all.

```
 1              MR. KOSOGLAD:  No, no, it doesn't, but --

 2              MS. FRONCZAK:  He can't see what --

 3      A.    Oh, sorry.

 4              MR. GAINER:  So -- oh, so you're trying to

 5  trick him?

 6      A.    Oh, I'm sorry --

 7              MR. KOSOGLAD:  No.

 8              MR. GAINER:  Like an eye chart?

 9      A.    -- "Cartolano."

10              MR. KOSOGLAD:  I'm trying to -- I'm trying to

11  --

12      A.    "Cartolano," sorry.

13              MR. GAINER:  Right.  Okay.

14              MR. KOSOGLAD:  He -- he's saying that he can

15  read it.  I -- I'm --

16              WITNESS:  Yeah.

17              MR. GAINER:  This is --

18              MR. KOSOGLAD:  I don't think he can.

19              MR. GAINER:  This is --

20              WITNESS:  Okay.

21              MR. GAINER:  -- preposterous.  I -- I just

22  want to go on the record to indicate that this is --

23              MR. OPPENHEIMER:  Just make your objection

24  then.

25              MR. GAINER:  I -- I'm about to.        2:33:21
```

```
 1              MR. OPPENHEIMER:  Okay.  Please make it --

 2              MR. GAINER:  This is --

 3              MR. OPPENHEIMER:  -- then.

 4              MR. GAINER:  -- harassing, and it's

 5  argumentative, and it's completely irrelevant, so --

 6              MR. OPPENHEIMER:  I mean, it goes to his

 7  credibility, so it's relevant.  Let's move on.

 8              MR. GAINER:  It goes to his credibility that

 9  he can't see the faded print on this report?  I've -- I

10  --

11              MR. OPPENHEIMER:  Move on.  Ask your --

12              MR. GAINER:  I'm sorry, I fail to see --

13              MR. OPPENHEIMER:  Ask your question.

14      Q.    How -- how long have you had problems with

15  your vision?

16              MR. GAINER:  And -- and I object that that

17  mischaracterizes what's been happening in this

18  deposition.  No one has ever testified he has problems

19  with his vision.

20              MR. KOSOGLAD:  He's wearing glasses.

21      A.    They're --

22              WITNESS:  Yeah?

23              MR. GAINER:  Go ahead, answer.

24              WITNESS:  Yeah.

25      Q.    I have problems --
```

1    A.   They're just -- they're just reading glasses.

2 Probably roughly the last year.

3    Q.   Okay.  When did -- have you ever had your

4 vision examined?

5    A.   I have.                              2:33:58

6    Q.   When?

7    A.   2010, when I came back on the job, 2013,

8 2015, and then just -- just recently.

9    Q.   Okay.  And how long have you worn glasses

10 for?

11    A.   I just wear them for -- for reading, like,

12 the last year.  Probably the last year.

13    Q.   Okay.  And the exam that you got in 2015, do

14 you know how your vision tested?

15    A.   20/20 in one eye and 20/40 in the other

16 because of astigmatism.

17    Q.   And do you know how long you have had

18 astigmatism?

19    A.   I -- I don't.

20    Q.   Okay.  When's -- when did you first find out

21 about your astigmatism?

22    A.   I mean, I -- I -- I think I knew when I came

23 on in 2001.  Yeah.

24    Q.   Okay.  To your knowledge, has your

25 astigmatism ever caused your -- problems with your

 1  ability to see?

 2      A.   No.

 3           MR. GAINER:  Object to form.

 4           MR. COHEN:  Join.                          2:35:11

 5      Q.   Okay.  So --

 6      A.   You know, it's terrible lighting in here as

 7  well by the way, so yeah, I just say --

 8           MR. GAINER:  That -- yeah, that has to do

 9  with your credibility, John.

10           WITNESS:  Right.

11           MR. GAINER:  The lighting, so we should, you

12  know --

13           WITNESS:  Right.  Yeah.

14           MR. GAINER:  -- watch what we say --

15      Q.   I mean, do -- do you think that the -- do you

16  think that the lighting in here is affecting your

17  ability to read this?

18      A.   Not the dark bold, the -- the other stuff,

19  yes.

20      Q.   All right.  Okay.  And you say that -- in box

21  36, can you read that?

22      A.   Okay.  What does it say in box 36?  The

23  bolded part?  This one right here?

24      Q.   You -- can you read it?

25      A.   "Cartolano."

1    Q.   Okay.  And can you read what it says above

2  that?

3         MR. GAINER:  Let me see this.

4    A.   I can't.

5    Q.   Okay.

6    A.   I can't.  I can barely make it out.

7    Q.   All right.  Okay.  So it says, "By whom."

8  All right.  And do you know who Officer Cartolano is?

9    A.   I don't.

10    Q.   All right.

11         MR. GAINER:  That's not even referring to an

12  officer.

13         MR. KOSOGLAD:  Okay.

14         MR. GAINER:  It's referring to a doctor.

15         MR. KOSOGLAD:  All right.

16         MR. GAINER:  So I would just ask that if

17  you're going to misrepresent the document, just tell us

18  before you do it.

19         MR. KOSOGLAD:  Okay.  I'll make sure to -- to

20  note that for the record in the future.

21         MS. FRONCZAK:  It's probably because it's

22  hard to read.

23    Q.   And then can you read box 37?

24    A.   I -- I really can't.

25    Q.   Okay.  It says, "Condition," and box one is

 1  checked.  It says, "Apparently normal."  Do you know

 2  why you checked that?

 3       A.   I don't.

 4       Q.   Okay.  Would you agree that Mr. Raye's

 5  condition was not normal?

 6            MR. GAINER:  Object to form.  Foundation.  Go

 7  ahead.

 8            MR. COHEN:  Join.

 9            MR. GAINER:  Calls for speculation.  Go

10  ahead.

11       A.   It depends on which time.  When I first

12  encountered him or I -- I -- I can't tell you why I

13  checked it, but I'm -- my thought process might have

14  been when I first -- when I first encountered him.

15       Q.   Okay.  So you think that you checked

16  "apparently normal," because when you first encountered

17  him, he was apparently normal?

18       A.   Yes.                                2:37:20

19       Q.   All right.  Is that you understanding --

20       A.   I -- I don't --

21       Q.   -- in how you're trained to fill out this

22  form?

23            MR. GAINER:  Form.  Go ahead.

24            MR. COHEN:  Join.

25       A.   You just try to answer as -- as truthful as

1  you can when you fill out these forms.  Nobody guides

2  you in doing it, so you -- you go through the form, and

3  you fill out as best you can.

4      Q.   I understand, sir.  My question is is -- is

5  it consistent with your training and your understanding

6  of how to fill out this form that when it asks for the

7  arrestee's condition that you are supposed to state it

8  at the time that you first encounter them?

9          MR. GAINER:  Object to form.  Go ahead.        2:37:51

10     A.   No.

11     Q.   Okay.  What's your understanding of -- of

12  what this form is asking for in terms of condition?

13         MR. GAINER:  I think that's asked and

14  answered.  Go ahead and answer again.

15     A.   So because it's under "subject information,"

16  my assumption is that when I encountered the subject, I

17  -- that's -- that's my only thought process at this

18  point two years later.

19     Q.   Sure.  So if you -- if you read these other

20  options, one says, "under the influence,"

21  "hospitalized," "not hospitalized," and "refused

22  medical aid," correct?

