## CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022

### SUMMARY REPORT OF INVESTIGATION[1]

## I.   EXECUTIVE SUMMARY

| Date of Incident: | November 23, 2016 |
|---|---|
| Time of Incident: | 11:07 pm |
| Location of Incident: | 6507 S. Marshfield |
| Date of IPRA Notification: | November 23, 2016 |
| Time of IPRA Notification: | 11:45 pm |

On November 23, 2016, at approximately 11:00 pm, Sgt. John Poulos drove to the intersection of 65th and Ashland to assist one of the units under his command in responding to a 911 call. The 911 caller reported that a male subject wearing a black jacket and red hoodie was choking a female in an alley east of 65th and Ashland. As Sgt. Poulos drove west on 65th, he observed a man, now identified as Kajuan Raye, matching the caller's description standing at a bus stop on the northwest corner of 65th and Ashland. Sgt. Poulos activated his unmarked vehicle's emergency lights, drove west across Ashland, and stopped in front of the bus stop. As he exited his vehicle and began to announce his office, Raye grabbed the waistline of his pants and ran west down 65th. Sgt. Poulos gave chase and pursued Raye on foot as he turned south into the alley between Ashland and Marshfield. Raye then veered west into a vacant lot at 6507 S. Marshfield.

According to Sgt. Poulos, when he entered the lot, Raye turned backwards, extended his right arm, and pointed a pistol at him. Sgt. Poulos drew his weapon and fired once. Raye turned away from Sgt. Poulos and continued to run west toward Marshfield. Several seconds later, Sgt. Poulos stated that Raye again extended his right arm and pointed a gun at him, and Sgt. Poulos discharged his weapon a second time. Raye ran out of the vacant lot, and Sgt. Poulos lost sight of him as he (Raye) crossed Marshfield in a southwesterly direction. At approximately 6510 S. Marshfield, Sgt. Poulos regained sight of Raye and continued to pursue him south on Marshfield. As Raye turned west in a gangway at 6524 S. Marshfield, he made a throwing motion with his right arm, causing Sgt. Poulos to dive for cover and again lose sight of Raye. Responding units later recovered Raye's jacket in the alley between Marshfield and Paulina, and they located Raye lying in a gangway at 6521 S. Paulina. The Medical Examiner later determined that Raye died as the result of a single gunshot wound to the back.

Responding officers searched the area for Raye's gun immediately after the shooting, but none was recovered. On February 19, 2017, nearly three months later, a 911 caller reported that her son discovered a handgun in the bushes in front of her home at 6510 S. Marshfield.[2] CPD

---

[1] On September 15, 2017, the Civilian Office of Police Accountability (COPA) replaced the Independent Police Review Authority (IPRA) as the civilian oversight agency of the Chicago Police Department. Therefore, this investigation, which began under IPRA, was transferred to COPA on September 15, 2017, and the recommendation(s) set forth herein are the recommendation(s) of COPA.

[2] Figure 1 in this report is a diagram that shows the positions of Sgt. Poulos and Kajuan Raye at the time of the shooting, the path of the foot pursuit, and the location where the handgun was recovered on February 19, 2017.

1

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913

officers recovered the gun. Through a combination of circumstantial, physical, testimonial, and social media evidence COPA concludes it likely and reasonable that this firearm was in Raye's possession at the time of his flight. COPA also concludes that at the time Sgt. Poulos discharged his weapon, he reasonably believed that Raye posed an immediate threat to his life, and Sgt. Poulos' use of deadly force was within policy as outlined by General Order G03-02-03, II, relevant Illinois state law, and the Fourth Amendment.[3]

Figure 1. Diagram of the Shooting Location and Path of the Foot Pursuit



A: Location where the police pursuit began (bus stop at 65th & Ashland)
B: Approx. location where Sgt. Poulos fired the first shot (vacant lot at 6507 S. Marshfield)
C: Approx. location where Sgt. Poulos fired the second shot and struck Raye (vacant lot at 6507 S. Marshfield)
D: Location where the Kahr Arms CW40 pistol was found (6510 S. Marshfield)
E: Location of witnesses Nakilno Hubbard and Lendell Whittington (6524 S. Marshfield)
F: Location where Raye's Pelle jacket was found (alley behind 6522 S. Marshfield)
G: Location where Raye was found (south gangway of 6521 S. Paulina)
- - - -: Path of Raye's flight

---

[3] On November 29, 2016, Kajuan Raye's mother filed a civil lawsuit against Sgt. Poulos and the City of Chicago pursuant to 42 U.S.C. § 1983 (N.D. Ill., Case 16-CV-10913). As of the date of this report, the case is still pending.

2

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**     **LOG #1083121 / U #16-022**

## II.   INVOLVED PARTIES

| Involved Officer #1: | POULOS, John; Star #814; Employee #5143; Date of Appointment: March 26, 2001; Chicago Police Sergeant; Unit 007; Date of Birth: December 24, 1971; Male; White. |
|---|---|
| Subject #1: | RAYE, Kajuan; Date of Birth: May 30, 1997; Male; Black. |

## III.   ALLEGATIONS

Any discharge of an officer's firearm results in a mandatory notification to COPA and investigation thereof. However, upon conclusion of the investigation, COPA determined there was insufficient evidence to support bringing allegations of excessive force against Sergeant Poulos.

## IV.   APPLICABLE RULES AND LAWS

General Orders

1. G03-02, Use of Force Guidelines (Effective Date: October 1, 2002)

2. G03-02-03, Deadly Force (Effective Date: February 10, 2015)

Federal Laws

1. U.S. Constitution, 4th Amendment

State Laws

1. 720 ILCS 5/7-5, Peace Officer's Use of Force in Making Arrest

## V.   INVESTIGATION[4]

COPA obtained and reviewed all relevant video, audio, forensic, and documentary evidence associated with this officer-involved shooting that occurred on November 23, 2016, and the subsequent recovery of the firearm from 6510 S. Marshfield on February 19, 2017. Additionally, COPA interviewed more than thirty (30) civilian and officer witnesses, including the involved sergeant. The following is a summary of the evidence obtained and analyzed by COPA in this investigation:

---

[4] COPA conducted a thorough and complete investigation. The following is a summary of the material evidence gathered and relied upon in our analysis.

3

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022

a. INTERVIEWS

i. Police Officer Statements

Sergeant John Poulos

In a **statement to COPA on November 14, 2017, Sergeant (Sgt.) John Poulos #814**[5] provided the following account of the incident. On the evening of November 23, 2016, Sgt. Poulos was working as a sector sergeant, assigned to Beat 710R. He wore a full uniform and protective vest; he drove a grey unmarked police sedan. As sector sergeant, his duties were to monitor the activities of eight to sixteen officers in the 7th District. At approximately 10:55 pm, Sgt. Poulos drove to the vicinity of 65th and Ashland to meet one of the units under his supervision, Beat 715R, and assist those officers in responding to the 911 call of a male choking a female in the alley. According to Sgt. Poulos, the description on his PDT[6] was "a man wearing a, I think it was black jacket, red hoodie, red sleeve, something very distinctive."[7] Beat 715R was unable to locate either the man or woman he allegedly assaulted. As Sgt. Poulos drove west on 65th, he observed a man fitting the description of the subject standing at the bus stop on the northwest corner of 65th and Ashland. The male subject, now identified as Kajuan Raye, appeared to be waiting for the bus with a second man of approximately the same height and build.[8]

Sgt. Poulos stated that he informed dispatch that he may have located the offender. When he saw Beat 715R approaching his location, Sgt. Poulos activated his emergency lights and drove across Ashland to approach Raye. According to Sgt. Poulos, he approached Raye with the intention of conducting a field interview with him. However, as soon as Sgt. Poulos exited his vehicle, Raye "looked up at me, grabbed a hold of his pants, [and] took off from me."[9] Raye ran west down 65th and turned south into the alley between Ashland and Marshfield. Sgt. Poulos pursued Raye on foot, and repeatedly said to him, "Stop, police!"[10] Sgt. Poulos approximated that he was about half a block behind Raye as they were running down 65th, and started gaining ground on Raye once they turned south down the alley. Sgt. Poulos said that Raye held the front of his waistband as he ran, and Sgt. Poulos did not see a weapon in his hand. Likewise, Sgt. Poulos' own weapon was not drawn at that point in the pursuit.

According to Sgt. Poulos, Raye veered off the alley and started to run west through the vacant lot at 6507 S. Marshfield. As Sgt. Poulos turned into the vacant lot behind Raye, "I see Mr. Raye, uh, he's still running, but he is turned backwards, and he's lifting his hand. Uh, and in his hand... I see a very large barrel."[11] Raye extended his right arm from his waistline upwards, pointing a gun in Sgt. Poulos' direction. Sgt. Poulos drew his firearm, screamed into his radio, "He's got a gun,"[12] and discharged his weapon once. He estimated that he was approximately 15

---

[5] Atts. #269-270, 282, 422.
[6] Portable Data Terminal
[7] Att. #282, pg. 18, lines 2-4.
[8] This possible individual was Julius Green, a childhood friend of Raye's who died in a car accident on October 25, 2017. In an interview with COPA investigators on March 23, 2018, Green's grandmother Lavada Beckley stated that Green told her he was with Raye at the bus stop at the time of the incident. Att. #390.
[9] Att. #282, pg. 24, lines 6-7.
[10] Att. #282, pg. 26, lines 11-12, 15; pg. 31, lines 22-24.
[11] Att. #282, pg. 35, lines 4-6.
[12] Att. #282, pg. 35, lines 11-12.

4

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913

feet away from Raye when he fired. Raye dropped his arm to his side, turned around, and continued to flee west across the lot, toward Marshfield.

Several seconds later, however, Raye again extended his right arm and pointed a gun in Sgt. Poulos' direction as he ran. "But, this time, he doesn't even look at me. He just points it at me, and I still have my gun out, uh, and I fire one more time."[13] Sgt. Poulos stated that he was approximately 30 feet away from Raye when he fired the second shot, and he did not have time to take cover. He characterized both discharges of his weapon as "a split-second decision."[14] After Sgt. Poulos fired the second shot, he saw Raye reach the end of the vacant lot and run across Marshfield in a southwesterly direction. Sgt. Poulos slowed his pace so as not to be blindsided by Raye when he crossed the street, and lost sight of Raye from the edge of the vacant lot at 6507 S. Marshfield to somewhere around 6510 S. Marshfield. Once he reacquired sight of Raye, he could no longer see if Raye had a weapon in his hand.

As Sgt. Poulos chased Raye south down the sidewalk along the west side of Marshfield, he observed three civilians sitting on a porch directly ahead of them. Sgt. Poulos yelled to them, "He's got a gun! Get down! Police."[15] When Raye reached the corner of the home where the civilians were sitting, Sgt. Poulos saw him extend his arm in an overhand motion, as if he were throwing something backwards. Sgt. Poulos could not tell if Raye had the gun in his hand, but because they were so close, his "first instinct was to jump out of the way and go for cover."[16] Sgt. Poulos slid face first into the neighbor's bushes, sustaining minor abrasions to his hands and left knee. Raye then turned west and ran down the home's south gangway, and Sgt. Poulos lost sight of him a second time. Sgt. Poulos got up, asked the civilians on the porch what address he was at and relayed the information to dispatch. Sgt. Poulos stated that he believed the location was 6524 S. Marshfield. He then ran down the gangway in the same direction that he last saw Raye fleeing.

As Sgt. Poulos reached the alley between Marshfield and Paulina, he noticed Raye's black and red jacket lying in the middle of the alley. He acknowledged picking up the jacket and patting it down, as he "expected to find the weapon in the jacket...but it was not."[17] Sgt. Poulos stated that he waited in the alley until Beat 706BR arrived, and then followed behind Officers Andrew Turner and Matthew Lucki as they proceeded west into a backyard and gangway looking for Raye. Within seconds, they located him sitting in the gangway of a home on Paulina. Two officers that Sgt. Poulos did not recognize were already with Raye, one of whom was on the ground next to Raye. Sgt. Poulos stated that Raye and the officer on the ground were talking to one another, though he could not make out the words that either said.

After Raye was secured and an ambulance called, Sgt. Poulos began retracing his steps to set up a perimeter. He met Commander (Cmdr.) Randall Darlin[18] in front of the home at 6524 S. Marshfield and walked him north to the vacant lot where the shooting occurred. Sgt. Poulos stated that he did not personally search for Raye's weapon and did not tell any other officers what specific

---

[13] Att. #282, pg. 40, lines 16-18.
[14] Att. #282, pg. 44, line 24 – pg. 45, line 1.
[15] Att. #282, pg. 48, lines 19-20.
[16] Att. #282, pg. 49, lines 10-11.
[17] Att. #282, pg. 54, lines 3-4.
[18] At the time of the incident, Cmdr. Darlin's rank was that of captain.

5

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**     **LOG #1083121 / U #16-022**

locations to search. Based on what he saw at the scene, however, he described the search as "not our finest moment...I just think there were a lot of new policies, and nobody really was clear on what those policies were."[19] Sgt. Poulos acknowledged that he knew from reading "Second City Cop"[20] that a gun was found in the area sometime after the shooting, but he denied knowing when or where it was recovered.

**Officer Eduardo Rey**

In a **statement to COPA on March 27, 2018, Officer Eduardo Rey #9995**[21] provided his account of the incident. On the evening of November 23, 2016, Officer Rey and his partner, Officer Jose Delgado, were assigned to Beat 715R. Both officers were in uniform, and Officer Rey was the passenger in their marked police SUV. Approximately one hour before the incident, Officer Rey stated that he and Officer Delgado were dispatched to a job in the vicinity of 1443 W. 65th. When the officers arrived at the location, they did not see anyone and closed out the job. Officers Rey and Delgado returned to the 7th District, where they heard a radio call requesting that they meet Sgt. Poulos at the corner of 65th and Ashland. Although Officer Rey did not recall the details of the job during his statement to COPA, the relevant Event Query indicates that he and Officer Delgado responded to the 911 call reporting a male choking a female in an alley[22].

Officer Rey stated that they were driving southbound on Ashland, near the intersection of Ashland and 64th, when they observed Sgt. Poulos driving his unmarked police car westbound on 65th. Sgt. Poulos stopped on the northwest corner of 65th and Ashland, near a bus stop where Officer Rey saw Raye standing with one or two other people. As soon as Sgt. Poulos exited his vehicle, Raye ran westbound on 65th and Sgt. Poulos gave chase. Officer Rey stated that he was too far away to see if Raye had a weapon or was holding anything in his hands.

Officer Delgado drove southbound on Ashland, then turned westbound on 65th in pursuit of Raye and Sgt. Poulos. Officer Rey stated that as their vehicle turned onto 65th, he saw Sgt. Poulos running southbound into the alley between Ashland and Marshfield. They drove past the alley and, as they approached Marshfield, Officer Rey heard two gunshots coming from the area south of their location. He stated that his view to the south was obstructed by a fence; he did not see the shooting or the activity immediately preceding it. Officer Delgado then turned southbound on Marshfield, at which point Officer Rey saw Sgt. Poulos standing on the sidewalk on the west side of the street, several feet in front of their vehicle. Officer Rey did not see Raye, who "vanished in between the, the buildings."[23] Officers Rey and Delgado drove past Sgt. Poulos, then turned westbound on 66th and northbound on Paulina, hoping to cut Raye off. As they exited their vehicle and searched for him, Officer Rey heard a radio transmission stating that the subject had been

---

[19] Att. #282, pg. 67, lines 7-13.
[20] Second City Cop is a public unofficial blogsite, open forum, with predominate posts relative to CPD, written anonymously. On February 22, 2017, one of the site's users wrote the following post: "Guess what turned up? ALSO, spring cleaning in Englewood... a truly (rare as it may be) upstanding citizen on a certain block that had an OIS'ing over the holiday season uncovers a weapon lodged in between branches of a heavy bush. The residential location being within throwing distance and directly on the path of the chase the good/dumb (you pick) Sgt took. Here's to praying some DNA, finger prints or any other form of identifiers are traced by the I.S.P. lab to this shitbag. Good luck Sgt and great work by 007 (and many others) keeping this investigation alive for this guy." Att. #313.
[21] Atts. #392, 396.
[22] Att. #393.
[23] Att. #396, pg. 25, lines 19-20.