23     A.   Yes.

24     Q.   All right.  And so is it your understanding

25  that if an -- an individual is taken to the hospital

1    after the incident, you're supposed to -- you're

2    supposed to check "hospitalized"?

3            MR. GAINER:  Object to form.  Go ahead.

4            MR. COHEN:  Join.

5        A.   Sure.

6        Q.   Okay.  All right.  But you don't know why you

7    didn't check that here, correct?

8        A.   I don't.

9            MR. GAINER:  Asked and answered.

10       A.   I don't, I don't.

11       Q.   All right.  And then go to -- under box 38,

12   it says, "Charges placed."  There's nothing filled in

13   there, correct?

14       A.   There's nothing there, correct.

15       Q.   All right.  And that's because no charges

16   were placed against Mr. Raye, right?

17       A.   Correct.

18       Q.   All right.

19       A.   To my knowledge.

20       Q.   Right.  And -- and that's because he died,

21   right?

22       A.   Mm-hmm.

23           MR. GAINER:  What?

24       A.   Yes.

25           WITNESS:  That's what I see down here.

Q.   And then the next section of this form is --
there's these checkmarks, correct?

       MR. GAINER:  I don't see any checkmarks on
this.

Q.   Okay.  The Xs, sir?  You see that, right?

A.   Yes.                                    2:39:22

Q.   All right.  And in the -- in the left hand
column, can you read the bold writing there?

A.   "Reasons for use of force.  Check all that
apply."

Q.   Okay.  And you have checked some under
"passive resister," correct?

A.   Yes.

Q.   You checked he "did not follow verbal
direction," correct?

A.   Under "subject's actions," yes, I checked he
"did not follow verbal -- verbal direction."

Q.   What was the verbal direction he did not
follow?

A.   "Stop, police."

Q.   Okay.  And when did you give him that
command?

A.   During our -- during the onset of the chase
from when he started to take off, up the alley, after
my first shot, up the west end -- the west sidewalk of

1  Marshfield, until we get to 6524.

2      Q.   Okay.  How many times did you yell, "Stop,

3  police"?

4      A.   Many.

5      Q.   Okay.  All right.  And -- and you say in here

6  that your response was you gave member presence and

7  verbal commands, correct?

8      A.   That is the member's response, yes.

9      Q.   Right.  Okay.  Then going to the next one, it

10 says, "Active resister," and you've checked off "fled,"

11 correct?

12     A.   Yes.                                    2:40:28

13     Q.   All right.  And I assume that relates to the

14 fact that he ran?

15     A.   Correct.

16     Q.   Okay.  And it says, under "assailant

17 assault," "imminent threat of battery," and you've

18 checked that off, correct?

19     A.   Correct.

20     Q.   All right.  And that is because he pointed

21 the weapon at you, correct?

22     A.   Correct.

23     Q.   Twice, right?

24     A.   Twice.

25     Q.   Okay.  And then it says, "Assailant battery,"

1  correct?

2      A.    Where are you looking at?  Right here in this

3  next one?

4      Q.    Can you read that?

5      A.    I can't read what that says.

6      Q.    All right.  And under that section, you've

7  checked "attack with weapon," correct?

8      A.    Correct.

9      Q.    All right.  How did he batter you?

10     A.    I'm sorry?

11     Q.    How did Mr. Raye batter you?

12     A.    When he pointed the gun at me.

13     Q.    Okay.  You consider when he pointed the gun

14  at you as a battery?

15     A.    An aggravated assault because it didn't

16  discharge, but --

17     Q.    Right.  That was what the assault checkmark

18  was for, correct?

19     A.    Yes.

20     Q.    There was no battery, right?

21         MR. GAINER:  Object to form.  Go ahead.

22     A.    No.                                    2:41:20

23     Q.    Okay.  Do you know why you checked that off?

24     A.    I don't.  It was -- it was -- you gotta

25  remember I had just gotten done in a chase discharging

1    my weapon.  It was a -- it was a rough patch.

2        Q.    Sure, so that might have been --

3        A.    Okay.

4        Q.    -- a mistake, right?

5        A.    Yes, yes.

6        Q.    Okay.  And it says -- under "assailant deadly

7    force," it says, "Uses force likely to cause death or

8    great bodily harm," correct?

9        A.    Correct.

10        Q.    And I take it that was for -- again, to the

11    pointing of the weapon, right?

12        A.    Yes, sir.

13        Q.    All right.  And here you write in the

14    comments section at the bottom, under "other,"

15    "perceived as firearm," correct?

16        A.    Correct.

17        Q.    And you wrote the same thing under the

18    "assailant assault," correct?

19        A.    Where's that?

20        Q.    It's right here.  You wrote, "Perceived as

21    firearm," right?

22        A.    Correct, correct.

23        Q.    Okay.  Why did you write, "Perceived as

24    firearm"?

25        A.    Because if asked the question of -- of what

1  kind of gun it was, "describe" -- not describe it,

2  "give me a make, model," I couldn't.  I could just tell

3  you that I saw a barrel and the diameter of -- of the

4  barrel.  It's -- it's a very -- the -- the description

5  which I could give, so I wrote, "Perceived as firearm."

6      Q.   And at the time that you -- you filled this

7  form out, you didn't know whether or not they had

8  recovered a firearm, correct?

9      A.   I did not.

10     Q.   All right.  All right.  And then below that,

11 in "member's response," you checked off "firearm,"

12 correct?

13     A.   Yes.

14     Q.   All right.  And do you know whether or not

15 you're able to enter a narrative section there?

16     A.   I don't.  I don't believe -- I don't believe

17 you are, but I -- I -- I couldn't say one way or the

18 other right now.

19     Q.   Okay.  If you were able to put a narrative of

20 what occurred in this report, would you have?

21          MR. GAINER:  Form.  Calls for speculation.

22 Go ahead.

23          MR. COHEN:  Join.                    2:43:12

24     A.   I would not have.

25     Q.   Why not?

```
 1          MR. GAINER:  Same objection.  Go ahead.

 2     A.   We're just told -- we document on the TRR and

 3  the OBR until, you know, we have representation, until

 4  some time has passed so we get the chance to calm down

 5  and collect our thoughts because of the traumatic

 6  incident, for -- for many reasons.

 7     Q.   Okay.  You were surprised that nobody had

 8  interviewed you in detail about what occurred the night

 9  of the shooting, correct?

10     A.   I was.

11          MR. GAINER:  Object --

12          WITNESS:  Sorry.

13          MR. GAINER:  It's okay.

14     Q.   All right.  Okay.  And then I'm going to go

15  back to some of the check boxes --

16     A.   Okay.

17     Q.   -- you've --

18     A.   If you can just help me -- if I can see where

19  you're pointing, then I can go to it also.

20     Q.   Sure, and I'm going to call your attention to

21  box 45, which is right here.

22     A.   Okay.

23     Q.   And the question says, "Did the discharge

24  result in a self-inflicted injury?"  And --

25          MR. GAINER:  Bless you.
```

1    MR. COHEN:  Bless you.

2    MS. GUTOWSKI:  Thank you.

3    Q.   You have checked "yes, subject" and "yes,

4  member," correct?

5    A.   Yes.

6    Q.   Okay.  Can you explain why you indicated

7  those check boxes?