6

## CIVILIAN OFFICE OF POLICE ACCOUNTABILITY                LOG #1083121 / U #16-022

located. Officers Rey and Delgado walked to a home on the east side of Paulina, where they briefly saw Raye lying on the ground, surrounded by other officers. They then walked east to Marshfield and searched the sidewalk on the east side of the street for a weapon. Officer Rey stated that numerous officers were involved in the search, but no one appeared to be organizing or coordinating the search it. He indicated that he did not look under hedges or leaves and characterized his own search efforts as "like a glance."[24]

**Officer Jose Delgado**

In a **statement to COPA on March 27, 2018, Officer Jose Delgado #15169**[25] stated that on the date and time of the incident, he and his partner were driving southbound on Ashland in response to Sgt. Poulos' request that they meet him at 65th and Ashland. As Officer Delgado drove past 64th, he saw Sgt. Poulos drive westbound on 65th, cross Ashland, and exit his unmarked police car in front of a bus stop on the northwest corner of the intersection. Within seconds, Raye took off running westbound on 65th. Sgt. Poulos pursued Raye on foot and, as Officer Delgado turned westbound on 65th, he saw Sgt. Poulos run southbound into the alley between Ashland and Marshfield. As Officer Delgado passed the alley and approached Marshfield, he heard two gunshots coming from the area south of him. He did not know who fired the shots and could not see Sgt. Poulos or Raye, when the shooting occurred because a fence obstructed his view. Officer Delgado then turned southbound onto Marshfield, at which point he saw Raye and Sgt. Poulos run out of a vacant lot on the east side of Marshfield and cross the street directly in front of his vehicle. Officer Delgado stated that the incident happened so quickly that he did not see if Raye had a weapon in his hand or threw anything as he fled. Officer Delgado drove to Paulina, where he and Officer Rey searched for Raye until they heard a radio transmission stating that he was in custody. Officer Delgado briefly observed Raye lying in a gangway on Paulina, then he and his partner walked east to Marshfield, where they searched for a weapon on the east side of the street until daylight. Officer Delgado did not recall whether he searched the west side of Marshfield.

**Officer Don Hoard**

In a **statement to IPRA on December 6, 2016, Officer Don Hoard #8105**[26] provided his account of the incident. On the evening of November 23, 2016, Officer Hoard was working a VRI[27] shift, assigned to Beat 4525B with Officer Michael Higgins. Officer Hoard stated that he and Officer Higgins were parked at 63rd and Wood when they heard a radio call for an officer in need of assistance. Officer Hoard drove to the scene of the incident, parked his vehicle on 65th at the mouth of the alley between Paulina and Marshfield, and began walking south down the alley with Officer Higgins.

As he walked down the alley, Officer Hoard saw several unknown officers congregating around a jacket lying in the middle of the alley, and he heard one of the officers state that it was

---

[24] Att. #396, pg. 52, line 19.
[25] Atts. #393, 397.
[26] Atts. #67, 118. COPA also obtained and reviewed a copy of Officer Hoard's May 8, 2018 deposition in *Ramsey v. City of Chicago, et. al.*, 16-CV-10913 (N.D. Ill.), the civil suit arising from this incident. Att. #453.
[27] VRI is the acronym for CPD's Violence Reduction Initiative.

7

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**          **LOG #1083121 / U #16-022**

the jacket that Raye wore.[28] Officer Hoard followed three white male officers, two of whom were in plainclothes, west down a gangway toward Paulina.[29] One of the officers spotted Raye with his flashlight, crouched down in the gangway and hiding behind shrubbery and bushes. Officer Hoard stated that two officers ran up to Raye and told him to put his hands up, but he was "fightin' and kickin'…and tryin' not to give 'em his arms."[30] The officers dragged Raye out from where he was hiding and put him on his stomach. As they handcuffed him, one of the officers asked, "Where the gun motherfucker?" Officer Hoard heard Raye respond, "I tossed it, I tossed it."[31] Other officers then asked Raye where he tossed the gun, but Officer Hoard could not hear Raye's response. Officer Hoard noticed that Raye was bleeding from his lower back and called for an ambulance, then left the gangway to look for Raye's gun. As he walked back east toward Marshfield, he came in contact with a lieutenant and informed him that he heard Raye say that he tossed his gun. Officer Hoard could not identify the lieutenant, but described him as an older, heavyset white male approximately 6'1" in height.[32] He also later reported Raye's statement to Officer Higgins as they were leaving the scene, and to his VRI sergeant before finishing his shift that night.[33]

Officer Hoard stated that he immediately began looking for Raye's weapon in the south gangway of 6524 S. Marshfield and the yard next door, and he became separated from his partner in the process. While Officer Hoard looked for Officer Higgins, he ran into a witness, Gary Wilkins, at 6500 S. Marshfield. Officer Hoard recognized Wilkins as a former student at Benjamin Banneker Elementary School, where Officer Hoard had worked as a school officer. The two men made small talk and Wilkins asked Officer Hoard to help him find a job. Officer Hoard took Wilkins' information, then reconnected with Officer Higgins at the corner of 65th and Marshfield and they left the scene.

The next day Officer Hoard called Wilkins about his job search. According to Officer Hoard, while they were on the phone Wilkins told him that he witnessed the incident and saw Raye throw his weapon when Raye came out of the lot at 6507 S. Marshfield. Wilkins explained that the officer chasing Raye was too far behind him to see him throw the gun, but Wilkins saw Raye throw it against a wood-frame home across from the vacant lot and he "heard a glunk against the, the buildin' where [Raye] threw it."[34] Officer Hoard stated that he immediately contacted 7th District Commander Kenneth Johnson, and Wilkins relayed this information to the commander during a three-way phone call.[35] Officer Hoard also reported the information to Sgt. Charles Brown, at the Area South Detective Division, who told him to contact IPRA.[36] On November 29,

---

[28] During Officer Hoard's deposition, he testified that two of the officers asked a third officer if the jacket belonged to the subject. That officer responded in the affirmative, then warned the two officers, "Watch out, he had a gun." Att. #453 at 33:39.

[29] The three unknown officers were later identified as Officer Andrew Turner, Officer Matthew Lucki, and Sgt. Poulos.

[30] Att. #118, pg. 11, line 31 – pg. 12, line 6.

[31] Att. #118, pg. 14, line 2.

[32] IPRA subsequently identified the lieutenant that Officer Hoard spoke to as Lt. John Doherty.

[33] During his deposition, Officer Hoard testified that he could not recall if he told Officer Higgins about Raye's declaration when they were leaving the scene; however, he confirmed that Officer Higgins was in the car with him when he informed their VRI sergeant about the declaration.

[34] Att. #118, pg. 25, lines 16-17.

[35] Phone records confirm that a three-way call occurred between Officer Hoard, Cmdr. Johnson, and Wilkins at 3:13 pm on November 24, 2016. Att. #469, pg. 3.

[36] On November 25, 2016, Officer Hoard informed an IPRA investigator about Wilkins' statement to him. Atts. #344-348. Officer Hoard subsequently texted the investigator that Wilkins, whom he identified only as a confidential

8

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**     **LOG #1083121 / U #16-022**

2016, Officer Hoard received a phone call from Lt. Martin Tannehill, who told him to come to the district and write a supplementary report[37] regarding both Raye's statement to him and Wilkins' eyewitness information. While he was in Lt. Tannehill's office, Officer Hoard contacted Wilkins a final time and asked him to relay what he saw to Lt. Tannehill over the speakerphone. Wilkins stated that he no longer wanted to be involved with the investigation, but he did confirm that he saw Raye toss his weapon.

**Officer Michael Higgins**

In a **statement to IPRA on December 5, 2016, Officer Michael Higgins #3766[38]** stated that on the date and time of the incident, he and his partner, Officer Don Hoard, Jr., were on routine patrol near 63rd and Wood, when they heard a radio call from an officer involved in a foot pursuit. Officer Hoard drove their vehicle south and parked on 65th at the mouth of the alley between Paulina and Marshfield. They walked south down the alley, and Officer Higgins noticed a red jacket lying in the middle of the alley. As he approached the jacket, he saw Raye on the ground in the gangway of 6521 S. Paulina and Sgt. Poulos standing approximately 15-20 feet away from Raye. Raye was lying on his side, in the fetal position. Officer Higgins walked through the backyard into the gangway and asked Sgt. Poulos, whom Officer Higgins recognized and worked with before, what was going on. Sgt. Poulos was still trying to catch his breath, but he said that someone needed to call for an ambulance. While Officer Higgins talked to Sgt. Poulos, Officer Hoard helped another officer search, handcuff, and question Raye.

Sgt. Poulos then walked Officer Higgins east, across the alley, and through the gangway that Sgt. Poulos said Raye cut across. Sgt. Poulos pointed to the front yard of a house on Marshfield and said, "He tossed the gun here and he ran through the, through the yard."[39] When Sgt. Poulos walked away with a supervisor, Officer Higgins searched the front yard of the house, looking unsuccessfully for Raye's weapon.[40] Officer Higgins eventually reconnected with his partner, who told him that when he asked Raye the location of his gun, Raye responded, "I pitched it, man go find it."[41] According to Officer Hoard, Officer Higgins did not tell him if Raye told him where he tossed the weapon.

---

informant, believed the gun was at "6502, 6504, and 6506 or 08 S. Marshfield. [Raye] threw the gun from the sidewalk according to my CI." Att. #347, pg. 2. Officer Hoard also texted the investigator photographs of these addresses.
[37] Att. #64.
[38] Atts. #66, 117. COPA also obtained and reviewed a copy of Officer Higgins' May 9, 2018 deposition in *Ramsey v. City of Chicago, et. al.* Att. #452.
[39] Att. #117, pg. 25, lines 1-2. Although Officer Higgins never identified the house's address during his IPRA statement, during his deposition he testified that the yard was unfenced, with numerous bushes lining the north end of the property, the sidewalk, and the walkway to the house. This description is consistent with the front yard of 6522 S. Marshfield.
[40] During his deposition, Officer Higgins testified that he used his flashlight and his hand to search in, around, and under the bushes at this location, "mov[ing] the bush around to see if there was anything stuck in the bush." Att. #452 at 45:42. When Plaintiff's counsel presented Officer Higgins with an aerial map showing 6500 to 6524 S. Marshfield, Officer Higgins made notations on the map indicating that the yard he searched was 6510 S. Marshfield. He later acknowledged, however, that the address might be farther south. After viewing photos of the houses between 6502 and 6512 S. Marshfield, Officer Higgins testified that none of the yards looked familiar and he did not believe that he had searched any of those locations.
[41] Att. #117, pg. 20, lines 9-10. Officer Higgins testified that he also heard Officer Hoard inform their VRI sergeant of Raye's declaration at the end of their shift.

9

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022**

**Officer Matthew Lucki**

In a **statement to IPRA on December 8, 2016, Officer Matthew Lucki #3055**[42] provided his account of the incident. On November 23, 2016, Officer Lucki and his partner, Officer Andrew Turner, were assigned to Beat 706BR. Both officers were dressed in plainclothes and a protective vest, and Officer Turner was driving their marked Ford Explorer. At the time of the incident, Officer Lucki and his partner were on routine patrol near 67th and Morgan when they heard Sgt. Poulos mention something about 65th and Ashland over the radio. As they drove toward that location, Officer Lucki stated that they heard reference to a foot chase and then shots fired by police. Sgt. Poulos' radio transmissions indicated that Raye ran westbound from Marshfield, so Officer Turner drove down 66th and into the alley between Marshfield and Paulina. Officer Lucki saw Sgt. Poulos standing in the alley and, after exiting his Explorer, Officer Lucki asked him in what direction Raye fled. Sgt. Poulos pointed west. Officer Lucki did not ask Sgt. Poulos where Raye's gun was, and Sgt. Poulos never told him.

Officer Lucki followed behind Sgt. Poulos and Officer Turner, walking west, and within a matter of seconds they found Raye in a gangway west of the alley. As Officers Lucki and Turner handcuffed Raye, Officer Lucki noticed him bleeding from the upper abdomen. He got down on the ground next to Raye and asked him questions to keep him talking and conscious. Raye struggled and kicked at him, but he told Officer Lucki a name that sounded like "Juan." Officer Lucki stated that he did not hear Raye say what happened to his gun, though he acknowledged that he briefly left Raye's side to put on latex gloves and "there were other [officers] that were talking with him."[43] Officer Lucki stayed with Raye, as they waited for an ambulance to arrive, and he continued to watch as the paramedics moved Raye to the ambulance. During this process, Officer Lucki saw several baggies of marijuana fall out of Raye's clothes, and he recovered them. He rode in the back of the ambulance with Raye to Christ Hospital. Officer Lucki stated that he did not hear Raye say anything, while he was in the ambulance or at the hospital. After waiting at the hospital for approximately one hour, Officer Lucki returned to the scene with Officer Turner,[44] then went to Area South to inventory the marijuana. While there, Officer Lucki stated that he wrote a supplementary report.[45]

---

[42] Atts. #68, 119. COPA also obtained and reviewed a copy of Officer Lucki's May 29, 2018 deposition in *Ramsey v. City of Chicago, et al.* Att. #456.

[43] Att. #119, pg. 13, lines 27-28. During Officer Lucki's deposition, he testified that he also stepped away from Raye a second time, for approximately 10-30 seconds, although he could not recall the reason why. Both times that he left Raye's side, Officer Lucki stated, "I saw officers around him, but I don't know what was being said, or what wasn't being said." Att. #456 at 48:53. He testified that he would not be surprised to learn that another officer reported hearing Raye say he tossed a gun.

[44] Officer Lucki's deposition testimony includes additional details about his involvement in the search for Raye's weapon. He testified that when he returned to the scene, he searched the north end of the 6500 block of S. Marshfield, on both sides of the street. The yards had a "very dense cover of leaves," Att. #456 at 1:04:01, and Officer Lucki used his asp to move leaves and shrubbery at some of the addresses. He observed approximately 40 officers assisting with the search, which he described as "as thorough as possible, given the circumstances." Att. #456 at 1:05:00. After 20-60 minutes of searching, Officers Lucki and Turner went to Area South to inventory the marijuana. They later returned to the scene a third time and searched the same areas of Marshfield for over an hour. Even in the daylight, Officer Lucki testified, "Because of how covered the ground was with leaves, it was still difficult." Att. #456 at 1:18:32.

[45] Att. #10.

10

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**          **LOG #1083121 / U #16-022**

**Officer Andrew Turner**

In a **statement to IPRA on December 8, 2016, Officer Andrew Turner #14932**[46] stated that on the date and time of the incident, he and his partner, Officer Matthew Lucki, were driving westbound on Marquette Road, when he heard over the radio that Beat 710R had an emergency. Officer Turner heard Sgt. Poulos say, "He's got a gun,"[47] then indicate that he was involved in a foot chase and shots had been fired. Officer Turner and his partner located Sgt. Poulos in the alley between Marshfield and Paulina, in the middle of the block. When they got out of their vehicle, they asked Sgt. Poulos in what direction the subject ran, and Sgt. Poulos pointed west. Officer Turner proceeded down a gangway west of the alley, with Officer Lucki and possibly Sgt. Poulos following behind him. He drew his weapon and used his flashlight to locate Raye in the gangway south of the house, where Raye was sitting with his back against the house. Officer Turner noticed Raye first, and he tried to handcuff him, as Raye kicked at him. During this process, Officer Turner noticed that Raye was bleeding from the stomach, near his belly button, and he ran to the front of the house to determine the address. He then called for an ambulance while his partner stayed with Raye. When he returned to the gangway, he asked Raye his name and tried to get more information from him, but Raye was not cooperating. Several other officers arrived and asked Raye where he threw his gun, but, according to Officer Turner, Raye did not respond.

While they waited for the ambulance to arrive, Officer Turner searched the backyard of 6521 S. Paulina for Raye's gun. He then walked across the alley toward Marshfield and searched the gangway next to 6524 S. Marshfield. When the paramedics left with Raye and Officer Lucki, Officer Turner drove to the hospital to meet his partner. When Officer Turner arrived at the ER, Raye was already pronounced dead. Officers Turner and Lucki, after about an hour or two, returned to the scene and again searched the backyards of 6521 S. Paulina and 6524 S. Marshfield for Raye's weapon, to no avail.