8    A.   Yes, the subject, because he had been shot,

9  and yes for me because I had injured myself during the

10  pursuit of the subject.

11    Q.   Okay.  Would you describe the subject's

12  injury as a self-inflicted injury?

13    A.   No.

14    Q.   Do you see it -- and if you know -- if the

15  question says, "Did the discharge result in a self

16  inflicted injury," why would you click "yes, subject"?

17    MR. GAINER:  Asked and answered.  Go ahead.

18    A.   I'm -- I'm going to go back to because of the

19  circumstances, it -- it -- it could be an error, but I

20  don't know, at this point, why I checked it.

21    Q.   Sure.  It doesn't sound right, right?

22    A.   Right.                              2:45:09

23    Q.   Okay.

24    A.   Okay.

25    Q.   All right.  And do you see in box 46, it asks

1  for a weapon type?  It's right there.

2      A.   Mm-hmm.

3      Q.   Is that a yes?  You have to say, "Yes."

4      A.   It says -- it says, "Weapon type."

5      Q.   Right, and you didn't check any of those off,

6  correct?

7      A.   Correct.

8      Q.   All right.  When it -- when it asks you for

9  lighting conditions, you described it as night,

10 correct?  It's in box 48.

11     A.   Yes.

12     Q.   Okay.  You also indicated that it was

13 raining?

14     A.   Yes, I -- I wrote "rain."

15     Q.   How heavy was the rain?

16     A.   Not heavy.  I think it had already rained.

17     Q.   Okay.  So it wasn't raining at the time of

18 the chase?

19     A.   I don't believe so.

20     Q.   All right.  All right.  And what was the kind

21 of weapon that you used?

22     A.   A Glock 45.                              2:46:03

23     Q.   Okay.  And do you know whether or not you're

24 required to have -- inside your -- when you load your

25 weapon, the same ammunition?  Same type of ammunition?

```
 1           MR. GAINER:  Object to form.

 2           MR. COHEN:  Join.

 3      A.    I believe so.  I -- I think we're given a box

 4  of ammo a year to load our -- our magazines with.

 5      Q.    Right.  And is that -- is the box of ammo

 6  you're given what you load your weapons with?

 7      A.    I believe so, yes.

 8      Q.    Okay.  And did you have the same type of

 9  ammunition in your weapon when you shot at Mr. Raye?

10           MR. GAINER:  Object to form.  Go ahead.

11      A.    I think so.

12      Q.    Okay.  If you didn't, no one's ever brought

13  that to your attention?

14           MR. GAINER:  Object to form.  Go ahead.

15      A.    Yeah, nobody.

16      Q.    All right.  Okay.  And the -- the serial

17  number that is listed here under box 55, which is

18  "WCX617," that's the serial number for your weapon,

19  correct?

20      A.    Yes.*2:47:00

21      Q.    Okay.  And you indicated in box 61 that the

22  ammunition used was department issued, correct?

23      A.    Yes, I see it.

24      Q.    And you have indicated in box 62 that you

25  discharged one weapon, correct?
```

1        A.    Yes.

2        Q.    And in box 62, that you fired two shots,

3   right?

4        A.    Yes, sir.

5        Q.    All right.  You had indicated in box 64 that

6   you fired the first shot, correct?  Down here, where it

7   says, "Member."

8        A.    Yes.

9        Q.    All right.  And in box 65, you indicated you

10  did not reload the weapon during the incident, right?

11       A.    Correct.

12       Q.    Okay.  And you indicated here that you -- you

13  wear your weapon on the right side on your waist,

14  right?

15       A.    Correct.

16       Q.    And that's true, correct?

17       A.    Correct.

18       Q.    And so you're strong side draw would be your

19  right hand, correct?

20       A.    Correct.                              2:47:48

21       Q.    All right.  And that -- in fact, box 66 --

22  68, excuse me, it says that you drew your weapon with a

23  strong side draw, correct?

24       A.    Correct.

25       Q.    All right.  And it says that you used your

1  sights, correct?

2      A.  Correct.

3      Q.  Did you?

4      A.  First shot, only front sight, front sight up.

5  Second shot, both sides.

6      Q.  Okay.  And that would be the -- the rear

7  sight and the --

8      A.  Rear and --

9      Q.  -- front sight?

10     A.  -- front sight, yeah.

11     Q.  Okay.  And you described the protective cover

12 you used during the incident as the bushes, correct?

13     A.  Correct.

14     Q.  And that would have been outside of 6524

15 South Marshfield, right?

16     A.  One house to the north.

17     Q.  Right.  And in box 72, you indicate that the

18 distance between yourself and the offender when the

19 first shot was fired was ten to 15 feet.  Do you see

20 that?

21         WITNESS:  Is that this right here?

22         MR. GAINER:  It's this right here.

23         WITNESS:  Yeah.

24     A.  Estimation.

25     Q.  Okay.  At the time that you made that

1 estimation, it would have been accurate, correct?

2      MR. GAINER:  Object to form.  Go ahead.

3      A.   It would have been what I thought at that

4 time.

5      Q.   Right.  And today, you know, you described

6 the distance between yourself and Mr. Raye as 20 to 30

7 feet when you fired the first shot, correct?

8      A.   Correct.

9      Q.   All right.  Would you agree that your memory

10 of the distance would have been better back then?

11      MR. GAINER:  Form.

12      MR. COHEN:  Join.                          2:48:58

13      A.   It -- it may have been.  May have been.

14      Q.   Okay.  If back then you thought that it was

15 between 20 and 30 feet, you would have checked option

16 four, which is "over 15 feet," correct?

17      MR. GAINER:  Form.  Go ahead.

18      MR. COHEN:  Join.

19      A.   Yes, at that time, had I thought it was more

20 than that, sure.

21      Q.   Okay.  You've reviewed this document before,

22 correct?

23      A.   Yes, I reviewed it yesterday.

24      Q.   Okay.  And aside from reviewing it yesterday,

25 had you reviewed it between the time of when you filled

1    it out and yesterday?

2        A.    During COPA, my COPA interview.

3        Q.    Okay.  And during your COPA interview, did

4    you indicate that there were mistakes made on this

5    document?

6        A.    I did.

7        Q.    Okay.  And did you indicate that you made a

8    mistake about the distance between yourself and the

9    offender when you fired your first shot?

10       A.    I -- I don't think that that came up.  I know

11   we went through the document, but I -- I don't remember

12   if that came up.

13       Q.    Okay.  All right.  In box 73, it says,

14   "Person/object struck as result of the discharge of

15   member's weapon," and you've checked off "subject," in

16   box one, and in box two, "other person," correct?

17       A.    Yeah.

18       Q.    All right.  And do you know why you clicked

19   off "other person"?

20       A.    I don't.  I think that was an error.

21       Q.    Okay.  All right.  Turning to page 2 of this

22   report, there is a section for your reporting member,

23   correct?

24       A.    Sure.                              2:50:51

25       Q.    Which is you, right?

1    A.    Mm-hmm.

2    Q.    John Poulos?

3    A.    Mm-hmm.

4    Q.    Is that a yes?

5    A.    Yes, it is.

6    Q.    And it's indicated the time and date is 24

7  November 2016 at 07:15:12, correct?

8    A.    Correct.

9    Q.    And that's 7:15 a.m., 12 seconds, right?

10   A.    Yes, sir.

11   Q.    And you've -- your signature here is listed

12 in the PC number, it's "PC0V496," right?