**Lieutenant John Doherty**

In a **statement to IPRA on December 2, 2016, Lieutenant (Lt.) John Doherty #172**[48] stated that on November 23, 2016, he was working as a VRI lieutenant assigned to Beat 4520. When he heard the 10-1[49] over the police radio, Lt. Doherty immediately responded to the scene and walked down the alley between Marshfield and Paulina. Lt. Doherty stated that he approached a group of officers standing in the gangway of a house and saw two officers next to a man lying in the gangway, bleeding from the stomach. One of the officers was on his knees, trying to comfort the man and ask him questions. Lt. Doherty handed the officer a pair of rubber gloves to wear since he was in direct contact with the injured man. He asked if they recovered the man's gun, and one of the officers told him that the man stated that he tossed the gun, but the man did not remember where. Although Lt. Doherty initially described that officer as a white or Hispanic male, in a second statement to IPRA, also on December 2, 2016, he acknowledged that the officer who made

---

[46] Atts. #69, 120.
[47] Att. #120, pg. 8, lines 1-2.
[48] Atts. #65, 136-137. COPA also obtained and reviewed a copy of Lt. Doherty's June 14, 2018 deposition in *Ramsey v. City of Chicago, et al.* Att. #451. Any discrepancies between Lt. Doherty's deposition testimony and the account he provided to IPRA are minor and/or immaterial, and they did not impact COPA's assessment of his credibility or the overall analysis of this case.
[49] A 10-1 is a radio call indicating an officer needs immediate emergency assistance.

11

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022

the statement could have been Officer Don Hoard, Jr., who is African-American. After speaking with the officers in the gangway, Lt. Doherty walked east and checked on the VRI sergeant who was with witnesses from 6524 S. Marshfield, before leaving the scene.

**Lieutenant Martin Tannehill**

In a **statement to IPRA on December 14, 2016, Lieutenant Martin Tannehill #622**[50] stated that several days after the shooting, he received information that Raye made a declaration to a VRI officer who responded to the scene. Lt. Tannehill spoke to Officer Higgins, who stated it was Officer Hoard who heard Raye's statement, and told him about it at the scene. Lt. Tannehill then brought Officer Hoard into his office to verify if the information was true. Officer Hoard told him that after Raye was handcuffed, Officer Hoard leaned over Raye and asked, "Where is the fucking gun?" Raye responded, "I tossed it." Lt. Tannehill informed the Area South Detective Division, who told him to relay the information to IPRA. Officer Hoard assured Lt. Tannehill that he already contacted IPRA. Lt. Tannehill further stated that while Officer Hoard was in his office on November 29, 2016, he instructed Officer Hoard to call Gary Wilkins on speakerphone. According to Lt. Tannehill, Officer Hoard asked Wilkins if he would come to the police station and tell his superiors what he witnessed the night of the shooting. According to Lt. Tannehill, Wilkins responded that he saw Raye throw his weapon, but he did not want to be involved in the investigation.[51] Lt. Tannehill advised Officer Hoard to memorialize both Raye's declaration and Wilkins' statement to him in a supplementary report, which Officer Hoard did.

**Lieutenant Mark Sedevic**

In a **statement to COPA on December 18, 2017, Lieutenant Mark Sedevic #206**[52] stated that on the date and time of the incident, he was the 1st Watch field lieutenant for the 7th District. Shortly after conducting the 10:30 pm roll call, Lt. Sedevic was notified about an officer-involved incident, and he and Lt. Timothy Wolf responded to the scene together. When he arrived, Cmdr. Darlin instructed Lt. Sedevic to coordinate a search for Raye's weapon along the path of the foot chase. Sgt. Poulos, who was sitting in a vehicle with Lt. Wolf, relayed the route to Lt. Sedevic and told him that they were looking for a handgun. Sgt. Poulos did not describe the incident or provide any details about what occurred. Lt. Sedevic gathered 30-40 1st and 3rd Watch officers from the 7th District, as well as various outside units, and began a "coordinated grid search" along the entire path of the foot chase. He instructed half of the officers to line up horizontally and walk back and forth through the vacant lot at 6507 S. Marshfield, aided by the use of flashlights, a rake, and a light truck. While Lt. Sedevic assisted in the search of the lot, he told the other half of the officers to search the remainder of the path, including both sides of the street between 6500 and 6538 S. Marshfield.[53] "I just tried to grab everyone together that I could, and basically walk that path, and

---

[50] Atts. #77-78. COPA also obtained and reviewed a copy of Lt. Tannehill's June 18, 2018 deposition in *Ramsey v. City of Chicago, et al.* Att. #461.
[51] During Lt. Tannehill's deposition, he testified that when Officer Hoard called Wilkins, the only thing he heard Wilkins say was that he did not want to be involved. Plaintiff's counsel did not specifically ask Lt. Tannehill if he heard Wilkins say that he saw Raye throw his gun.
[52] Atts. #322, 337. COPA also obtained and reviewed a copy of Lt. Sedevic's July 25, 2018 deposition in *Ramsey v. City of Chicago, et al.* Att. #460.
[53] During his deposition, Lt. Sedevic clarified that after he assisted the officers searching the vacant lot, he personally searched the entire path of the foot pursuit, including the front and back yards of every address between 6500 and

12

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY     LOG #1083121 / U #16-022

search front yards, back yards, gangways, looking for weapons. Streets, under vehicles— yeah, as best we could."[54] Lt. Sedevic had no specific recollection of 6510 S. Marshfield, but he stated that the front yard, including the grass and any hedges, would have been searched.

The following morning, Lt. Sedevic relieved the 1st and 3rd Watch officers with approximately 10-15 2nd Watch officers. They began the search anew, with half focusing on the east side of the 6500 block of S. Marshfield and half on the west. Lt. Sedevic called off the search at approximately 11:15 am on November 24, 2016, "because I felt that we searched for hours on end, I felt that we searched pretty thoroughly."[55] During the 12 hours he was at the scene, Lt. Sedevic and his officers found a shell casing at 6507 S. Marshfield, a fresh bullet hole in the fence between 6507 and 6509 S. Marshfield, and two shell casings on the street near 6530 S. Marshfield. He stated it was possible a gun was missed, as "[t]here's always going to be places you're probably not going to be able to see everything. We tried to do the best we could to see everything we could, with what we had access to, and yeah, some yards were locked up pretty tight."[56] On November 30, 2016, Cmdr. Darlin instructed Lt. Sedevic to write a supplementary report[57] regarding the search efforts, and he returned to the scene to compile a list of the addresses and locations that he and his officers searched. To the best of his knowledge, there are no other notes, reports, diagrams, or photographs (other than those taken by the evidence technicians) relating to the search.

**Forensic Investigator David Ryan**

In a **statement to COPA on December 18, 2017, Forensic Investigator (F/I) David Ryan #7636**[58] stated that on the evening of November 23, 2016, he was working in CPD's Mobile Crime Lab when he was notified of the officer-involved shooting and instructed to respond to the scene. When he arrived, F/I Ryan learned that Raye, who was now deceased, was in a foot pursuit, and possibly threw a weapon during the pursuit. F/I Ryan stated that he searched the entire path of the foot pursuit, including the area between 6507 and 6530 S. Marshfield, looking for a handgun and other evidence. "I was searching lawns, front yards, bushes, under cars, on top of cars, up and down the block from that location [6507 S. Marshfield] and on west through that gangway at 6524, and even the lot that was south of the gangway, all the way to where I knew that the offender collapsed in the gangway."[59] Rather than use a metal detector, which "reacts to any piece of metal"[60] and is "not very functional to use in certain areas,"[61] F/I Ryan used a rake to comb through the front lawns and vacant lots. He searched the area on the night of the incident and again the following morning, photographing and marking any potential evidence he found. In addition to his efforts, F/I Ryan observed more than 40 CPD members conducting a separate search for a handgun,

---

6538 S. Marshfield. If he saw overgrown bushes in one of the yards, he stated, "I would have moved the bushes around with my flashlight and my hand, and search through inside there, and around, and the back." Att. #460 at 1:06:25.
[54] Att. #337, pg. 16, lines 4-7.
[55] Att. #337, pg. 46, lines 2-3.
[56] Att. #337, pg. 39, lines 13-17.
[57] Att. #317, pgs. 4-5.
[58] Atts. #320, 336. COPA also obtained and reviewed a copy of F/I Ryan's July 30, 2018 deposition in *Ramsey v. City of Chicago, et al.* Att. #460. Any discrepancies between F/I Ryan's deposition testimony and the account he provided to COPA are minor and/or immaterial, and they did not impact COPA's assessment of his credibility or the overall analysis of this case.
[59] Att. #336, pg. 21, lines 5-10.
[60] Att. #336, pg. 24, lines 13-14.
[61] Att. #336, pg. 24, lines 14-15.

13

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913

and Chicago Fire Department personnel were also using ladders to search rooftops, garages, and balconies along the path of the foot pursuit. F/I Ryan described the various search efforts as thorough, and stated that it was "possible, but not probable,"[62] that a handgun was missed. "I mean, it can always be possible, because you can't always say you're going to find everything. You can always try to find everything, but that doesn't mean you always will. So, it's possible, but in my estimation, not probable."[63]

After his on-scene activities were completed, F/I Ryan returned to his office and began to inventory the evidence. It was at this point that he discovered a tension spring, a small piece of plastic marked "2 P40," and a fired bullet in the inside left breast pocket of Raye's jacket. To F/I Ryan, who estimated that he has processed several thousand crime scenes over the past twenty years, these items looked like a tension spring from a handgun and part of the plastic base on a .40 caliber magazine. As a result, he took the additional step of photographing the items before they were inventoried.

**Sergeant Walter Chudzik**

In a **statement to COPA on April 3, 2018, Sgt. Walter Chudzik #2273**[64] stated he is a member of Unit 193, Gang Intelligence Division. He did not respond to the scene on the night of the incident or participate in the search for Raye's weapon. The morning after the shooting, Sgt. Chudzik received an email from his superior, Cmdr. Christopher Kennedy, requesting that he reach out to any of his confidential informants who might have information regarding the incident. Sgt. Chudzik stated that one of the officers on his team previously obtained credible information from a civilian who lived in that area. However, when Sgt. Chudzik interviewed the informant, it was determined that the purported credible evidence was third-hand information that CPD was unable to corroborate. Sgt. Chudzik stated that the informant did not personally witness the incident or have any first-hand knowledge as to the whereabouts of Raye's weapon.

**Officer Markus Williams**

In a **statement to IPRA on March 14, 2017, Officer Markus Williams #5503**[65] stated that on February 19, 2017, he and his partner, Officer Jonathan Newsome, drove to 6510 S. Marshfield in response to an anonymous 911 call from someone who found a handgun in the bushes at that address. When they arrived, Officer Williams entered the front yard and observed a two-tone semi-automatic handgun lying in the dirt beneath the bushes in front of the house. The gun was covered in dirt and had specks of rust around the magazine release. Officer Williams used a clear plastic bag to retrieve the gun and removed two live rounds from the magazine (the others

---

[62] Att. #336, pg. 49, lines 10-11.
[63] Att. #336, pg. 49, lines 11-15.
[64] Atts. #412-413. COPA also obtained and reviewed a copy of Sgt. Chudzik's July 24, 2018 deposition in *Ramsey v. City of Chicago, et al*. Att. #449. Any discrepancies between Sgt. Chudzik's deposition testimony and the account he provided to COPA are minor and/or immaterial, and they did not impact COPA's assessment of his credibility or the overall analysis of this case.
[65] Atts. #174-176. COPA also obtained and reviewed a copy of Officer Williams' May 30, 2018 deposition in *Ramsey v. City of Chicago, et al*. Att. #463. Any discrepancies between Officer Williams' deposition testimony and the account he provided to IPRA are minor and/or immaterial, and they did not impact COPA's assessment of his credibility or the overall analysis of this case.

14

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022**

appeared "stuck" in the magazine). He noted that the gun's slide was in the forward position and no round was in the chamber when he cleared it. Officer Williams further stated that while he was aware of the police-involved shooting on November 23, 2016 and worked as part of the VRI unit that night, he was not on the 6510 S. Marshfield block and did not participate in the search. When he recovered the gun on February 19, 2017, at the scene, he had "no inclination" that it might have been linked to the shooting and thought they "just were recovering a weapon."[66] Once he returned to the 7th District, however, he discussed the weapon with other officers and realized that, due to the location where the weapon was discovered, it might be connected to the incident.

**Officer Jonathan Newsome**

In a **statement to IPRA on March 14, 2017, Officer Jonathan Newsome #4786**[67] stated when he and his partner arrived at 6510 S. Marshfield on February 19, 2017, he observed a semi-automatic handgun lying on the ground under the southernmost part of the bushes in front of the house. Officer Newsome knocked on the front door and spoke to a black female, approximately 70 years old, who stated that she made the 911 call reporting the gun's discovery but wished to remain anonymous.[68] While Officer Newsome spoke to the woman, Officer Williams recovered the weapon. They transported it to the 7th District, where Officer Newsome inventoried the gun, the magazine, and two live rounds under Inventory #13861374.[69] Officer Newsome stated that he did not realize the gun might be connected to the November 23, 2016, shooting until officers at the station brought it up. At that point, he informed his supervisor, Sgt. Clinton Sebastian #1944, of the discovery, and he and Officer Williams hand-carried the weapon to the Evidence and Recovered Property Section.[70]

**ii.  Police Officer Depositions**[71]

**Commander Kenneth Johnson**

In a **deposition on June 11, 2018, Cmdr. Kenneth Johnson**[72] testified that he was the commander of the 7th District on the date of the incident. When he received notification that a

---

[66] Att. #175 at 22:36
[67] Atts. #177-179. COPA also obtained and reviewed a copy of Officer Newsome's June 13, 2018 deposition in *Ramsey v. City of Chicago, et al.* Att. #457.
[68] IPRA investigators subsequently identified the woman that Officer Newsome spoke to as Bernice Jackson. Her son, Ronald Jackson, provided IPRA with a statement about the discovery of the gun.
[69] During Officer Newsome's deposition, he testified that when he inventoried the gun he did not notice that there were any parts missing from it. He could not recall if he examined both sides of the gun before he put it in the inventory box, but he acknowledged that would be his usual procedure.
[70] IPRA first learned about the gun on February 21, 2017, when Lt. Rahman Muhammad #313 forwarded an email regarding its discovery to IPRA Deputy Chief Josh Hunt. In the forwarded email, which was dated February 19, 2017, Sgt. Robert Beck #2118 stated that Sgt. Sebastian had informed him that a civilian found the gun in the bushes while cleaning her yard at 6510 S. Marshfield. Sgt. Beck related that 7th District personnel "believe this may be from the Police Shooting on 24 Nov. 2016, RD #HZ527352, at 6507 S. Marshfield." Att. #442.
[71] COPA investigators obtained and reviewed the deposition testimony of nine police witnesses who did not provide statements to IPRA/COPA. Four of the deponents (Cmdr. Christopher Kennedy #599, Sgt. John Pellegrini #1932, Sgt. James Baker (retired), and Officer Nicholas Pienta #3438) did not respond to the scene and had no substantive involvement in the investigation. See Atts. #424, 446, 455. The relevant testimony of the remaining five police witnesses is summarized below.
[72] Att. #454. Cmdr. Johnson has since retired from the Department.

15

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022

police-involved shooting had occurred, he responded to the scene, arriving within an hour of the incident. Cmdr. Johnson located Sgt. Poulos standing in the alley west of Ashland, talking to 2-3 other officers. Sgt. Poulos provided Cmdr. Johnson with an overview of the incident and relayed the path of the foot pursuit. Sgt. Poulos stated that after Raye fled from the bus stop, he gave chase on foot, "engaged the subject in the alley, and the subject produced a weapon."[73] Sgt. Poulos told Cmdr. Johnson that he discharged his weapon after Raye pointed a gun at him. Cmdr. Johnson did not learn until he returned to the Area that Sgt. Poulos had reported that Raye pointed the weapon at him a second time.

Cmdr. Johnson testified that he also spoke briefly with Officer Hoard at the scene and learned that Officer Hoard was one of the officers who located Raye after the incident. Officer Hoard told Cmdr. Johnson that he questioned Raye as to the whereabouts of his gun and that Raye said that he had thrown it. Cmdr. Johnson did not ask Officer Hoard any follow-up questions, and he did not recall relaying Officer Hoard's information to anyone else at the scene. Cmdr. Johnson remained at the scene for approximately 11-12 hours, coordinating resources and speaking to Dep. Chief Larry Watson, Lt. Sedevic, and other supervisors. He did not direct or organize the search for Raye's weapon, but he recalled seeing as many as 100 officers using flashlights, rakes, and canines to search the front yards on both sides of Marshfield, as well as the vacant lot at 6507 S. Marshfield. He testified that the search was "as good as it was going to get. I believe that there was a very strong effort to conduct a complete and thorough search."[74]

The following morning, Cmdr. Johnson received a phone call from Officer Hoard, who informed him that one of the civilians who had been at the scene knew where the gun was located. Officer Hoard stated that the source, whom he did not identify by name, said "that the gun was in the front yard of one of those locations over there, on the street over there…on Marshfield."[75] Officer Hoard told Cmdr. Johnson that the source saw the subject toss the gun near a house on the southwest corner of 65th and Marshfield, but he did not provide a specific address. Officer Hoard conferenced Cmdr. Johnson into a phone call he was having with the source, so that Cmdr. Johnson could listen into the call. Cmdr. Johnson testified that he did not identify himself or say anything during the call. He heard a male voice tell Officer Hoard that "the gun was thrown on the block, and it's still out there right now."[76] Cmdr. Johnson sent Sgt. Juan Candelaria and his tactical team to search that location, with negative results.