13   A.    Correct.

14   Q.    And that is your PC number, correct?

15   A.    It is.

16   Q.    And then this is your electronic signature,

17 correct?

18   A.    Correct.

19   Q.    All right.  And by signing this, you're

20 indicating that it's true and accurate to the best of

21 your belief, correct?

22   A.    Yes, sir.

23   Q.    All right.  And here, it shows that your

24 lieutenant signed off on this document at 24 November

25 2016 at 7:19 a.m. and 34 seconds, right?

```
 1        A.    Correct.

 2        Q.    Okay.  When -- prior to your lieutenant

 3   signing off on this document, did he go over it with

 4   you?

 5        A.    I don't think so.

 6        Q.    Okay.  Did anyone go over it with you?

 7        A.    No.

 8        Q.    Okay.  Did anyone call your attention to what

 9   might be mistakes in the document?

10        A.    No.                                2:51:48

11        Q.    All right.  And then there's a section down

12   here on "additional discharged weapons," correct?

13        A.    Correct.

14        Q.    Okay.  And do you know whether there were any

15   weapons discharge aside from your own?

16        A.    I don't believe so.

17        Q.    Okay.  So do you know why this section

18   appears in the report?

19        A.    I don't.  It appears to be self-populated, so

20   I have no idea, and it's --

21        Q.    Sure.

22        A.    -- below the signature page.  I don't know.

23        Q.    Okay.  And when you say that it's -- it's

24   self-populated, do you mean that sometimes in these

25   forms when you click off certain options, other things
```

```
 1    appear, correct?

 2            MR. COHEN:  Object to the --

 3        Q.   That's not really --

 4            MR. COHEN:  -- foundation.

 5        Q.   That's not really what it means, but I -- I

 6    tried to ask a good question, it didn't --

 7        A.   Yeah, so --

 8        Q.   -- come out that way.

 9        A.   -- I just think that when I checked the

10    front, it mirrors this section.

11        Q.   Yeah, you think this -- this additional

12    section mirrors the front section, correct?

13        A.   Correct.

14        Q.   All right.  And then calling your attention

15    to page 3 of this section, this is for the lieutenant

16    to fill out, correct?

17        A.   Correct.                              2:53:09

18        Q.   Or the watch commander, right?

19        A.   Right, the OCIC, maybe.

20        Q.   Right.  And do you recognize the name Larry

21    Watson?

22        A.   I do.

23        Q.   And who is that?

24        A.   He's the deputy chief area south.

25        Q.   Right.  And is he the individual you did the
```

1    walk-through with?

2         MR. GAINER:  Object to form.  That

3    mischaracterizes his testimony.  Go ahead.

4         A.    No.

5         Q.    Okay.

6         A.    I did the walk-through with Captain Darlin.

7         Q.    Sorry, I -- I -- I think -- at some point,

8    did you speak to Deputy Chief Watson about this case?

9         A.    I did at the --

10        Q.    What --

11        A.    -- area.

12        Q.    At the area.  Okay.  And which area was it?

13        A.    Area south.

14        Q.    South, okay.  Okay.  And this -- the

15   lieutenant's part of the report, in box 81, it just

16   says, "Subject is deceased," right?

17        A.    Correct.

18        Q.    All right.  And in box 82, it says, "Further

19   investigation required by IPRA," correct?

20        A.    Correct.

21        Q.    And it provides a U number, right?

22        A.    Correct.

23        Q.    Which is a file number --

24        A.    Yeah.

25        Q.    -- for a shooting?

1        A.    Mm-hmm.

2        Q.    A police involved shooting, right?

3        A.    Yes.                                    2:54:02

4        Q.    All right.  Okay.  And it indicates that this

5   report was signed by Deputy Chief Watson at 8:03 a.m.

6   and two seconds, correct?

7        A.    Yes, sir.

8        Q.    On 24 November 2016, right?

9        A.    Yes, sir.

10            MR. KOSOGLAD:  All right.  I'm going to have

11   this marked as Exhibit 2 for identification, please.

12        Q.    Need a minute?

13        A.    Sorry, I -- I'm ready.

14        Q.    Okay.  Do you recognize this document?

15        A.    I do, it's the officer battery report.    2:54:48

16        Q.    Okay.  And when you say, "The officer battery

17   report," it's the officer battery report that you

18   filled out in connection with the incident with Mr.

19   Raye, right?

20        A.    Correct.

21        Q.    And even though it's called a battery report,

22   this is a report that's required to be filled out

23   whenever there's an assault or a battery, right?

24        A.    Correct.

25        Q.    And in this case, there was an assault

1  because Mr. Raye pointed his weapon at you, right?

2      A.   Yes, sir.

3      Q.   All right.  Okay.  And again, do you know

4  whether or not the information about yourself would

5  have been self-populated when you put your PC number

6  in?

7      A.   I believe so, yes.

8      Q.   All right.  And the information about the --

9  the incident, you would have filled out in the right

10 hand column, correct?

11     A.   Yes.                                    2:55:29

12     Q.   All right.  And can you read this document

13 okay?

14     A.   Yes.

15     Q.   All right.  So do you see where it says,

16 "Address of occurrence"?

17     A.   Yes.

18     Q.   All right.  And that would have been

19 information you got from someone at the area, right?

20     A.   Correct.

21     Q.   All right.  And it asks for a location code,

22 it says, "200 vacant lot," right?

23     A.   Correct.

24     Q.   That would have been something you would have

25 put in, right?

1      A.   Correct.

2      Q.   Okay.  And as far as the beat of occurrence,

3  do you know if that's self-populating?

4      A.   No, I would have had to call OEMC, maybe

5  through radio transmission or somebody would have done

6  it there.

7      Q.   Sure.  And it says, "Number of officers

8  battered," and you indicated one, right?

9      A.   Correct.

10     Q.   And there -- so you indicated there were

11  assisting units on the scene, right?

12     A.   Correct.

13     Q.   And you indicated there were two other

14  officers at the time of the battery, correct?

15     A.   Correct.

16     Q.   And I take it that, in this particular

17  section, even though it says, "Battery," you mean

18  assault, right?

19     A.   I do, correct.

20     Q.   Right.  There isn't any -- there isn't any

21  place to indicate the number of officers assaulted,

22  right?

23     A.   Correct.

24     Q.   Okay.  Okay.  And in the section under

25  "manner of attack," do you see what you checked there?

```
 1      A.   "Manner of attack"?   "Other, including verbal

 2  or" -- I can't read that other one.

 3      Q.   It says, "Threats."

 4      A.   A threat, okay.

 5      Q.   Okay.   What did you mean by that?

 6      A.   The gun.

 7      Q.   You mean that he pointed the weapon at you,

 8  correct?

 9      A.   Correct.

10      Q.   All right.  And then under "type of

11  weapon/threat," you indicated that it was a

12  semi-automatic, correct?

13      A.   Yes.                                      2:57:02

14      Q.   Okay.  And you did not know the firearm

15  caliber at that point, right?

16      A.   I did not.

17      Q.   All right.  And at -- it says, "Firearm use

18  information," correct?

19      A.   Correct.

20      Q.   And it says, "Officer at gunpoint," right?

21      A.   Correct.

22      Q.   All right.  Do you see under "type of

23  activity," what you checked for there?

24      A.   I -- I checked "other," but what I should

25  have checked was -- I think it was -- where's it at,
```

1  "investigative (sic) suspicious person."