**Commander Randall Darlin**

In a **deposition on August 28, 2018, Cmdr. Randall Darlin #93**[77] testified that he was a captain in the 7th District on November 23, 2016. When the incident occurred, he heard Sgt. Poulos' radio transmissions of "shots fired by police" and immediately responded to the scene. Cmdr. Darlin drove southbound down the alley west of Marshfield, where he observed a jacket lying in the alley. He exited his vehicle and quickly located Raye in a nearby gangway, surrounded by two officers from the 7th District and two officers he did not recognize. Raye was injured, but

---

[73] Att. #454 at 32:37.
[74] Att. #454 at 52:35.
[75] Att. #454 at 1:50:27.
[76] Att. #454 at 1:53:36.
[77] Att. #450.

16

he was moving and breathing. Cmdr. Darlin testified that some of the officers were asking Raye questions, but he could not recall if Raye responded. He ensured that an ambulance was enroute and returned to the alley, where he assigned an officer to guard the jacket.

Cmdr. Darlin spoke to multiple officers to determine the size and perimeter of the scene, then directed officers to put up crime scene tape and remove the civilians standing inside the perimeter. He estimated that it took approximately 5-10 minutes to secure the scene. Cmdr. Darlin located Sgt. Poulos, who told him the location where he discharged his weapon and the path of the foot pursuit. When Cmdr. Darlin learned that officers had not recovered Raye's gun, he coordinated a search for it between the location where Sgt. Poulos discharged his weapon and the location where Raye was apprehended. He also personally participated in the search, testifying that he obtained a rake from an evidence technician and raked the side yard of 6524 S. Marshfield. Additionally, Cmdr. Darlin used his flashlight to search the sidewalks and street between 6500 and 6524 S. Marshfield. He observed at least 6-10 other officers searching for the weapon, and he stated that a light truck and canines were brought in several hours later to aid in the search. Cmdr. Darlin could not recall if he searched or directed officers to search 6510 S. Marshfield, but he stated that it fell within the general search area.

Cmdr. Darlin testified that several months later, he learned that a gun had been recovered along the path of the foot pursuit. He concluded that it had a high likelihood to be Raye's weapon, as it was recovered in Raye's flight path, in an overgrown set of bushes, in a timeframe reasonably close to the incident. When Cmdr. Darlin was asked if he was surprised the gun was not recovered during the initial search, he stated,

> "Not at all…The area of the search was probably encompassing a football field, maybe more, two football fields, two sides of the street, overgrown shrubbery, vacant lots. You know, not locating a firearm in the amount of space that had to be covered, in the dark, with heavy shrubbery, fall like conditions, I mean, I was raking because there were mounds of leaves. For a firearm to be, you know, secreted in an area that was that much shrubbery, that much foliage, and that much coverage in the dark, doesn't surprise me at all that we wouldn't come up with the firearm."[78]

**Lieutenant Timothy Wolf**

In a **deposition on September 6, 2018, Lt. Timothy Wolf #431**[79] testified that on the evening of November 23, 2016, he was on duty in the watch commander's office when he heard radio transmissions of "shots fired by police." He and Lt. Sedevic responded to the scene together, and when they arrived Lt. Wolf located Sgt. Poulos standing in the alley west of Ashland. Sgt. Poulos relayed the path of the foot pursuit to Lt. Wolf and told him that he discharged his weapon twice inside the vacant lot at 6507 S. Marshfield. Sgt. Poulos also stated that "after there was the second round fired, as the offender was running down Marshfield, there was some kind of like, uh,

---

[78] Att. #450 at 1:13:15.
[79] Att. #464.

17

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**          **LOG #1083121 / U #16-022**

I believe, a movement with the hand, or there was a possible movement with the hand, like as if he discarded something."[80]

Lt. Wolf instructed several officers to search the vacant lot for Sgt. Poulos' casings, but he did not otherwise participate in the search for evidence that night. He retrieved Sgt. Poulos' vehicle from Ashland and he and Sgt. Poulos remained inside the vehicle, parked at the scene, for several hours. Lt. Wolf drove Sgt. Poulos to Little Company of Mary Hospital for medical treatment, then to the Area, where Lt. Wolf completed Sgt. Poulos' injury on duty report and reviewed his TRR. Lt. Wolf recalled that Sgt. Poulos' jeans were ripped and he had minor cuts and scrapes, which Sgt. Poulos attributed to falling during the foot pursuit. The following morning, Lt. Wolf returned to the scene to assist in the search for the weapon. He searched the front yards between 6500 and 6524 S. Marshfield, on both sides of the street. Lt. Wolf testified that during his search, he "shook some bushes. Lifted stuff up. I mean, guns and other evidence winds up in weird spots if it's thrown by fleeing offenders."[81] He stopped searching when CPD released the scene around noon on November 24, 2016. Lt. Wolf acknowledged that he was surprised when he later learned that a gun had been discovered in the path of the foot pursuit, as officers had searched the scene for the better part of 12 hours following the incident, including during the daylight hours.

**Sergeant Juan Candelaria**

In a **deposition on July 23, 2018, Sgt. Juan Candelaria #1194**[82] testified that he was off duty at the time of the incident and first learned about it when he arrived at work the morning of November 24, 2016. He went to the scene with the members of his tactical team, where a supervisor (possibly Cmdr. Darlin) informed them that a search was underway for the weapon that Raye reportedly tossed during the foot pursuit. Sgt. Candelaria and his team conducted a visual search for the weapon from approximately 10am until the early afternoon on November 24, 2016. They focused on the west side of Marshfield, from 65th Street south approximately one quarter of a block, as well as on the corresponding portion of the alley west of Marshfield. They searched "front yards, sidewalks, actual streets, underneath the cars, and then subsequently the rears of those locations,"[83] but they did not find any evidence related to the shooting.

In the early afternoon, Cmdr. Johnson called Sgt. Candelaria on a three-way phone call with another officer, whom Sgt. Candelaria subsequently learned was Officer Hoard. While Sgt. Candelaria was listening, Officer Hoard related to Cmdr. Johnson that he had an informant who "had seen the person running from Poulos, throw the gun, and that it was subsequently in a gangway between 6500 and 6508 Marshfield."[84] After the call ended, Sgt. Candelaria and his team searched the gangways and yards at those addresses, as well as the interior of the abandoned house at 6508 S. Marshfield, but they did not find any evidence. Sgt. Candelaria reported the negative results to Cmdr. Johnson via phone and completed a supplementary report[85] regarding the search later that day. He did not conduct any subsequent searches at the scene or have any additional involvement with the investigation.

---

[80] Att. #464 at 15:57.
[81] Att. #464 at 29:38.
[82] Att. #448.
[83] Att. #448 at 18:52.
[84] Att. #448 at 14:10.
[85] Att. #317, pg. 10.

18

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913

**Sergeant Charles Brown**

In a **deposition on June 11, 2018, Sgt. Charles Brown #1753**[86] testified that on the date and time of the incident, he was the supervising sergeant at the Area South Detective Division. When he received notification of the incident, he was informed that Raye was still alive. As a result, he assigned two detectives and responded to the shooting scene. Shortly after Sgt. Brown arrived at the scene, he learned that Raye was deceased. At that point, he testified, his investigation into the incident ended because Raye could not be criminally charged. He did not direct or take part in the search for any evidence at the scene. Sgt. Brown acknowledged that he observed canines in the vacant lot and numerous officers "walking up and down Marshfield. [But] as far as actively searching, I can't say."[87] Sgt. Brown could not recall how long he remained at the scene, though he stated that a timeframe of 1-2 hours was possible.

Sometime after the incident, he was on his way into work when he ran into Officer Hoard in the parking lot of the 5th District. Sgt. Brown stated that Officer Hoard referenced the shooting in passing, telling him words to the effect of, "Little buddy threw the gun."[88] Sgt. Brown testified that he believed this to be a reference to the information that Wilkins provided to Officer Hoard. He stated that Officer Hoard did not tell him about Raye's declaration.

### iii.   Civilian Witness Statements

**Nakilno Hubbard**

In a **statement to IPRA on November 24, 2016, Nakilno Hubbard**[89, 90] stated that on the date and time of the incident, he and Lendell Whittington were walking northbound on the 6500 block of Marshfield. As they approached the home of Whittington's aunt at 6524 S. Marshfield, Hubbard heard two gunshots "right behind each other"[91] coming from the direction of Ashland. He turned around and saw a man running out of a vacant lot near the intersection of 65th and Marshfield and a police officer chasing him. Hubbard described the man as young, dark-skinned, and wearing a red and black sweater. He did not notice anything in the man's hands. Hubbard stated that the officer was a white male, wearing a police uniform and a bulletproof vest that said Chicago Police, with a badge displayed on the left side of his chest.

The man and the officer ran south down Marshfield in Hubbard and Whittington's direction. As they approached, Hubbard heard the officer yell to him, "Move, he have a gun!"[92]

---

[86] Att. #457.
[87] Att. #447 at 14:40.
[88] Att. #447 at 16:39.
[89] Hubbard was a 17-year-old juvenile at the time of the incident and on the date that he gave a statement to IPRA. As a result, IPRA investigators obtained the consent of Hubbard's mother, Nicole Williams, prior to taking his statement, and Williams was present throughout the interview. Atts. #49, 52-53.
[90] COPA also obtained and reviewed a copy of Hubbard's July 12, 2018 deposition in *Ramsey v. City of Chicago, et al.* Att. #465.
[91] Att. #53, pg. 7, line 23.
[92] During Hubbard's deposition, he stated that he did not recall whether the officer said anything as he chased the man down Marshfield. Hubbard acknowledged that his memory of the incident was better at the time that he provided a statement to IPRA (the morning of November 24, 2016), and he testified that he told the truth during that statement.

19

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022

Hubbard ran into the gangway on the north side of 6524 S. Marshfield to get out of their way, while Whittington ran onto the front porch of the residence. The man ran past Hubbard and turned down the gangway on the south side of the home, and the officer tripped and fell as he tried to follow the man. When the officer got up he asked what address he was at, and Hubbard told him "6524." Hubbard heard the officer repeat the address to dispatch over his radio, then he watched as the officer walked up to a marked police SUV driving south down Marshfield. Throughout the incident, Hubbard stated that he did not hear the man say anything, and he did not hear any additional gunshots.

## Lendell Whittington

In a **statement to IPRA on November 24, 2016, Lendell Whittington**[93] stated that on the date and time of the incident, he and Hubbard were walking northbound on Marshfield's west sidewalk toward Whittington's home at 6520 S. Marshfield. As they walked, Whittington heard a gunshot, and a couple of seconds later, a second gunshot. He did not hear any yelling or other noises. Whittington observed a man running south down Marshfield and a police officer chasing closely behind him,[94] pointing a gun or a taser at the man. When Whittington saw them, the officer was about a house-length away from the man. Whittington did not recognize the man and was unable to describe him, except to say he did not have anything in his hands. The officer was white or Hispanic, wearing a police or detective uniform, a bulletproof vest, and a badge, possibly worn around his neck. Whittington stated that he never saw the officer before.

As the man and the officer ran toward him, Whittington stated that he ran onto the porch of 6524 S. Marshfield and Hubbard went down the gangway, on the north side of the residence. Whittington saw the man turn and run down the gangway, on the south side of the house. The officer attempted to follow him but slipped and fell directly in front of 6524 S. Marshfield. When he got up, Whittington heard him say either "shots fired" or "two shots fired" into his radio. The officer went down the gangway after the man, but seconds later he returned to the front of the house and asked for the address. Whittington and Hubbard told him that he was at "6524," and Whittington heard the officer relay that information over his radio. The officer then walked toward a marked police SUV driving south down Marshfield. Whittington told Hubbard to go home and Whittington went inside of 6524 S. Marshfield, his aunt's house. He stated that he did not know if the officer got into the police vehicle or went back down the gangway after the man he chased. Throughout the incident, Whittington said that the man never said a word to the officer. He could not remember if the officer ever said anything to the man.

## Gary Wilkins

In a **statement to IPRA on December 10, 2016, Gary Wilkins**[95] stated that on the date and time of the incident, he was walking south to a friend's house at 6500 S. Marshfield, when he

---

[93] Atts. #56-57. COPA also obtained and reviewed a copy of Whittington's July 12, 2018 deposition in *Ramsey v. City of Chicago, et al.* Att. #466. Any discrepancies between Whittington's deposition testimony and the account he provided to IPRA are minor and/or immaterial, and they did not impact COPA's assessment of his credibility or the overall analysis of this case.
[94] During Whittington's deposition, he testified that the man and the officer were approximately three houses south of 65th when he first saw them.
[95] Atts. #82-83.

20

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY            LOG #1083121 / U #16-022

saw a young man wearing a black and red coat running from a police officer. Wilkins did not recognize either man but described the officer as a white male in uniform. He watched as the officer chased the man from the bus stop at 65th and Ashland, west on 65th, and south down the alley between Ashland and Marshfield. Wilkins did not see anything in the man's hands or hear either the man or the officer say anything. As soon as the officer turned down the alley, Wilkins stated that the officer fired his weapon in the direction of the man. Wilkins could not actually see the man or what he was doing at the time the officer fired, as his view was obstructed by a church parking lot. Approximately five seconds later, Wilkins saw a muzzle flash and heard a second gunshot as the chase continued west into the vacant lot next to the church parking lot.

As this took place, Wilkins arrived at 6500 S. Marshfield and stood on the front porch. He regained sight of the man and the officer as they ran out of the vacant lot. Wilkins estimated that he lost sight of them for approximately ten seconds. The man emerged from the lot first, followed by the officer three to four seconds later. Wilkins stated that he could tell that the man was shot, as he ran slower than before. The man crossed Marshfield and continued running south down the sidewalk on the west side of the street. As the officer chased him, Wilkins could hear him yelling "shots fired," and "officer in pursuit of a suspect with a gun"[96] over his radio. Wilkins stated that he watched until both men ran down a gangway further down Marshfield and out of his sight.

Later that night, Wilkins was standing on the porch of 6500 S. Marshfield with five or six friends when he was approached by one of the officers who responded to the scene.[97] Wilkins could not remember the officer's last name, but he stated that his first name is "Don," he is a friend of Wilkins' family, and Wilkins has known him since he was a student at a grammar school where Don worked.[98] According to Wilkins, the only thing he told Don was that after the officer shot the man he said "the suspect have a gun"[99] over his radio. Wilkins denied he told Don that he saw the man possess or dispose of a gun. Don, Wilkins stated, must have misheard him or taken his words out of context.[100] Wilkins also denied that he ever talked to any of Don's superiors on the phone. He stated that he did not want to be involved in the investigation, as it involved a police officer and he feared that "shit gonna get real ugly."[101]

**Derrick Thompson**

In a **statement to IPRA on November 24, 2016, Derrick Thompson**[102] stated that on the date and time in question, he was walking east down 65th in the direction of his home at 6532 S. Marshfield. When Thompson approached the alley east of Hermitage, a police officer dressed in plainclothes and a protective vest stopped him. The officer asked him where he came from and, as

---

[96] Att. #83, pg. 4, lines 12-13.
[97] Wilkins declined to provide IPRA with the names of these friends, stating, "I don't wanna get them into [it] like I seem to be in [it]." Att. #83, pg. 26, lines 28-29.
[98] The person Wilkins knows as "Don" is Officer Don Hoard, Jr.
[99] Att. #83, pg. 22, lines 17-18.
[100] During Wilkins' interview at IPRA, he also claimed that on the night of the incident he told an IPRA investigator that he saw the "police shot that boy." Att. #83, pg. 23, line 27. The investigator's on-scene report, however, indicates that Wilkins told her that he did not witness the incident at all. Att. #4. When confronted with the discrepancy, Wilkins insisted the investigator, like Don, must have misheard him.
[101] Att. #83, pg. 26, line 4.
[102] Atts. #58-60.