2      Q.   So you think that was just a mistake?

3      A.   Yes, sir.

4      Q.   All right.  And under type of injury to

5  yourself, you indicated it was non-fatal and minor,

6  correct?

7      A.   Correct.

8      Q.   And you would agree with that, right?  It was

9  -- you suffered minor injuries?

10     A.   Yes, sir.

11     Q.   All right.  You also indicated that it was

12 not drug related, right?

13     A.   Yes, I think that's somewhere on here.

14     Q.   It's in -- under "offender information," in

15 the bottom right corner.

16     A.   Mm-hmm.

17     Q.   You see that?

18     A.   Yes.

19     Q.   Okay.  And you also indicated it was not gang

20 related, right?

21     A.   Correct.                                2:58:11

22     Q.   All right.  And again, you indicated the

23 lighting conditions was "night," right?

24     A.   Correct.

25     Q.   And under "weather conditions," you indicated

Exhibit 5, LLC

 1  "rain"?

 2      A.   Correct.

 3      Q.   Correct.  Do -- can you read what the

 4  temperature was -- you said it was outside?

 5      A.   There's -- there's -- the log number's over

 6  it, but I see a five and then Fahrenheit -- Fahrenheit.

 7  I -- I -- I don't know if it's 45 or --

 8      Q.   It looks like "45," but --

 9      A.   Yeah, something --

10      Q.   -- I hear what you're saying.  And then I'm

11  going to call your attention to the back of this --

12  this report.  It says, "Unusual circumstances regarding

13  officer control tactics and safety."  Do you see that?

14      A.   Yes.

15      Q.   And it says, "If you need more space, use

16  additional sheets," correct?

17      A.   Yes.

18      Q.   And this is the section where you can write a

19  narrative about what occurred, correct?

20      A.   Correct.

21      Q.   And you chose not to, right?

22      A.   Yes.

23      Q.   And the reason that you chose not to was why?

24      A.   I had just been through a traumatic incident,

25  I hadn't had time to collect my thoughts or -- or

1    really gather myself, and I was waiting to be

2    interviewed, and that's where I would have given a

3    statement had I been interviewed.

4        Q.   Sure.  And do you know if this battery report

5    is part of the TRR?

6        A.   It is.                                    2:59:21

7        Q.   All right.  And you signed it, correct?

8        A.   Yes.

9        Q.   And also, your Deputy Chief Watson signed it,

10   right?

11       A.   Correct.

12            WITNESS:  I get a headache wearing these.  I

13   get a headache wearing them.

14            MR. GAINER:  Yes.

15            MR. KOSOGLAD:  All right.  Let's -- let's

16   take another few minute break.  I think we're close.

17            RECORDER:  Off the record, 1:50 p.m.

18                    (Off the record)

19            RECORDER:  Back on the record, 1:58 p.m.

20       Q.   I want to make sure that I have a -- I

21   understand something about what happened after the

22   shooting.  How long was it that you didn't know -- or

23   during what period of time were you unaware of whether

24   or not a gun had been recovered?

25       A.   That a gun had been recovered or had not been

1    recovered?

2        Q.   That you were unaware of whether or -- that

3    you didn't know whether one had been recovered.

4        A.   I think by -- yeah, I didn't -- by that

5    morning, I knew nothing had been found, and then --

6    God, I can't tell you -- yeah, by that morning, I knew

7    nothing had been found.

8            MR. KOSOGLAD:  I hear you.

9            WITNESS:  I didn't.  Speak up.

10       Q.   So -- so -- so while you were still at the

11   area, you learned that no weapon had been recovered,

12   correct?

13       A.   Yes.                                    3:00:58

14       Q.   All right.  And how did you learn that?

15       A.   I don't know.  I know that they had not found

16   anything yet.

17       Q.   Okay.  And how did you feel about that?

18           MR. GAINER:  Form.  Go ahead.

19       A.   Not good.

20       Q.   Can you be any more specific than "not good"?

21       A.   No, not -- not really any more specific.

22       Q.   Okay.

23       A.   It's -- yeah, not good.

24       Q.   Okay.  Did you consider the possibility that

25   he didn't have a weapon?

1    A.   I did not.

2    Q.   Okay.  So from the time that -- were you

3  worried about the fact that they hadn't found a weapon

4  from the time of that morning when you found out and

5  until you learned about the weapon being recovered?

6    A.   I was worried about -- not until the moment

7  the weapon was recovered.  I was worried that they

8  hadn't found the gun.  The longer that it took, the --

9  the less likelihood it would be.

10        MR. KOSOGLAD:  Okay.  All right -- I think --

11  I think --

12        MR. OPPENHEIMER:  Okay.  That's enough.

13        MR. KOSOGLAD:  All right.  I have no further

14  questions.

15        MR. GAINER:  You guys have any questions?

16  Okay.

17                    EXAMINATION

18  BY MR. GAINER:

19    Q.   Sergeant Poulos, I want to ask you a question

20  or some questions about the time period between the

21  shooting and when you were stripped of your police

22  powers, okay?  You testified here that you were

23  stripped of your police powers, correct?

24    A.   Correct.                          3:02:47

25    Q.   And how many days after the shooting were you

1    stripped of your police powers?

2         A.    Two days.

3         Q.    I'm sorry?

4         A.    Two days.

5         Q.    All right.  Between the time of the shooting

6    and the time you were stripped of your police powers,

7    did you speak to anyone from the police department

8    about what happened that night, specifically?

9         A.    When I was called to the -- to headquarters

10   to be stripped Saturday morning.

11        Q.    Okay.  3510 South Michigan, that's where you

12   were called to?

13        A.    Yes, sir.                          3:03:25

14        Q.    Okay.  And when you went to 3510 South

15   Michigan, did you know when you went there you were

16   going to be stripped?

17        A.    I did.

18        Q.    Okay.  And when you got there to 3510 South

19   Michigan, to whom did you speak, either before you were

20   stripped or while you were being stripped?  Name all

21   the people.

22        A.    I -- I started in the first deputy's office

23   with Kevin Navarro, the superintendent, Eddie Johnson,

24   came in.  Subsequently, I was walked out by Chief Eddie

25   Welch, and a sergeant from IAD, from internal affairs.

1    Q.   Okay.  So when you spoke, did you speak with

2  First Deputy Navarro at the time about what happened

3  during the shooting?  Just did you have a conversation

4  with him about it?

5    A.   With him?  No.

6    Q.   Okay.  Did you have a conversation with the

7  superintendent, Eddie Johnson, about what happened

8  during the shooting?

9    A.   Yeah, subsequently that morning, when I went

10 into the first deputy's office, we exchanged niceties.

11 Like I said, he was my former commander and captain,

12 and then the superintendent came in.

13   Q.   All right.  And when the superintendent come

14 in, did you have a conversation about the shooting?

15   A.   I did.                              3:04:37

16   Q.   Okay.  Can you tell us what that conversation

17 entailed?

18   A.   The superintendent sat to my right, I

19 believe, and he just said, "Tell me what happened."