21

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022

Thompson started to answer, he heard two gunshots coming from the direction of Marshfield. Thompson then saw six or seven civilians run toward him from the corner of 65th and Marshfield, away from the gunfire. The officer told Thompson to turn around and go back in the direction he came from. Thompson, however, decided to continue walking east toward his home on Marshfield. When he approached Paulina, a second officer detained, searched, and questioned Thompson about why he was running. As the officer walked Thompson toward his police vehicle, a third officer ran up to them and announced that the police detained a suspect wearing a black and red jacket. The officer released Thompson, who walked home. When he reached his front porch, Thompson saw an officer trip and fall several houses down. The officer stood up, drew his weapon, and went through the gangway between two homes on Marshfield. He did not see the officer chasing anyone.

**James Randolph**

In a **statement to IPRA on December 6, 2016, James Randolph**[103] provided the following account of a conversation he had with several acquaintances, while standing on the corner of 65th and Marshfield, shortly after the incident. According to Randolph, as he walked toward the corner he ran into two men, whom he knows as "Dave" and "Squirrel," debating what they witnessed earlier that night. Squirrel insisted that the man who was shot pointed a gun at the police officer and then took off running, while Dave said that the man was just running with a gun and did not point it at the officer at all. Randolph said as Dave and Squirrel had this conversation, a woman he knows as "Pooh" walked up to them and offered her own information. Pooh claimed she saw the man toss his gun "down some alley or some fence"[104] as he ran from the officer. She told one of her friends, Lavelle Cox, where the gun was located and Cox picked up the gun before the police arrived on the scene.[105] According to Randolph, a woman named "Samantha" and a man named "Murdoch" also overheard and took part in this conversation.[106] The following day, Randolph stated that he approached Murdoch and Murdoch told him that he witnessed the shooting. Murdoch said that he was walking down the alley next to a church on Ashland when he saw the man and the officer "hit the corner." Just after that he heard a sound that he described to Randolph as "like a gun being clicked and not goin' off,"[107] and then he saw the man and the officer running.

Randolph further stated that he recognized Raye as a "Stone"[108] who hung out with the other kids on Marshfield smoking weed. He described Raye as "a hot head [and] …a known pistol totter"[109] who carried a gun, whenever he came to the neighborhood to buy promethazine.

[103] Atts. #86-87, 295.
[104] Att. #87, pg. 22, line 32 – pg. 23, line 1.
[105] When Randolph later asked Cox if he picked up the gun, Cox denied it. IPRA investigators repeatedly attempted to arrange an interview with Cox; however, he was killed in a quadruple shooting at 123 E. 51st on March 10, 2017. Atts. #149-53.
[106] Randolph identified photographs of David Lewis as "Dave," George Richmond as "Squirrel," and Michael Gillard as "Murdoch." Att. #295. IPRA interviewed Lewis, Richmond, Gillard, Shinalla Smith as "Pooh," and Samantha Nash; however, all five individuals denied witnessing the incident, knowing anyone with first-hand knowledge of it, or having any information about what happened to Raye's weapon. Additionally, Smith stated that she did not know anyone by the name of Lavelle Cox. Atts. #90-91, 94-95, 99-100, 138-39, 391.
[107] Att. #87, pg. 23, lines 28-29.
[108] This is a reference to the Chicago street gang known as the Black P. Stones.
[109] Att. #87, pg. 26, line 11.

22

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**          **LOG #1083121 / U #16-022**

Randolph also said he heard that prior to the shooting, Raye "got into it with some females"[110] who live on the 6500 block of S. Marshfield.

### Ronald Jackson

In a **statement to IPRA on February 22, 2017, Ronald Jackson**[111] reported that on February 19, 2017, he was raking leaves in the front yard of his home at 6510 S. Marshfield. As he raked under the hedge of bushes against the southeast corner of his home, he pulled out a gun. Jackson described the weapon as a silver and black semi-automatic pistol approximately six to seven inches in length. He did not touch the gun and left it lying on the ground in front of the bushes. He informed his mother Bernice Jackson about the discovery and she called 911. Two uniformed male officers, one black and one white, arrived approximately ten minutes later and retrieved the gun. Jackson stated that no one raked beneath his front bushes for months, and not since November 23, 2016. He acknowledged that he was home at the time of the shooting, but he stated that he did not witness the incident and could not recall if any officers searched his front yard or bushes in its aftermath. He remembered that Chicago firemen used a ladder to search his roof and gutters on November 24, 2016.

### Marcus Brandon

In a **statement to IPRA and an Electronically Recorded Interview (ERI) with the Cook County State's Attorney's Office on March 8, 2017, Marcus Brandon**[112] confirmed that he owned a .40 caliber Kahr Arms pistol until November 2016.[113] Initially, Brandon claimed the gun was stolen out of a small safe in the back of his unlocked pickup truck. Upon further questioning, however, Brandon admitted that he gave the gun to Damien Dixon to sell on his behalf in early November 2016. Dixon took the gun and returned later that day with $200.00, which he gave to Brandon as the proceeds of the sale. Brandon maintained he was not present when Dixon sold the gun and does not know the identity of the purchaser.

### Damien Dixon

In an **ERI with IPRA and the Cook County State's Attorney's Office on April 5, 2017, Damien Dixon**[114] stated that Marcus Brandon used to live with Dixon and his girlfriend, who is Brandon's sister, at their home in Lansing, Illinois. Sometime in the beginning of November 2016, Dixon saw a van drive up to his house and recognized the passenger in the front of the vehicle as a man he knew as "Little Joe." When he told Brandon that Little Joe pulled up, Brandon asked Dixon to take a metal security box containing his gun, which Dixon described as a silver semi-automatic pistol, and give it to Little Joe. Dixon did and Little Joe handed him an undetermined amount of money. According to Dixon, when he went back inside he gave Brandon the money. When Dixon learned Brandon was claiming that Dixon sold the gun for $200 and Brandon did not know the purchaser's identity, Dixon responded, "That don't even sound right." No gun sale

---

[110] Att. #87, pg. 27, line 15.
[111] Atts. #132-133, 144.
[112] Atts. #145-146, 199-200.
[113] Brandon is the last registered owner of the Kahr Arms CW40 pistol that was recovered from 6510 S. Marshfield on February 19, 2017. See summary of ATF report, pg. 37.
[114] Atts. #209, 217.

23

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**     **LOG #1083121 / U #16-022**

paperwork was completed for the transaction. When Dixon was shown a booking photo of Kajuan Raye, he stated that Raye was not Little Joe.

### Joseph Cherry

IPRA investigators attempted to interview **Joseph Cherry (aka "Little Joe")** [115] at the Cook County Jail on April 6, 2017, but he declined to speak with investigators. IPRA subsequently obtained the recordings of six phone calls that Cherry placed from the jail between April 6, 2017, and April 8, 2017, but neither Cherry nor anyone else on the calls referenced Raye or the sale of the Kahr Arms CW40 pistol.

### Karonisha Ramsey

In a **deposition on May 23, 2018, Karonisha Ramsey** [116] testified that she was Kajuan Raye's mother. At the time of the incident, Kajuan lived with Ramsey and her husband, Wyman Raye, at the family's home in Dolton, Illinois. Ramsey stated that she received a phone call from Kajuan at approximately 2pm on November 23, 2016, and he told her that he was at Julius Green's house in Englewood and needed a ride home. Ramsey told him that she was at home cooking and said that he should ask his father Wyman to pick him up on his way home from work. When Wyman returned home at approximately 8:30pm, he told Ramsey that Kajuan had not called him. Around 11pm, one of Kajuan's childhood friends called Ramsey to tell her that she should check on Kajuan, because rumors were circulating that he ran from the police and "something happened to him." [117] After Ramsey was unable to reach Kajuan, the family went to Christ Hospital, where they learned of Kajuan's death.

Ramsey testified that on November 25, 2016, she and five family members located Julius Green at 93rd and Halsted and asked him what happened. Green told them that on the night of the incident, his mother dropped him and Kajuan off at the bus stop at 65th and Ashland so that they could take the bus to Kajuan's house. When an officer approached Kajuan, Kajuan ran in one direction and Green ran in another, ending up at his aunt's house. Green did not tell Ramsey what he and Kajuan had been doing earlier in the evening, who else they had been with, or how long they were at the bus stop. When Ramsey asked if Kajuan had a gun, Green responded, "no." Ramsey testified that she did not know her son to carry a gun or sell drugs, and she never found any weapons or drugs in her home.

### Additional Canvasses

IPRA investigators conducted two **Canvasses** [118] on November 24, 2016, and November 28, 2016, to locate additional witnesses and/or evidence. The people located during the canvasses did not see the incident, nor were they able to provide relevant information. Two individuals reported that they heard two gunshots, but neither could provide a first-hand account of the actual shooting.

---

[115] Atts. #349-357. A CPD Detective obtained the proper name for "Little Joe" from Marcus Brandon.
[116] Att. #467.
[117] Att. #467, pg. 131, line 11.
[118] Atts. #19-22, 261.

24

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**     **LOG #1083121 / U #16-022**

b. **DIGITAL EVIDENCE**

IPRA obtained **Surveillance Video from Nazarene All Nations Church,**[119] which is located at 6500 S. Ashland. Three of the church's six operating security cameras captured images of the initial foot chase. Camera #5, which faces northeast onto 65th, captures a sedan driving west on 65th and crossing Ashland before coming to a stop on the northwest corner of 65th and Ashland. As the vehicle stops, a male figure standing on the corner, now identified as Raye, immediately begins running west down 65th. An officer, now identified as Sgt. Poulos, exits the vehicle and begins chasing Raye. Camera #4, which faces northwest onto 65th, shows the man Raye running west down 65th and turning south down the alley between Ashland and Marshfield. Sgt. Poulos follows him, continuing to give chase. Camera #6, which faces west onto the alley and the church parking lot located at 6501 S. Marshfield, captures Raye running south down the alley. He enters and exits the frame of the camera in two seconds. One second later, Sgt. Poulos enters the camera frame running in the same direction as Raye. In all three videos both men appear to be running with their hands at their sides, out of their pockets, though the picture is too grainy to indicate whether either is holding a gun. None of the camera angles capture the shooting or the remainder of the foot chase. Approximately 20 seconds after Camera #6 shows the men running south down the alley, Camera #4 captures a marked police SUV driving westbound on 65th and turning south on Marshfield.

IPRA obtained the video footage from **POD #2425-TSP (OEMC/Operation Virtual Shield).**[120] The POD camera is located on the northeast corner of 65th and Ashland and captures the southern corners of the intersection. At 10:58 pm on the night of the incident, the POD video captures Sgt. Poulos' unmarked tan police sedan traveling westbound on 65th and stopping as it reaches Ashland. At 11:06 pm, the vehicle activates its emergency lights and continues westbound, across Ashland, and outside the frame of the camera. The video does not capture any other portion of the incident. IPRA also requested and obtained the video taken by POD #5072, #7357, and #7348 on the date and time in question, but none of these cameras captured relevant images.[121]

IPRA obtained the **In-Car Camera (ICC) Video** associated with Beat 706BR[122] (Officers Matthew Lucki and Andrew Turner). The video begins at approximately 11:02 pm[123] and captures the audio from Sgt. Poulos' radio transmissions as Beat 706BR responds to the scene. As the vehicle turns north from 66th into the alley between Marshfield and Paulina, Beat 706BR can be heard notifying dispatch that they "are with him," in apparent reference to Sgt. Poulos. The video captures the vehicle as it approaches an object lying in the middle of the alley, and an officer standing several feet away on the west side of the alley. At 11:04:48 pm, the video cuts off. It begins again at approximately 11:32 pm, when the vehicle is backing out of the alley, going south. As it backs up, at least six officers can be seen shining their flashlights along the alley. IPRA also requested the ICC video for Beat 715R (Officers Delgado and Rey); however, no video was found for that vehicle during the relevant timeframe. The vehicle assigned to Beat 710R (Sgt. Poulos) was not equipped with in-car camera on the night of the incident.[124]

---

[119] Atts. #31, 76, 203.
[120] Atts. #205, 212.
[121] Atts. #28, 202, 206-207, 213.
[122] Atts. #30, 201, 411.
[123] The time code on Beat 706BR's ICC video appears to be off by approximately 3-4 minutes.
[124] Atts. #27, 300.

25

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**     **LOG #1083121 / U #16-022**

The **Office of Emergency Management and Communications (OEMC) Event Queries,**[125] **PCAD Messages,**[126] **911 Calls,**[127] **and Radio Transmissions**[128] document the following relevant and material communications:

| | |
|---|---|
| 10:06 pm | OEMC receives an anonymous 911 call reporting a male strangling a female in the alley at 1443 W. 65th. The caller states that the male is wearing a black and red jacket and a red hoodie.[129] |
| 11:00 pm | Sgt. Poulos: "I think the offender might be on the corner of 65 and Ashland." |
| 11:06:20 pm | Sgt. Poulos: "Running with him." The dispatcher then reports a unit with an emergency. |
| 11:06:35 pm | Sgt. Poulos: "Shots fired by police. He's gotta gun." |
| 11:06:55 pm | Another unit: "What color jacket?" |
| 11:06:59 pm | Sgt. Poulos: "Black and red jacket, hoodie." |
| 11:07:05 pm | Dispatch: "What's your location?" |
| 11:07:11 pm | Sgt. Poulos: "6524 Marshfield. Heading west. Two shots fired by the police." |
| 11:08:10 pm | Beat 706BR: "We're with them. They're west. Go to Paulina." |
| 11:08:17 pm | Sgt. Poulos: "Dropped his jacket. In the alley of 6524." |
| 11:08:31 pm | Sgt. Poulos (telling Raye): "Get on the fucking…get on the ground."[130] |
| 11:08:48 pm | Sgt. Poulos: "Roll an ambulance." |
| 11:09:07 pm | Beat 4525B: "Roll an ambulance here, squad, he's hit." |
| 11:09:33 pm | Beat 706BR: "6521 on Paulina. Send an ambulance. Officer's good, offender's in custody." |

---

[125] Atts. #15, 376-378.
[126] Atts. #16, 373-375.
[127] Atts. #305, 309.
[128] The OEMC radio transmissions quoted herein were transcribed by a COPA investigator. They do not include every transmission made within this time frame. For the full content, see Atts. #40-48, 306.
[129] IPRA investigators spoke with the woman who made the 911 call. She described the man she saw as black, approximately 30 years old, 5'11-6'0 tall, and wearing a black "Pelle" coat, red hoodie, and a blue, red and white hat. She did not recognize either the man or the woman he was assaulting and has not seen either of them since that night. (Att. #74.)
[130] During his statement to COPA, Sgt. Poulos disputed this transcription of his radio transmissions and stated what he actually said was, "He's on the ground." Atts. #282, pg. 87, lines 12-15.

26

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022

The **Chicago Fire Department Event Queries**[131] **and Radio Transmissions**[132] indicate that on November 24, 2016, Fire Truck #41 responded to 6500 S. Marshfield to assist CPD members in locating evidence on rooftops. The reports indicate that the fire truck arrived at the scene at 3:09 am and departed at 3:49 am and returned again between 9:18 am and 10:08 am. They do not specify which locations CFD searched or the results.

c. PHYSICAL EVIDENCE

i. Forensic Evidence

**Crime Scene Processing Report #321245**[133] documents the recovery of evidence, including three cartridge casings found in the vacant lot at 6507 S. Marshfield (two "Winchester 45 Auto" and one "CBC 45 Auto"), a fired bullet lodged in the floor joist of the rear porch at 6509 S. Marshfield, and a black and red Pelle jacket recovered from the alley pavement behind 6522 S. Marshfield. Inside the left front breast pocket of the jacket, forensic investigators discovered a fired bullet, a small piece of black plastic, and a silver-colored tension spring. The report notes that CPD and CFD personnel were also "searching the scene for a possible firearm," but none was found.