20   Q.   And did you respond?

21   A.   I did.

22   Q.   How did you respond?

23   A.   I responded that -- I explained to him the

24 call, I explained to him what took me to the area, I

25 explained the description, the -- the chase, the fact

1    that he had pointed a gun at me twice, that I only

2    discharged my weapon in fear for my life twice, that I

3    was certain there was a gun.

4        Q.    Okay.  And when -- was that the extent of

5    your conversation with Eddie Johnson about the

6    shooting?

7        A.    No, the superintendent told me that a

8    community activist had come forward, and that there was

9    an eyewitness to -- that there was a gun, and the gun

10   was picked up, and said that, you know, "We're going to

11   get through this," and you know, "This is the optics of

12   it at this point, we just -- we -- we need to finish

13   our investigation."

14       Q.    Okay.  Did you and the superintendent have

15   any further discussions about the shooting?

16       A.    No, that was it.

17       Q.    Okay.  And then --

18       A.    About the shooting.

19       Q.    -- who was present for that conversation,

20   other than you and the superintendent?

21       A.    The First Deputy Kevin Navarro.

22       Q.    Was there anyone else present?

23       A.    No, sir.

24       Q.    After your conversation with the

25   superintendent and Kevin Navarro about the shooting,

1    what happened next?

2        A.    I had told him that I had heard some rumors

3    that there was an existing CR being circulated, and we

4    discussed that.

5        Q.    Okay.  And then after having that discussion,

6    where did you go or what did you do?

7        A.    I was walked down the block -- or down the

8    hallway of the fifth floor to the chief's office, chief

9    of IAD, I believe, or a conference room similar to

10   this, and I was read my administrative rights and what

11   I could and can't do while being stripped.

12       Q.    All right.  And after doing the

13   administrative work relating to being stripped of your

14   police powers, did you leave 35th and Michigan?

15       A.    I did.                              3:07:05

16       Q.    Have you now told us about all of the

17   discussions you had at 35th and Michigan, 3510 South

18   Michigan, about the shooting with anyone?

19       A.    Yes.

20            MR. GAINER:  All right.  Okay.  I don't have

21   any other questions for you.

22                      EXAMINATION

23   BY MR. KOSOGLAD:

24       Q.    Okay.  I'm going to follow up on a --

25       A.    Sure.

1      Q.   -- couple of those things.  So when did you

2   get called to the headquarters?

3      A.   Saturday morning, roughly 9:30.

4      Q.   Okay.  And how did you find out before the

5   meeting that you were going to get stripped?

6      A.   I think the first deputy sergeant called me

7   and said, "You are to report to headquarters tomorrow

8   morning."

9      Q.   So that would have been Friday?

10     A.   Friday.

11     Q.   And what's that person's name?

12     A.   I think it might have been Sergeant Aguilar,

13  I -- I believe.  I'm not sure if it was her.

14     Q.   Sergeant what?

15     A.   Aguilar.

16     Q.   Aguilar.  All right.  And he (sic) notified

17  you that you would be stripped and that you should

18  report to the headquarters tomorrow morning?

19     A.   She.

20     Q.   She?

21     A.   She.

22     Q.   She, I'm sorry.

23     A.   She told me to report.  I didn't know that I

24  was being stripped per se, I just -- I -- I had a

25  feeling.

1    Q.   You had a feeling?

2    A.   Yes.                                    3:08:25

3    Q.   Had -- had you been something like this

4  before?

5    A.   No, I -- the -- the -- both the

6  superintendent had come out and said that he had more

7  questions than answers, and the mayor had made some --

8  some comment on that Friday, so.

9    Q.   Okay.  And when you reported, did you talk to

10  anyone about the conversation you had with the first

11  deputy sergeant?

12       MR. GAINER:  I --

13    A.   Who --

14       MR. GAINER:  -- object to form.

15       MR. COHEN:  Join.

16    Q.   Did I get the rank right?  I'm sorry, I

17  thought --

18    A.   No, no, the --

19    Q.   -- you said, "First deputy sergeant."

20    A.   No, the -- the first deputy's administrative

21  sergeant --

22    Q.   Sorry.

23    A.   -- would have been the one who would have

24  notified me to report.

25    Q.   I see.  And do you think that person -- that

1   she -- her name was Aguilar, right?

2       A.   I believe so.

3       Q.   Okay.  Sorry, I -- I'm --

4       A.   Yeah, it's okay.

5       Q.   And after you got that call, did you talk to

6   anyone about it?

7       A.   No.                                    3:09:10

8       Q.   Okay.  You didn't talk to your family about

9   it?

10      A.   My wife.  I -- I probably, yes, talked to my

11  wife.

12      Q.   But aside from your wife, you didn't talk to

13  anyone?

14      A.   Maybe my brother that I had to report, but

15  that's -- yeah --

16      Q.   You say maybe your brother, did you --

17      A.   Yeah.

18      Q.   -- do you remember talking to your brother?

19      A.   I -- I don't.  I don't.

20      Q.   Is your brother a police officer?

21      A.   He's not.

22      Q.   All right.  So you don't remember talking to

23  anyone about that phone call, correct?

24      A.   No.

25      Q.   Okay.  And then you did report the next

1    morning?

2         A.    I did.

3         Q.    And what happened?  Where did you go first?

4         A.    I went to the desk.  I -- I still had my

5    credentials, so they just said, "Yeah, go up to the

6    fifth floor."  I used the telephone that's outside of

7    the fifth floor because the door's locked, and I think

8    it was the first deputy who came out and got me, and we

9    walked to his office.

10        Q.    Okay.  And the first deputy is Kevin Navarro?

11        A.    Yes, sir.

12        Q.    And this is the same individual who

13   recommended you for the merit promotion?

14        A.    Yes, sir.

15        Q.    Okay.  And did you talk to Mr. Navarro during

16   that walk?

17        A.    We exchanged pleasantries, you know, how am I

18   holding up, that kind of stuff.

19        Q.    Okay.  And then you had a conversation with

20   him?

21        A.    We went into the office.  Yes, we just sat

22   across, and he didn't ask me anything about the

23   incident, and again, it was just how am I holding up,

24   that -- have I gone to EAP.

25        Q.    What's EAP?

1     A.   The, what's it called, employee assistance

2   program.  It's -- our psychiatrists are there.  You

3   have to report there after a shooting.

4     Q.   Did you go to the EAP?

5     A.   I did.                                    3:10:49

6     Q.   When did you do that?

7     A.   The following Tuesday, I think.

8     Q.   Okay.  Following the meeting with -- when you

9   got stripped?

10    A.   Yes.

11    Q.   Okay.  Was that the only time you visited

12  EAP?

13    A.   No.

14    Q.   How many times did you go there?

15    A.   I think I went once every two weeks or three

16  weeks for a little over a year.

17    Q.   Okay.  Did you talk about the shooting with

18  the EAP?

19    A.   So let's --

20         MR. GAINER:  Just -- anything that Sergeant

21  Poulos has discussed with any sort of mental health

22  care provider is privileged, and so he's testified

23  where he went and how frequently he went there, but I'm

24  not going to let him testify about what they discussed.

25    Q.   Okay.  When -- when you went to the EAP, did

1  -- did you have an understanding of whether or not the

2  EAP would be reporting what occurs during the meetings

3  with the City of Chicago?