At the Area South Detective Division, a forensic investigator recovered Sgt. Poulos' Glock 21 and a 13-round capacity magazine. There were 11 live rounds of ammunition in the magazine and one live round in the chamber of the weapon.[134]

According to the **Inventory Sheets**, items recovered immediately after the shooting included Raye's clothing and Pelle jacket, a small piece of black plastic and a silver colored tension spring found inside the jacket, eight small plastic baggies containing suspected marijuana, and Sgt. Poulos' handgun, fired bullets, and expended shells.[135] A later inventory sheet documents the recovery of a Kahr Arms CW40 pistol and a magazine containing an unknown number of live rounds from 6510 S. Marshfield on February 19, 2017.[136]

**Evidence Technician (ET) Photographs**[137] **and Crime Scene Video**[138] depict the shooting scene from various angles. They include images of the expended shells found in the vacant lot at 6507 S. Marshfield, the bullet strike to the fence and rear porch at 6509 S. Marshfield (with trajectory rods), the black and red Pelle jacket found in the alley, and a blood stain in the gangway of 6521 S. Paulina. The photographs also include images of Raye's body and clothing, and injuries to Sgt. Poulos' left knee, left palm, and right thumb.

---

[131] Atts. #223, 229, 232.
[132] Atts. #230, 304.
[133] Atts. #34-35.
[134] This evidence indicates that the weapon was fully loaded with a cartridge in the chamber prior to its discharge by Sgt. Poulos.
[135] Att. #36.
[136] Att. #116.
[137] Atts. #103-106.
[138] Att. #107.

27

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913


Figure 2. Photograph of the vacant lot at 6507 S. Marshfield, taken from the alley facing west


Figure 3. Photograph of leaves on the west side of the 6500 block of S. Marshfield and the rakes CPD used to search for Raye's alleged weapon

28

Karonisha Ramsey, et al. v. City of Chicago, et al., 16 C 10913                    FCRL 044020

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913



Figure 4. Photograph of the Pelle jacket recovered from the alley west of Marshfield, including the inside breast pocket where the plastic piece and bullet were recovered



Figure 5. Photograph of the hedges in front of an apparently wood-frame building at 6510 S. Marshfield, where witness Ronald Jackson discovered the Kahr Arms CW40 pistol[139]

---

[139] Photograph taken by a COPA investigator on February 22, 2017. Att. #129.

29

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022



Figures 6 and 7. Photographs of both sides of the black plastic piece recovered from the inside left breast pocket of the Pelle jacket found in the alley at 6522 S. Marshfield[140]



Figure 8. Photograph showing the black plastic piece next to the opening in the Kahr Arms CW40 pistol that was recovered from 6510 S. Marshfield on February 19, 2017[141]

---

[140] Photographs taken by a COPA evidence specialist on October 26, 2017. Atts. #262-263.
[141] Photograph taken by an ISP forensic scientist on March 9, 2018. This photograph has been cropped and does not include all of ISP's handwritten notes; for the original, see Att. #418.

30

Karonisha Ramsey, et al. v. City of Chicago, et al., 16 C 10913                    FCRL 044022

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022**

**Illinois State Police Forensic Science Laboratory Reports (ISP)** document the examination of recovered firearms evidence in this investigation. An analysis of the reports resulted in the following facts relevant to this investigation:

Initial inspection of the Kahr Arms CW40 pistol recovered from 6510 S. Marshfield noted that the weapon had a "missing side plate." An ISP forensic scientist determined it to be operable as received, with the following caveat: "The side of the receiver of the [firearm] is missing causing the trigger bar to move out of place. A piece of lead was taped to the [firearm] to act as part of the receiver and hold the trigger bar in place during test firing." The magazine submitted with the weapon was dented and determined not to function. The weapon was test fired using a different magazine and a test-fired casing was entered into the IBIS[142] database; however, no identification was made to any other casings in the database.[143]

An ISP forensic scientist compared the piece of black plastic recovered from the front left breast pocket of Raye's Pelle jacket to the opening on the side of the Kahr Arms CW40 pistol and determined that the "piece of black plastic was observed to be unbroken and the possibility of a physical match was precluded. However, .... [they] have the same class characteristics in terms of texture, color, and shape." The report notes that the "plastic piece appears to be side panel for a Kahr CW series pistol."[144]

The examination of the Kahr Arms CW40 pistol, the magazine, and two live (unfired) cartridges did not reveal any latent fingerprint impressions suitable for comparison.[145, 146]

The examination of Sgt. Poulos' weapon determined it to be operable as received and it was test fired using a magazine and ammunition submitted with the weapon.[147]

Two fired bullets removed from the porch at 6509 S. Marshfield and the inside breast pocket of Raye's jacket could not be identified or eliminated as having been fired from Sgt. Poulos' weapon, but neither were fired from the Kahr Arms CW40 pistol.[148]

Two Winchester 45 auto fired cartridge casings recovered from the vacant lot at 6507 S. Marshfield were identified as having been fired by Sgt. Poulos' weapon. One Magtech 45 auto fired cartridge casing recovered from the vacant lot at 6507 S. Marshfield and two Federal 45 auto fired cartridge casings recovered from the street in front of 6530 S. Marshfield were determined to not have been fired by Sgt. Poulos' weapon or the Kahr Arms CW40 pistol.[149]

---

[142] Integrated Ballistics Identification System, which compares fired evidence to other crimes.
[143] Atts. #254, 290.
[144] Atts. #402-403, 417-420.
[145] Att. #241.
[146] Due to the tests for latent prints, ISP could not test the Kahr Arms CW40 pistol, its magazine, or the unfired cartridges for the presence of DNA. Att. #292.
[147] Att. #210.
[148] Atts. #210, 254.
[149] Atts. #210, 242, 254.

31

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913

No gunshot residue was found on samples taken from the back of Raye's right and left hands, the cuffs of Raye's grey sweatshirt, or the cuffs of the jacket found in the alley behind 6522 S. Marshfield.[150]

An **Illinois State Police Forensic Science Laboratory Report (ISP)**[151] documents the examination of a green, leafy substance recovered by the responding officers in this incident. Results of that testing were positive for cannabis.

The **GPS Data**[152] taken from Sgt. Poulos' vehicle reveals that at 10:58:05 pm on November 23, 2016, Sgt. Poulos traveled west down 65th, approximately 1.5 blocks east of Ashland. Thirty seconds later, the vehicle arrived at the northeast corner of 65th and Ashland, where it remained for the next seven minutes. At 11:06:05 pm, Sgt. Poulos drove across Ashland and stopped his vehicle on the northwest corner of the intersection, where it stayed until the data window ended at 11:30 pm.[153]

## ii.   Medical Evidence

The **Chicago Fire Department Ambulance Report**[154] states that on November 23, 2016, at 11:18 pm, at 6521 S. Paulina, EMS Ambulance 49 personnel found Raye lying on his stomach on the gangway, handcuffed, and surrounded by numerous officers. Raye presented with a gunshot wound to his left upper quadrant, labored breathing, and minimal eye movement. EMS personnel moved Raye to the ambulance, initiated CPR and advanced life support, and transported him to Advocate Christ Medical Center.

The **Medical Records**[155] obtained from Advocate Christ Medical Center indicate that Raye arrived at the hospital's Emergency Room at approximately 11:45 pm via Ambulance 49.[156] Upon arrival he was unconscious/unresponsive with a gunshot wound to the mid-chest and back. Dr. Thomas Cartolano pronounced Raye deceased at 11:51 pm.

The **Report of Postmortem Examination**[157] indicates that the autopsy of Kajuan Raye was performed in the morgue of the Cook County Medical Examiner's Office on November 25, 2016, at 8:15 am. The autopsy determined that Raye sustained a single gunshot wound to the back. The projectile penetrated his back on the lower right side, traveled through skin and tissue, and fractured his right 11th posterior rib. It then perforated his liver and diaphragm before exiting on the left side of his anterior upper abdominal/lower chest wall. The direction of the wound track was back to front, and right to left.

---

[150] Atts. #243, 260.
[151] Att. #211.
[152] Att. #32.
[153] Att. #32, pg. 2, 41–42.
[154] Att. #24.
[155] Att. #75.
[156] The medical records contain varying times of arrival for Raye, ranging from 11:34 pm to 11:45 pm. Based on the Ambulance Report, which states that the ambulance carrying Raye departed the scene at 11:32 pm and arrived at the hospital at 11:42 pm, it is likely that the correct time of admission is 11:45 pm.
[157] Atts. #111, 147.

32

## CIVILIAN OFFICE OF POLICE ACCOUNTABILITY    LOG #1083121 / U #16-022

Defects on some of Raye's clothing corresponded to the location of the gunshot wound, and black clothing fibers were recovered from the wound. The wound was of indeterminate range with no evidence of close range firing. The pathologist determined that the cause of death was a single perforating gunshot wound to the back, and the manner of death was Homicide.

A **Breathalyzer Test**[158] taken by Sgt. Poulos at 2:21 am on November 24, 2016, revealed that his BAC was .000. Sgt. Poulos also submitted to a urine drug test on the same date, which revealed negative results.

**City of Chicago Injury on Duty Report, Claim #2016347429,**[159] indicates that Sgt. Poulos suffered multiple physical injuries to multiple body parts as a result of his encounter with Raye. According to the report, which Lt. Timothy Wolf filed on November 24, 2016, "In a foot pursuit of a wanted offender [Sgt. Poulos] fell, causing abrasions to his right thumb, left palm and left knee. Member is also experiencing pain to his left hip area."

### d. DOCUMENTARY EVIDENCE

#### i. Department Reports

The **Tactical Response Report (TRR)**[160] completed by Sgt. Poulos indicates that Raye did not follow verbal directions, fled, attacked Sgt. Poulos with a weapon, and used force likely to cause death or great bodily harm, in that Sgt. Poulos perceived a firearm. Sgt. Poulos responded with member presence, verbal commands, and discharged his firearm. The TRR indicates that Sgt. Poulos fired two rounds.

The **Officer's Battery Report (OBR)**[161] completed by Sgt. Poulos indicates that he was On-Duty, in uniform, and working alone at the time of the incident. The report identifies the Type of Weapon/Threat as a semi-automatic firearm and indicates that it was pointed at the sergeant. Sgt. Poulos sustained minor non-fatal injuries.

The **Supplementary Reports for RD# HZ-527352/ Aggravated Assault PO: Handgun**[162] document the observations of the following first responding officers:

- A report written by Officer Don Hoard states that he and three unknown officers located Raye in a gangway next to 6517 S. Paulina. As the assisting officers were placing Raye into handcuffs, Raye was asked, "Where's the gun?" He responded, "I tossed it." The report further documents Officer Hoard's interactions with witness Gary Wilkins. It states that during a phone call the day after the incident, Wilkins told Officer Hoard that "dude threw

---

[158] Att. #63.
[159] Att. #312.
[160] Att. #8.
[161] Att. #9.
[162] There is apparently no "final" Detective Supplementary Report for RD #HZ-527352/ Aggravated Assault PO: Handgun or RD #HZ-536327/Law Enforcement Related Death: Officer Involved Shooting. On December 17, 2016, CPD Detectives requested that the status of RD #HZ-536327 be reclassified "as SUSPENDED pending the outcome of the ongoing IPRA investigation in the related case under RD #HZ527352." (Att. #252.)

33

the gun last night when he came out the lot." Officer Hoard conveyed this information to 7[th] District Cmdr. Kenneth Johnson and a sergeant from the Area South Detective Division, who told him to contact IPRA. On November 25, 2016, Officer Hoard informed an IPRA Investigator that he "heard the offender say he had a gun and heard an independent witness state he saw him throw the gun while being chased." The report further states that Cmdr. Johnson sent a team to search the area between 6502 and 6508 S. Marshfield, but no weapon was recovered.[163]

- A report written by Officer Matthew Lucki states that he and his partner, Officer Andrew Turner, responded to a call of shots fired by police and helped Sgt. Poulos locate Raye. While assisting EMS in Raye's treatment, Officers Lucki and Turner observed a clear plastic bag containing eight smaller baggies of suspected cannabis fall out of Raye's pocket. The officers then accompanied Raye to Christ Hospital, where he was pronounced deceased. They subsequently relocated to the 7th District and inventoried the cannabis under Inventory #13808837.[164]

- A report written by Lt. Mark Sedevic documents the search for evidence CPD conducted immediately after the incident. According to the report, Lt. Sedevic led 1st and 3rd watch personnel, from the 7th District, in a coordinated grid search of the area between 11:20 pm on November 23, 2016 and 5:40 am on November 24, 2016. The search "consisted of the front yards, gangways, street, and under vehicles" from 6500-6538 S. Marshfield, the vacant lot at 6507 S. Marshfield, the two alleys between Ashland and Paulina, and other relevant backyards, rooftops, and gangways. Additionally, Lt. Sedevic led 2nd watch personnel, from the 7th District, in a second coordinated grid search between 6:00 am and 11:15 am on November 24, 2016. The report documents the discovery of a fired cartridge casing in the vacant lot at 6507 S. Marshfield and a fired bullet lodged in the back porch of 6509 S. Marshfield, among other evidence.[165]

- A report written by Sgt. Juan Candelaria documents an additional search conducted as a result of information received from an informant. According to the report, Cmdr. Johnson relayed to Sgt. Candelaria that an officer told him that one of his informants witnessed the shooting and indicated that Raye's weapon was in a gangway between 6500 and 6508 S. Marshfield. Sgt. Candelaria and a team of officers subsequently searched the gangways and yards of those addresses, as well as the inside of the abandoned house at 6508 S. Marshfield, but no weapon was recovered.[166]

The **Original Case Incident Report**[167] **and Event Query**[168] **for RD #JA-159591/Non-Criminal Weapon Turn-In** indicate that, on February 19, 2017, Beat 0765C responded to a 911 call for a weapon turn-in at 6510 S. Marshfield. When the officers arrived, the caller told them that "she was cleaning her front yard and observed what looked to be a handgun in the front yard

---

163 Att. #64.
164 Att. #10.
165 Att. #317.
166 Att. #317.
167 Att. #114.
168 Att. #115.

34

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY         LOG #1083121 / U #16-022

bushes." They recovered the weapon, a two-toned Kahr Arms CW40, .40 caliber semi-automatic pistol loaded with approximately five live rounds, from the bushes in front of the house. After determining that the status of the gun was clear and that it was not registered, Officer Jonathan Newsome inventoried it under Inventory #13861374.

According to the **Major Incident Notification Detail**[169] **and IPRA's Preliminary Report,**[170] Sgt. Poulos responded to a 911 call of a male choking a woman in an alley. While stopped at the intersection of 65th and Ashland, Sgt. Poulos observed a male subject (now identified as Kajuan Raye) fitting the description of the offender, and he approached him for an interview. When Raye saw Sgt. Poulos, he "reached into his waist area,"[171] turned, and fled. Sgt. Poulos exited his vehicle and chased Raye on foot. During the chase Raye turned towards Sgt. Poulos and pointed what appeared to be a firearm at him, causing Sgt. Poulos to discharge his weapon. Raye continued to flee and again turned toward Sgt. Poulos, extended his arm, and pointed a firearm at him. Sgt. Poulos discharged his weapon a second time and continued to pursue Raye until he was found, injured, in the gangway next to 6521 S. Paulina. Raye was transported to Advocate Christ Hospital, where he expired with a gunshot wound to the upper left chest.

COPA obtained and reviewed the **emails of four CPD members**[172] pertaining to this incident, with the following results:

- At 10:14 am on November 24, 2016, Deputy Chief Larry Watson emailed Gang Intelligence Division Commander Christopher Kennedy: "Please reach out to your c/i's on the 6500 block of South Marshfield. We are looking for info of who could of possibly picked up the weapon of the offender connected to our police shooting. So far no weapon recovered…" Cmdr. Kennedy then forwarded the email to the members of his unit.

- At 1:36 pm on November 24, 2016, Sgt. Walter Chudzik responded to Cmdr. Kennedy, stating, "We have some intel on who has the firearm. We will call Area South with info."

- At 6:15 pm on November 24, 2016, Sgt. Chudzik emailed Cmdr. Kennedy the following additional information: "We came in, grabbed our long-time informant in Englewood. He lays out some 3[rd] party info and whereabouts of gun. I called Area South, willing to bring c/s there. They said, 'It is completely out of our hands, you have to go through COPA/IPRA.' We are surprised and doing what we can with the info."

### ii.    Other documentary evidence

**Correspondence between COPA investigators and Kahr Arms**[173] indicates that the small piece of black plastic and silver-colored spring found in Raye's jacket pocket are consistent with two of the components of a Kahr Arms CW40 pistol. Kahr Arms concluded that, based on the photographs and dimensions of the items, the black plastic "is a .40 caliber side panel, that can

---

[169] Att. #268.
[170] Att. #4.
[171] Att. #268, pg. 2.
[172] Atts. #326-329.
[173] Att. #294.