4      A.   They do not.                                3:11:52

5      Q.   Okay.  And are you going to follow your

6  lawyer's advice and refuse to answer questions about

7  what you discussed with the EAP?

8      A.   Yes, they were private meetings.  He's a

9  doctor.

10      Q.   So and you said that you -- you -- you met

11  with them every two to three weeks for over a year,

12  right?

13      A.   Yes, sir.

14      Q.   Okay.  So going back to this conversation you

15  had with First Deputy Navarro, what else did he say to

16  you and you say to him?

17      A.   Like I said, just pleasant -- like, regular

18  conversation that you would have with somebody outside

19  of work, "how are things going, how's the family," how

20  am I holding up, how -- you know, "use the EAP as" --

21  you know, "it's a good tool," that kind of stuff.

22      Q.   Okay.  And outside of those kinds of

23  pleasantries, as you called them, there were no other

24  conversation, right?

25      A.   No, no.                                    3:12:53

```
 1      Q.   Okay.  All right.  And what happened after
 2  you met with the first deputy --
 3      A.   We were just passing time until the
 4  superintendent could come in.
 5      Q.   Okay.  And he -- then he came into the --
 6      A.   He did come in.
 7      Q.   -- first deputy's --
 8      A.   He --
 9      Q.   He came into the first deputy's office?
10      A.   He came into the first deputy's office.
11      Q.   Okay.  And he sat down?
12      A.   He sat down next to me.
13      Q.   All right.  And can you explain what
14  happened?
15      A.   Sure, he asked me -- he said, "Tell me what
16  happened."
17      Q.   Is that the first thing he said to you?
18      A.   No, I think he asked me -- he gave me a hug,
19  and asked me how I was doing, and then he said, "Tell
20  me what happened," and I -- I told him.
21      Q.   Did you give him a detailed account of what
22  occurred?
23      A.   A little more than the broad strokes, but I
24  wouldn't say as detailed as we have been today.
25      Q.   Okay.  Well can you explain what details you
```

1    shared with him?

2        A.   Sure.  Like I said previously, I -- I told

3    him of what brought me to the incident, what brought

4    the -- the young man to the -- to my attention, the

5    chase, the -- I don't -- we didn't go into the

6    direction of the chase, or the distance, or anything

7    like that, but that we went onto -- we got onto the

8    vacant lot, and he pointed a gun at me, I discharged my

9    gun once, then he pointed the gun at me again, and I

10   discharged a second time, and you know, I was -- I was

11   adamant in that meeting that he had a gun.

12       Q.   Did you tell him about the overhand motion

13   you saw?

14       A.   Yes.                                  3:14:29

15       Q.   Okay.  Did you tell him that he -- that you

16   dove into the bushes to take cover?

17       A.   I did.

18       Q.   Okay.  Did anyone take any notes during that

19   meeting?

20       A.   No.

21       Q.   Did you say anything other than describing

22   the circumstances of -- well let me -- let me rephrase

23   the question.  Did you tell the superintendent that no

24   one had asked you about where the gun was?

25       A.   I don't remember discussing the process of

 1  the investigation or -- I -- I mean, I -- I -- I

 2  wouldn't have to tell him that.  He's superintendent of

 3  police, he knows the process of the investigation.

 4      Q.   So you're saying he would have known that, to

 5  date, no one would have asked you where the gun was

 6  located?

 7          MR. GAINER:  Objection.  Form.  Calls for

 8  speculation.  Go ahead.

 9          MR. COHEN:  Join.

10      A.   I would just assume he would have known that,

11  with the new rules in place, IPRA conducts the

12  investigation, so -- why would he ask me if anybody had

13  talked to me?  He wouldn't.

14      Q.   Right, but I just -- I'm trying to make a --

15  I don't -- I'm trying to make it clear for --

16      A.   Okay.

17      Q.   -- the record that -- that he didn't -- you

18  didn't tell him that no one had asked you to -- for

19  assistance locating where the weapon was, right?

20          MR. GAINER:  Asked and answered.  Go ahead.

21      A.   No, I did not.                    3:16:01

22      Q.   Okay.  But -- but at that point, when you had

23  met with the superintendent, it was true that no one

24  had asked you for assistance in locating the weapon,

25  correct?

 1     A.    Correct.

 2     Q.    Okay.  And after you described the shooting

 3 to him, what did he say?

 4     A.    He told me to keep my head up, he -- he said

 5 that he had been approached by -- by an activist,

 6 community activist, who said they had a -- they had a

 7 witness who saw Mr. Raye with the gun in the vacant

 8 lot.

 9     Q.    Okay.  Did you ever find out who that witness

10 was?

11     A.    I did not.

12     Q.    Did you ever find out who the community

13 activist was?

14     A.    I did not.

15     Q.    All right.  And what happened next?

16          MR. GAINER:  So do you want him to answer the

17 question that you just asked?

18          MR. KOSOGLAD:  Yes.

19          MR. GAINER:  Okay.  Go ahead.

20     A.    He explained to me the process of -- of being

21 stripped, that it was -- because of the optics, it was

22 necessary.  I said I understood, and I got stripped.

23     Q.    And then -- and -- and -- and he specifically

24 said it was -- did he use that phrase, "because of the

25 optics"?

1    A.    Yes.                                              3:17:36

2    Q.    And did you understand what he meant by that?

3    A.    Yes.

4    Q.    What was your understanding?

5          MR. GAINER:  Calls for speculation.  Go

6  ahead.

7    A.    I would assume the optics are that a -- that

8  a Caucasian male officer shot an African American teen,

9  and at this point, no weapon had been recovered.

10   Q.    All right.  Was there any discussion about

11 the fact that you had shot -- previously shot an

12 unarmed person?

13   A.    No.

14   Q.    Did you think that had something to do with

15 the optics?

16   A.    I don't believe so.

17   Q.    Okay.  All right.  And after the

18 superintendent explained to you the circumstances of

19 the process for being stripped, what happened next?

20   A.    I told him that -- okay.

21         MS. MAISURIA:  There's a baby here somewhere.

22   Q.    Go ahead.

23   A.    So I --

24         MR. GAINER:  Wait a minute.  What's the

25 question?  Can you read back the last question, please?

1    Are you able to do that?

2                    (Record replayed)

3            MR. GAINER:  Thank you.  Go ahead.

4        A.    So --

5        Q.    Hang on one second, just let --

6            WITNESS:  Are you ready?  Okay.

7        A.    I -- I'm not sure how we got on the subject,

8    but I told them that there was a rumor that my file had

9    been released and so --

10       Q.    Why did you tell him that?

11       A.    Because normally, the instances of -- of an

12   officer's file being released so soon after a shooting

13   almost never happens, so I wanted him to know that

14   somebody was passing information around about my file.

15       Q.    How did you find that out?

16       A.    Somebody had -- I -- I can't remember who,

17   but somebody had told me that -- that my -- that a

18   Ja'Mal Green had made a Facebook post that I had

19   something in my file from -- that I should have never

20   been hired.