35

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913

be used on any of our polymer .40 models," including the CW model. The company further identified the spring as a trigger bar spring, which is common to all Kahr Arms handguns.

Pursuant to **Search Warrant #17SW6273 and #17SW6274,**[174] IPRA obtained the complete Facebook and Instagram records for four accounts believed to have belonged to Raye. The warrants resulted in the digital preservation of more than 8,800 pages of material from Facebook accounts "cb.liltank" and "cb.tank" and Instagram accounts "cb_liltank" and "cbliltank." These materials include more than 250 photographs of Raye posing with different firearms, as well as hundreds of Facebook messages documenting Raye's attempts to sell various weapons. On November 22, 2016, Raye used Facebook Messenger to send a photograph of what appears to be a Kahr Arms CW40 pistol to another Facebook user. That image is displayed below.



---

[174] Atts. #278-80, 283-86.

36

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913

The **Kahr Arms website (http://www.kahr.com/pistols/kahr-cw40.asp)** [175] advertising its Model CW40, .40 caliber semi-automatic handgun contains the following photograph of the weapon.



The **Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives National Tracing Center Report, Trace # T20170056710,** [176] documents that on July 7, 2015, the Kahr Arms CW40 pistol subsequently recovered from 6510 S. Marshfield was sold to Marcus Brandon by Borderline Shooting Sports, located at 952 E. Steger Road, Crete, Illinois.

COPA obtained and reviewed the redacted **cell phone records of Officer Hoard.** [177] The records reveal that a cell phone number belonging to Gary Wilkins called Officer Hoard at 12:36:22am on November 24, 2016, but the call was not completed. At 2:43:44pm, Officer Hoard placed a call to Wilkins that lasted 2 minutes, 17 seconds. When the call ended, Officer Hoard placed a 47-second-long call to a number belonging to Cmdr. Johnson. Officer Hoard then exchanged a series of text messages with both Wilkins and Cmdr. Johnson. At 3:12:33pm, Officer Hoard received a call from Cmdr. Johnson, which lasted until 3:14:54pm. At 3:13:34pm, Officer Hoard placed a 43-second-long call to Wilkins. [178] Approximately 75 minutes later, Officer Hoard called Cmdr. Johnson again and the two spoke for 45 seconds. The records show multiple calls between Officer Hoard and various CPD and IPRA personnel over the next five days. On November 29, 2016, at 6:08:22pm, Officer Hoard placed a call to Wilkins that lasted just under two minutes. [179] The final attempt at communication between Officer Hoard and Wilkins appears to be a series of missed calls on December 7, 2016.

---

[175] Att. #281.
[176] Att. #124.
[177] Atts. #468-469. All of the times have been adjusted from Coordinated Universal Time (UTC) to Central Standard Time (CST).
[178] The overlapping nature of these calls suggests that Officer Hoard may have conferenced Wilkins into his call with Cmdr. Johnson.
[179] This call took place during the same time frame that Officer Hoard was in Lt. Tannehill's office.

37

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**  **LOG #1083121 / U #16-022**

A search of the **Law Enforcement Agencies Data System (LEADS)**[180] revealed that Raye had an active warrant for the offense of burglary. Cook County Sheriff's Department issued Warrant #W16K0452 for Raye's arrest on July 25, 2016.

The **Complaint at Law in the United States District Court for the Northern District of Illinois (16-CV-10913)**[181] alleges that on November 23, 2016, Sgt. Poulos shot Raye without justification, causing his death. As of the date of this report, the case is still pending.

## VI.  ANALYSIS

### a.  Legal Standard

The applicable Chicago Police Department order is General Order 03-02-03, II,[182] which states that a sworn member is justified in using force likely to cause death or great bodily harm only when he or she reasonably believes that such force is necessary:

1. to prevent death or great bodily harm to the sworn member or to another person, or:
2. to prevent an arrest from being defeated by resistance or escape and the sworn member reasonably believes that the person to be arrested:
   a. has committed or has attempted to commit a forcible felony which involves the infliction, threatened infliction, or threatened use of physical force likely to cause death or great bodily harm or;
   b. is attempting to escape by use of a deadly weapon or;
   c. otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

With respect to Illinois state law, the use of deadly force is codified at 720 ILCS 5/7-5 (1986). The section states:

(a) A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest. However, he is justified in using force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or such other person, or when he reasonably believes both that:

(1) Such force is necessary to prevent the arrest from being defeated by resistance or escape; and

---

[180] Att. #314.
[181] Atts. #135, 379.
[182] This report cites the version of General Order 03-02-03 in effect on November 23, 2016.

38

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**         **LOG #1083121 / U #16-022**

(2) The person to be arrested has committed or attempted a forcible felony which involves the infliction or threatened infliction of great bodily harm or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

Finally, with respect to Constitutional law, determinations regarding the use of excessive force in the course of an arrest, investigatory stop, or other "seizure" are properly analyzed under the Fourth Amendment's objective reasonableness standard. The question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 2003). Moreover, the reasonableness calculation "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in that particular situation." *Graham*, at 396-397. Consequently, "when an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Muhammed v. City of Chicago*, 316 F.3d 380, 683 (7th Cir. 2002), quoting *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (en banc) (emphasis omitted).

### b. Legal and Factual Determinations

Sgt. Poulos stated that he saw Raye holding a firearm in the vacant lot at 6507 S. Marshfield, and Raye pointed the weapon at him twice as he ran through the lot. In response, Sgt. Poulos discharged his own weapon at Raye two times. COPA's analysis of Sgt. Poulos' use of deadly force rests on two major questions: (1) whether Sgt. Poulos' belief that Raye possessed a firearm at the time of the incident was reasonable, and (2) whether Sgt. Poulos reasonably believed Raye posed an imminent threat and that deadly force was necessary to eliminate the threat. COPA's conclusions to these questions are based on a preponderance of the evidence standard. A proposition is proved by a preponderance of the evidence when it is found to be more probably true than not. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill.2d 100, 191 (2005).

#### i. Sgt. Poulos reasonably believed that Raye was armed with a firearm at the time of the incident.

A preponderance of the evidence demonstrates that Sgt. Poulos reasonably believed Raye was armed with a firearm at the time of the incident.

Sgt. Poulos stated that when he turned into the vacant lot, he observed Raye holding a handgun with a shiny black barrel in his right hand.[183] Although a gun was not recovered immediately after the shooting, a preponderance of the evidence demonstrates Raye was armed at

---

[183] There is no evidence that Raye possessed any other object that Sgt. Poulos could have mistakenly believed was a firearm.

39

the time of the incident. COPA's finding rests on the combination of all relevant physical, testimonial, documentary, and social media evidence.

*First*, the physical evidence supports COPA's finding, by a preponderance of the evidence, that Raye possessed a firearm on the night of the incident.

Ronald Jackson found a Kahr Arms CW40 pistol in the front yard of 6510 S. Marshfield while doing yard work on February 19, 2017, approximately three months after the incident. The location and condition of the Kahr Arms CW40 pistol is circumstantial evidence that the firearm belonged to Raye. 6510 S. Marshfield is a property located on Raye's flight path on the date of the incident, and Raye reasonably could have discarded the firearm in this location. While the firearm was not located during the Department's search for a weapon on November 23/24, 2016,[184] Jackson found the gun buried in a pile of leaves, underneath a row of hedges, up against the house, and he stated that the last time anyone raked beneath the bushes was prior to the incident. There are no records indicating that CPD or CFD personnel searched the hedges following the shooting. Cmdr. Darlin, Lt. Sedevic, and F/I Ryan all told COPA that 6510 S. Marshfield fell within the general search area, but they also left open the possibility that the pistol might have been missed.[185] Additionally, although Lt. Sedevic's supplementary report indicates that CPD searched 6500 to 6538 S. Marshfield, he acknowledged that he wrote the report a week after the incident and returned to the scene after the fact to identify the areas searched. No contemporaneous documentation of the search efforts exists, so it cannot be known for certain whether the hedges at 6510 S. Marshfield were searched on the night of the incident. Regardless, an officer could have missed a firearm located up against the house, under the hedges in a pile of leaves. Moreover, the firearm was speckled with rust, consistent with it being exposed to the elements for an extended period of time and not simply placed there immediately before Jackson discovered it.

Other physical evidence circumstantially ties the weapon to Raye. On the night of the incident, the forensic investigators who inventoried Raye's jacket recovered a small piece of black plastic with the imprint "2 P40" and a silver-colored tension spring from the jacket's left breast pocket. A representative from Kahr Arms stated that both items are components of their handguns, and the plastic piece is a side panel to one of their .40 caliber polymer models, which includes the CW40. When ISP examined the Kahr Arms CW40 pistol after it was recovered in February 2017, it noted that the weapon had a missing side panel. COPA subsequently requested that ISP compare the plastic piece to the weapon but its results were inconclusive. ISP could neither include nor exclude the plastic piece as coming from that specific Kahr Arms CW40 pistol. However, it did

---

[184] To be clear, COPA is troubled by the fact the firearm was not discovered for approximately three months and has accounted for this fact when weighing the evidence.

[185] Indeed, while Cmdr. Johnson, Lt. Sedevic, and Inv. Ryan described the search for Raye's gun as coordinated and thorough, several of the officers who participated in the search were less convincing. Officer Rey, for example, characterized his search efforts as "like a glance." He stated that he only looked for the gun along the sidewalk on Marshfield, and he did not search under any hedges or leaves. Additionally, COPA identified specific addresses searched following the incident, and the address where the gun was later found is not among them. Officers Turner and Lucki stated that they searched the backyards of 6521 S. Paulina and 6524 S. Marshfield, and Cmdr. Darlin testified that he raked the side yard at 6524 S. Marshfield. Officer Higgins stated that he searched the front yard and bushes at 6522 S. Marshfield. Sgt. Candelaria testified that he and his tactical team searched the gangways and yards between 6502 and 6508 S. Marshfield. COPA was unable to identify anyone—officers or supervisors—who specifically recalled searching the bushes at 6510 S. Marshfield.

40

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022

find that the opening on the gun, where the side panel was missing, had the same texture, color, and shape as the plastic piece. ISP also noted that the "plastic piece appears to be [a] side panel for [a] Kahr CW series pistol." There were only two pieces missing from the recovered handgun: the right-side panel and the tension spring. A right-side panel and a tension spring that Kahr Arms identify as being pieces of its .40 caliber polymer models were found in Raye's inner jacket pocket. Although certainly not conclusive, it is possible, therefore, that the plastic piece recovered from Raye's jacket pocket could be the missing side panel from the Kahr Arms CW40 pistol located at 6510 S. Marshfield. Indeed, COPA finds this is the most reasonable explanation for why a missing side panel was recovered from Raye's jacket pocket after the incident.[186] This physical evidence circumstantially links Raye to the gun that was subsequently recovered along his flight path.

*Second*, testimonial evidence supports COPA's finding, by a preponderance of the evidence, that Raye possessed a firearm on the night of the incident. Sgt. Poulos stated he observed Raye holding a firearm during the incident. Sgt. Poulos' account is bolstered by the fact that he made contemporaneous statements about observing the firearm *during* the foot pursuit. It is unlikely that during a foot pursuit— a tense, evolving situation— Sgt. Poulos would have had the foresight to fabricate a purposefully false narrative about the shooting. *See, e.g. United States v. Joy*, 192 F.3d 761, 766 (7th Cir. 1999) ("[A] person is unlikely to fabricate lies (which presumably take some deliberate reflection) while his mind is preoccupied with the stress of an exciting event."). For example, as Sgt. Poulos and Raye ran out of the vacant lot and crossed Marshfield, civilian witness, Gary Wilkins, heard Sgt. Poulos yell "suspect has a gun" into his radio. Wilkins' recollection is confirmed by the audio recordings of Sgt. Poulos' radio transmissions, which indicate that Sgt. Poulos told dispatch, "He's gotta gun," at 11:06:35 pm. Civilian witness Nakilno Hubbard also recalled that Sgt. Poulos yelled to him, presumably for his safety, "Move, he have a gun!" as Raye ran towards Hubbard's location on Marshfield.

Furthermore, Officer Don Hoard, who was one of the first responding officers on the scene, also reportedly heard two statements. First, Officer Hoard told IPRA that as he was taking Raye into custody, he heard Raye say that he "tossed the gun." Officer Hoard timely relayed this information to Cmdr. Johnson, Lt. Doherty, and his partner while he was still on scene, and to his sergeant later that night. Several days later, Officer Hoard also informed Lt. Tannehill and completed a supplementary report memorializing Raye's statement. Second, Officer Hoard stated that the day after the shooting, Gary Wilkins told him that he witnessed portions of the incident and saw Raye throw his gun "when he came out the lot." Cmdr. Johnson testified that he heard Wilkins repeat this information during a three-way phone call with Officer Hoard, and he sent a team of officers to search 6502 to 6508 S. Marshfield. Five days later, Lt. Tannehill also heard Wilkins say that he saw Raye toss his gun. Additionally, Officer Hoard reported Wilkins' statement to an IPRA investigator and a sergeant in the detective division, and he completed a supplementary report memorializing Wilkins' statement to him.

---

[186] COPA notes the side panel in Raye's jacket pocket could have theoretically come from a different Kahr Arms firearm that Raye possessed at some point prior to the incident, but COPA has not located any evidence supporting this theory.

41

COPA's analysis considers the credibility of each of these witnesses. With regard to the civilian witness, Nakilno Hubbard, who heard Sgt. Poulos warn that Raye had a gun,[187] COPA recognizes two possible concerns with the reliability of Hubbard's statement: one, that Hubbard stated he did not notice anything in Raye's hands; and two, that Hubbard was walking with another civilian witness, Lendell Whittington, who did not report hearing Sgt. Poulos warn that Raye had a gun. Whittington also stated that Raye did not have anything in his hands when he saw him. However, Hubbard's statement that he heard Sgt. Poulos' warning is corroborated by Sgt. Poulos, who told COPA that he yelled for Hubbard and Whittington to get out of the way because Raye had a gun. There is no evidence that Hubbard and Sgt. Poulos knew each other before the incident or spoke to each other after the incident. Additionally, Hubbard's and Whittington's statements that Raye did not have anything in his hands at the time they encountered him is consistent with Raye discarding the gun at 6510 S. Marshfield, as Raye would have had empty hands at the time he encountered Hubbard and Whittington near 6524 S. Marshfield.

COPA's analysis also accounts for concerns with the reliability of Gary Wilkins' statements. Wilkins told IPRA that he saw parts of the foot pursuit, heard the gunshots, and heard Sgt. Poulos yelling things like "shots fired" and "suspect has a gun" into his radio. However, he insisted that when he spoke to Officer Hoard after the incident, the only thing he told him was that "the police shot the young man." Officer Hoard, on the other hand, stated that Wilkins told him that he saw Raye throw his weapon during the foot pursuit, that he heard the sound of the gun hitting a building, and that Sgt. Poulos was too far away from Raye at that point to have seen him toss the gun. Officer Hoard's version of what Wilkins said[188] is corroborated by the fact that the Kahr Arms CW40 pistol was later recovered where Wilkins told Officer Hoard that Raye threw it. According to Officer Hoard, Wilkins stated that he saw Raye toss a gun "when he came out the lot," meaning, when he ran out of the vacant lot at 6507 S. Marshfield. The address where the weapon was recovered is almost directly across the street from the vacant lot, and it is along the path of the foot pursuit. Additionally, Sgt. Poulos stated that he lost sight of Raye from the time Raye ran out of the vacant lot to somewhere around 6510 S. Marshfield, the same location where the gun was later recovered. Therefore, it is entirely possible Raye tossed the gun as he "came out the lot," just as Wilkins allegedly told Officer Hoard, and Sgt. Poulos did not see him dispose of it.

It is also important to note the timing of Wilkins' statement to Officer Hoard, and Officer Hoard's statement to IPRA. On December 6, 2016, Officer Hoard told IPRA that Wilkins saw Raye throw his gun against a wood-frame house, and that Wilkins "heard a glunk" as Raye's gun hit the building. When the Kahr Arms CW40 pistol was recovered on February 19, 2017, more than two months after Officer Hoard's statement to IPRA, it was found against or very near a wood-frame house. If Wilkins had not actually heard the sound of Raye's gun hitting the building, then it would have to be sheer coincidence that the gun was later found against or very near a building, exactly as Officer Hoard stated months earlier.