21       Q.    Somebody told you about a Facebook post by a

22   Ja'Mal Green that you should have never been hired?

23       A.    Yes.                              3:19:57

24       Q.    Okay.  Did you investigate that Facebook

25   post?

```
 1      A.   I believe I did.

 2      Q.   Okay.  Did you find it?

 3      A.   I -- I think I did, yes.

 4      Q.   When you say you -- you think you did, do you

 5 remember finding it or no?

 6      A.   Yeah, I think I did.

 7      Q.   Okay.

 8      A.   But -- so I think I did, I mean, it was two

 9 years ago, so.

10      Q.   Yeah, how did you go about investigating

11 that?

12      A.   On Facebook.

13      Q.   So you got on your own -- do you have a

14 Facebook account?

15      A.   No -- I do have a Facebook account, yes.  I

16 do have Facebook, but I don't think I used mine at the

17 time.

18      Q.   Okay.  Whose did you use?

19      A.   I don't remember, to be honest with you.

20           MR. KOSOGLAD:  What?

21      Q.   Oh, yeah, did you -- did you save a copy of

22 the post?

23      A.   No.

24      Q.   Okay.

25      A.   But I'm sure it's out there.
```

```
 1        Q.   You told the superintendent about it?

 2        A.   I did.

 3        Q.   All right.  And this thing that you said

 4   people were -- or somebody was sharing your file, were

 5   you referring to the investigation into whether or not

 6   you lied on your police application?

 7        A.   Yes.                                    3:20:54

 8        Q.   Okay.  And what did he say in response to

 9   that?

10        A.   He just said, "We've -- you know, let's just

11   get through this, and that will be fine.  Let's just

12   get through this."

13        Q.   Did he say anything else about it?

14        A.   No.

15        Q.   All right.  Did you ever make a complaint

16   that someone had shared your file?

17        A.   To him right then and there.

18        Q.   Outside of what you said to the

19   superintendent?

20        A.   No.

21        Q.   Okay.  Did you -- did you ever ask the

22   superintendent to follow up after the investigation was

23   over?

24        A.   No, just what I had said to him at that

25   meeting.
```

1     Q.   Did you think at all that the file figured

2  into the optics of the situation?

3         MR. GAINER:  Form.  Go ahead.

4         MR. COHEN:  Join.

5     A.   No, I -- I didn't because I believed that --

6  that -- that CR was closed.

7     Q.   Okay.  All right.  And after the

8  superintendent, you talked about the -- the CR file.

9  What happened next?

10     A.   The chief came in, and we walked down the

11  hall, and I was given my administrative rights.

12     Q.   Who -- who was the chief?

13     A.   Chief Eddie Welch.

14     Q.   Okay.  And when you say he came in and you

15  were escorted down the hall, did you shake hands with

16  everyone there and --

17     A.   Yes.

18     Q.   And did someone say the meeting was over?

19     A.   I think the superintendent said, "You'll --

20  you know, you'll go with the chief, and he'll give you

21  your administrative rights, and" --

22     Q.   Okay.  And then you went with the deputy

23  chief?

24     A.   I went with the chief, not deputy chief.

25  With the chief, and --

1    Q.   Sorry, the chief.

2    A.   -- and a sergeant, yes.

3    Q.   All right.  Who was the sergeant?

4    A.   Sergeant -- I'm going to butcher his name,

5    Sheroff (phonetic) -- he's -- he's in internal affairs.

6    He's a sergeant in internal affairs.

7    Q.   All right.  And where did you go?

8    A.   Down the hall to, I think it was a conference

9    room adjacent to the chief's office.

10   Q.   Okay.  And they gave you your -- and did they

11   read you your administrative rights?

12   A.   They gave me my administrative rights, a few

13   sheets of paper that I had to fill out for turning in

14   my star and my shield, and -- and then they gave me a

15   different ID that signified that I'm an employee of the

16   City of Chicago Police Department, rather than as

17   Sergeant John Poulos.

18   Q.   Sure.  Okay.  And did anything else happen in

19   that room?

20   A.   No.                                    3:23:34

21   Q.   All right.  And then did you leave at that

22   point?

23   A.   Yes.

24   Q.   Okay.  Did you talk to anyone else about that

25   --

1   A.   No.

2   Q.   -- conversation?  And so at this point, have

3 you testified about all the conversations you had in

4 relation to the shooting?

5   A.   Yes.

6   Q.   Okay.  So do you -- you are aware that there

7 was a piece of plastic and a coil recovered from the

8 jacket, correct?

9   A.   I am.

10   Q.   Today, right?  You're aware --

11   A.   Yes.

12   Q.   -- of that?

13   A.   Yes.

14   Q.   Do you -- do you know how that piece of

15 plastic and coil got there?

16   A.   No.

17   Q.   Okay.  Do you know how you're going to

18 contend in this lawsuit that that piece of plastic and

19 coil got there?

20       MR. GAINER:  Okay.  So that directly

21 infringes upon the attorney-client privilege.  We're

22 not answering that question.

23   Q.   I'm --

24       MR. COHEN:  I also object -- I'm sorry, I'll

25 also object to form and foundation.

```
 1            MR. KOSOGLAD:  Sure.
 2       Q.   Do -- do -- do you have a personal theory
 3  about how the -- the piece of plastic and coil got
 4  inside the jacket?
 5            MR. COHEN:  Same objection.              3:24:39
 6            MR. GAINER:  You know what, he's not
 7  answering that question either.  Any personal theory he
 8  has is based on conversations he had with his lawyer,
 9  so --
10            WITNESS:  Right.  I --
11            MR. GAINER:  -- that's privileged, and he's
12  not answering.
13            MR. OPPENHEIMER:  He can say that any
14  personal theory he has came from his conversation with
15  his lawyer, but --
16            MR. GAINER:  Right, but since --
17            MR. OPPENHEIMER:  -- he had no personal
18  theory independent of conversations with his lawyer, if
19  that's the truth.
20            MR. GAINER:  Since -- since any conversation
21  --
22            MR. OPPENHEIMER:  I find that hard to
23  believe, but that's okay.
24            MR. GAINER:  I don't care what you think
25  about --
```

1          MR. OPPENHEIMER:  Okay.

2          MR. GAINER:  -- is hard to believe.

3          MR. OPPENHEIMER:  That's fine.

4          MR. GAINER:  And you're --

5          MR. OPPENHEIMER:  He can say that then.

6          MR. GAINER:  Okay.  He -- no, he can't

7  because any conversations about theories relating to

8  the piece of plastic and the coil are privileged, so

9  he's not going to answer.

10         MR. OPPENHEIMER:  So he's not allowed to have

11 a personal theory on his own about how a piece of

12 plastic that allegedly belonged to this gun got in this

13 kid's pocket?

14         MR. GAINER:  You know what, I -- I'm

15 instructing you not to answer that question if it

16 infringes upon any conversations with your lawyers

17 relating to the piece of plastic and the trigger bar

18 spring in Kajuan Raye's jacket.  If you have a theory

19 about those things, aside from what I just said, that

20 are personal, not in conjunction with your attorneys,

21 you can go ahead and answer.

22    A.   My only conversations have been with my

23 attorneys.

24         MR. KOSOGLAD:  I -- I have nothing further.

25         MR. GAINER:  Okay.  I have nothing further.

1  Do you guys have any questions?  All right.

2          RECORDER:  Signature?

3          MR. GAINER:  Reserved.

4          RECORDER:  All right.  Off the record, 2:25

5  p.m.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATION

2     I certify that the foregoing is a correct

3     transcript from the record of proceedings

4          in the above-entitled matter.

5

6

7               Olivia Driscoll

8             November 14, 2018

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25