---

[187] COPA recognizes that Hubbard testified in his sworn deposition, approximately two years after the incident, that he did not *recall* whether Sgt. Poulos warned him that Raye had a gun. However, Hubbard acknowledged that his memory was better when he gave a statement to IPRA investigators shortly after the incident, and he expressly stated during his sworn deposition that he told the IPRA investigators the truth.
[188] Officer Hoard's credibility is addressed below.

42

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**     **LOG #1083121 / U #16-022**

Officer Hoard's credibility is also bolstered by the actions he took after learning Wilkins' information. Within a day of speaking with Wilkins, Officer Hoard informed Cmdr. Johnson, Sgt. Brown, and an IPRA investigator about the conversation. Several days later, he relayed the same information to Lt. Tannehill, and Officer Hoard memorialized Wilkins' statement to him in a written report. Most importantly, Officer Hoard put Cmdr. Johnson and Lt. Tannehill in direct contact with Wilkins, and Wilkins reportedly also told them he saw Raye toss his gun. Wilkins later denied that he ever spoke to any of Officer Hoard's superiors, but both Cmdr. Johnson and Lt. Tannehill confirmed that they heard Wilkins say that he saw Raye throw his weapon.

COPA believes that Wilkins' shifting explanations as to what he saw the night of the incident can be explained by his increasing reluctance to be involved in the investigation. The day after the incident, Officer Hoard stated that Wilkins volunteered that he saw Raye toss his weapon when he ran out of the vacant lot. Five days later, Lt. Tannehill stated that Wilkins repeated the same information but refused to come to the police station to give a formal statement, stating that he no longer wished to be involved. Two weeks after that, Wilkins told IPRA that he never saw Raye throw a weapon at all.[189] Wilkins did, however, repeat that he did not want to be "in it," as the case involved a police officer and he feared that "shit gonna get real ugly." Wilkins' assertions that he did not want to be involved in the investigation lends credence to the idea that he may have changed his story after talking to Lt. Tannehill, minimizing what he witnessed in an attempt to remove himself from the case. Given all of these considerations, COPA finds that it is more likely than not that Wilkins did, in fact, tell Officer Hoard that he saw Raye throw his weapon, and that Wilkins' statement to Officer Hoard is the most credible account of what Wilkins' actually witnessed.[190]

*Third,* social media evidence supports COPA's finding, by a preponderance of the evidence, that Raye possessed a firearm on the night of the incident. The night before the shooting, Raye used Facebook Messenger to send another user a photo of a weapon that appears to be a Kahr Arms CW40 pistol, the same type of pistol that was later recovered along his flight path.

COPA recognizes that no single piece of evidence, standing alone, is sufficient to conclude that Raye was armed on the night of the incident. The physical evidence linking Raye to the Kahr Arms CW40 pistol is circumstantial, and the witness accounts of Wilkins, Officer Hoard, and Hubbard each present difficult credibility determinations. However, viewed in their totality, COPA finds that the above-referenced combination of physical evidence, social media evidence, and

---

[189] COPA notes that when Wilkins was confronted with Officer Hoard's statements, he offered the same explanation as he did regarding a discrepancy in his communications with an IPRA investigator. According to Wilkins, in both situations Officer Hoard and the IPRA investigator must have "misheard" him. COPA finds it unlikely that two completely independent people both misheard Wilkins about the same set of facts.

[190] Although COPA finds Officer Hoard to be credible as to Wilkins' statement to him, COPA is unable to corroborate Officer Hoard's claim that he heard Raye say that he "tossed" his gun. Officer Hoard claimed that Raye made this statement in the presence of at least two other officers, while Raye was being handcuffed. Those officers, however, did not corroborate Officer Hoard's account. Officer Turner told IPRA that he heard other officers ask Raye where he threw his gun, but Raye did not respond. Similarly, Officer Lucki stated that he did not hear Raye say what happened to his gun, though he acknowledged that he left Raye's side on two occasions and "there were others [officers] that were talking to him." Officer Hoard's credibility is somewhat strengthened by the fact that he told Cmdr. Johnson, Lt. Doherty, and Officer Higgins about Raye's statement while he was still on scene, as well as his sergeant later that night. However, in light of Officer Lucki and Officer Turner's statements, COPA is unable to conclude that Raye told Officer Hoard that he "tossed" his gun. Therefore, COPA gives little to no weight to that statement in this analysis.

43

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**        **LOG #1083121 / U #16-022**

testimonial evidence meets the preponderance of the evidence standard required for COPA to conclude that Sgt. Poulos reasonably believed Raye was armed on the date of the incident.

> **ii. Sgt. Poulos reasonably believed that Raye posed an imminent threat of death or great bodily harm and that deadly force was necessary to eliminate the threat.**

While COPA concludes it was reasonable to believe that Raye was armed, being armed, in and of itself, is insufficient justification for the use of deadly force. *Haugen v. Brosseau*, 339 F.3d 857, 863 (9th Cir. 2003) (citations omitted). The pertinent inquiry is whether it was reasonable for Sgt. Poulos to believe that Raye presented an imminent threat of harm and that deadly force was necessary to eliminate the threat. There are no known independent eyewitnesses or video footage of the actual shooting. Because Raye died as a result of his gunshot wound, the only eyewitness to the shooting is Sgt. Poulos. Therefore, COPA must assess Sgt. Poulos' account of the incident in light of the other available evidence.

Sgt. Poulos stated that he first noticed Raye, who fit the description of the offender in the battery call, standing at the bus stop on the corner of Ashland and 65th. Sgt. Poulos waited for backup, and when he saw Beat 715R approaching, he drove westbound on 65th to conduct a field interview with Raye. This description of the beginning of the incident is consistent with the OEMC event queries and radio transmissions, the video captured by POD #2425-TSP, the GPS data taken from Sgt. Poulos' vehicle, and the statements of Officers Delgado and Rey. After Sgt. Poulos approached Raye, the surveillance video from Nazarene All Nations Church captured the initial moments of the foot pursuit, showing Sgt. Poulos pursuing Raye westbound on 65th, then south down the alley between Ashland and Marshfield. Up to this point, Sgt. Poulos' account is corroborated by a substantial amount of independent evidence.

When Raye and Sgt. Poulos turned into the vacant lot at 6507 S. Marshfield, however, they ran outside the range of the church security cameras and out of the view of Officers Delgado and Rey. According to Sgt. Poulos, it was at this point that Raye turned back towards him and raised his right arm, pointing a gun at Sgt. Poulos.[191] Sgt. Poulos stated that he drew his firearm, yelled into his radio, "He's got a gun," and discharged his weapon once from the northeast corner of the lot. The OEMC radio transmissions confirm that Sgt. Poulos yelled into his radio, "He's gotta gun," at approximately 11:06:35 pm, and one of Sgt. Poulos' fired cartridge casings was recovered from the northeast corner of the vacant lot. Additionally, the trajectory and angle of the bullet, which went through the fence and lodged in the back porch of 6509 S. Marshfield, are consistent with Sgt. Poulos's account that he fired in a southwesterly direction, as Raye fled westbound along the southern fence line of the vacant lot.

Sgt. Poulos stated that after he discharged his weapon, Raye dropped his arm to his side, turned around, and continued to flee westbound through the vacant lot. According to Sgt. Poulos, several seconds later Raye again raised his right arm and pointed a gun in Sgt. Poulos' direction, "but this time, he doesn't even look at me. He just points it at me, and I still have my gun out, uh, and I fire one more time." According to the medical examiner's report, Raye was shot in his lower

---

[191] COPA notes that CPD did not recover any items from Raye's person or Pelle jacket that Sgt. Poulos could have mistaken for a weapon (i.e., cell phone, wallet, or other large, shiny object).

44

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY          LOG #1083121 / U #16-022

right back, approximately 3.25 inches from the centerline. The location of the entry wound and the right-to-left trajectory of the wound are consistent with Sgt. Poulos' statement that the second time that Raye pointed his gun in Sgt. Poulos' direction, Raye had his back to Sgt. Poulos and was raising his right arm up behind him as he ran. Sgt. Poulos' account also matches the location where CPD evidence technicians recovered his second fired cartridge casing.[192]

Moreover, witness accounts and radio transmissions from the moments immediately following the shooting support that Sgt. Poulos did, in fact, believe Raye pointed a firearm at him. At 11:06:35 pm, OEMC radio transmissions record Sgt. Poulos yelling into his radio, "Shots fired by police. He's gotta gun." Gary Wilkins told IPRA that he heard Sgt. Poulos making these statements just seconds after the shooting, as Sgt. Poulos ran west across Marshfield and began pursuing Raye south down the sidewalk. Hubbard also told IPRA that when he saw Sgt. Poulos and Raye running towards his location at 6524 S. Marshfield, he heard Sgt. Poulos yell to him, "Move, he have a gun!" At the time that Sgt. Poulos made these statements, he was in the middle of an active foot pursuit, chasing a suspect he believed was still armed. As explained above, COPA finds it unlikely that during this tense, evolving situation, Sgt. Poulos would have had the foresight to fabricate a purposefully false narrative about the shooting. *See, e.g. United States v. Joy*, 192 F.3d 761, 766 (7th Cir. 1999) ("[A] person is unlikely to fabricate lies (which presumably take some deliberate reflection) while his mind is preoccupied with the stress of an exciting event."). Additionally, Hubbard and Whittington stated that they saw Sgt. Poulos fall face first in front of 6524 S. Marshfield as Raye turned down the south gangway. Sgt. Poulos told COPA that he dove for cover when Raye extended his arm backwards as he rounded the house, because Sgt. Poulos feared that Raye was about to fire at him.[193] All of these factors lend credibility to Sgt. Poulos' statement that he believed he saw Raye with a weapon and that Raye pointed it at him before he discharged his own weapon.

COPA recognizes that Sgt. Poulos' statement is the only evidence that Raye actually *pointed* his gun at Sgt. Poulos. Given the totality of the evidence and in the absence of contradictory evidence, COPA cannot conclude that Sgt. Poulos provided an inaccurate or untruthful account of the incident. Therefore, based on the preponderance of the evidence, COPA finds that it was reasonable for Sgt. Poulos to believe Raye possessed and pointed a firearm in his direction, placing him in imminent threat of death or great bodily harm, and that deadly force was reasonably necessary to eliminate the threat.

---

[192] COPA considered the fact that the bullet that struck Raye was recovered from the same jacket pocket as the plastic piece. COPA analyzed the possibility that Raye's gun may have been in his pocket at the time he was shot, not in his hand, and that the plastic piece broke off from Raye's firearm as a result of the impact of the bullet strike. COPA finds that this theory is too remote and unlikely a possibility to sufficiently refute Sgt. Poulos' account of the incident. In order for the location of the bullet hole in Raye's left breast pocket to align with the location of the damage on the gun, Raye likely would have had to place the gun into his pocket so that the grip of the gun was at bottom of the pocket and the barrel of the gun was at the top of the pocket, where it opens. The muzzle of the gun would also likely have had to be pointed to the right. COPA finds it impractical for anyone— right or left-handed— to place or carry a gun positioned in such a way. Additionally, while the parts of a gun were found separated from the gun itself, there was no damage to the pieces, as would be expected if they had become separated due to a bullet strike.

[193] Sgt. Poulos stated that he lost sight of Raye from the edge of the vacant lot at 6507 S. Marshfield to approximately 6510 S. Marshfield. He was thus unaware that Raye threw his weapon into the hedges in front of 6510 S. Marshfield.

45

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**     **LOG #1083121 / U #16-022**

The law is clear and well-established regarding the use of deadly force by police officers. As outlined in the General Order, deadly force is permitted by an officer who reasonably believes that it is necessary to prevent death or great bodily harm to the sworn member or to another person. As explained above, the relevant consideration is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Graham v. Connor, supra; see also Estate of Phillips v. City of Milwaukee, supra.* Additionally, the analysis of the circumstances must be from a perspective of "a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . We thus allow for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2020, 188 L. Ed. 2d 1056 (2014) (internal citation and quotations omitted). Such an analysis must take into account the totality of the circumstances confronting the officer, rather than just one or two factors. *Plumhoff,* 134 S. Ct. at 2020; *see also Scott v. Edinburg,* 346 F.3d 752, 756 (7th Cir. 2003).

The law permits police officers to utilize deadly force when the officer "believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury." *Scott v. Edinburg,* 346 F.3d at 758 (internal citations and quotations omitted). There is no requirement that an officer wait until a shot is fired by a fleeing suspect before employing deadly force to protect himself. *Thompson v. Hubbard,* 257 F.3d 896 (8th Cir. 2001).

In this case, a reasonable officer with Sgt. Poulos' training and experience would perceive that Raye presented an imminent threat of death or great bodily harm and that deadly force was reasonably necessary to eliminate the threat. A preponderance of the evidence demonstrates Sgt. Poulos was confronted with a situation where: (1) he was responding to a 911 call about a man strangling a woman in an alley; (2) as he approached the scene he observed Raye, who fit the 911 caller's description of a black male wearing a black and red jacket and a red hoodie; (3) Raye grabbed his waistband and fled when Sgt. Poulos approached him; (4) Raye ignored Sgt. Poulos' repeated commands to stop; (5) Raye continued to hold the front of his waistband as he ran; (6) Raye displayed a handgun and pointed it at Sgt. Poulos; (7) Raye lowered the gun and continued fleeing after Sgt. Poulos fired one round at Raye; and (8) Raye pointed the gun at Sgt. Poulos a second time and Sgt. Poulos then fired a second round at Raye. Given the totality of these circumstances, Sgt. Poulos reasonably believed that Raye posed an immediate threat to his life and the lives of the civilians in the area and that deadly force was necessary to eliminate the threat when he fired both rounds at Raye. Therefore, Sgt. Poulos' use of deadly force complied with Department policy.

Moreover, Sgt. Poulos' use of deadly force was reasonable notwithstanding the fact that Raye appeared to be running away from Sgt. Poulos at the time he was shot. Sgt. Poulos stated that at the point that he discharged his weapon, Raye had just pointed his gun at him and was continuing to flee with the gun in his right hand. Case law supports that Sgt. Poulos was justified in using deadly force at the moment he did, rather than waiting for Raye to fire upon him or anyone else in the area. *See, e.g., Williams v. Indiana State Police Dep't.,* 797 F.3d 468, 479 (7th Cir. 2015); *Blanford v. Sacramento County,* 406 F.3d 1110, 1116 (9th Cir. 2005) (concluding that

46

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913

officers did not use excessive force in shooting a suspect who was carrying a sword, failed to comply with orders to drop the sword, and was attempting to enter a house that may or may not have been empty, even though the suspect was at all times walking away from the officers and did not actually threaten the officers — or anyone else — with the weapon); *Long v. Slaton,* 508 F.3d 576, 581 (11th Cir. 2007) ("Even if we accept that the threat posed by Long to Deputy Slaton was not immediate in that the cruiser was not moving toward Slaton when shots were fired, the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.") As detailed above, Sgt. Poulos stated that Raye twice pointed a weapon at him, leading Sgt. Poulos to fear that Raye might fire at him or anyone else in the area. COPA finds that Sgt. Poulos reasonably believed that Raye posed an immediate threat to his life and that deadly force was reasonably necessary to eliminate the threat. Therefore, Sgt. Poulos was justified in using deadly force against Raye notwithstanding the fact that Raye was running away at the time he was shot.[194]

## VII. CONCLUSION

    Based on the analysis set forth above, COPA concludes that Sgt. Poulos use of deadly force with **Within Department Policy.**

Approved:

*[signature]*
_____

Sydney Roberts
*Chief Administrator*

April 23, 2019

Date

---

[194] Because COPA finds that Sgt. Poulos' use of deadly force was justified on this basis, this report does not analyze Sgt. Poulos' actions under the second prong of General Order 03-02-03, II, *i.e.*, whether or not Sgt. Poulos reasonably believed that the use of deadly force was necessary prevent Raye's arrest from being defeated by resistance or escape.

Karonisha Ramsey, et al. v. City of Chicago, et al., 16 C 10913      FCRL 044039

Confidential!! Subject to Protective Order in Ramsey v. City of Chicago, et al., 16 C 10913

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**     **LOG #1083121 / U #16-022**

## Appendix A

Assigned Investigative Staff

| Squad#: | Seven |
|---|---|
| **Major Case Specialists:** | Steffany Hreno and Jim Lukas |
| **Supervising Investigator:** | Mark Javier |
| **Deputy Chief Administrator:** | Andrea Kersten |

Karonisha Ramsey, et al. v. City of Chicago, et al., 16 C 10913                    FCRL 044040